KTF:BET/SAE
F. #2024R00832

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

DEWITT JOHN,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No. 24-CR-492 (DC)

THE GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS

> JOSEPH NOCELLA, JR.
> United States Attorney
> Eastern District of New York
> 271 Cadman Plaza East
> Brooklyn, New York 11201

Brooke Theodora
Assistant U.S. Attorney

Sarah Elardo
Special Assistant U.S. Attorney
    (Of Counsel)

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ................................................................................................. 1

    I.     The Offense Conduct ................................................................................... 1

    II.    The Search Warrant ..................................................................................... 5

    III.   The Execution of the Search Warrant and Defendant's Interview ........................ 6

    IV.   The Defendant's Arrest, Charges, and Instant Motion ......................................... 8

ARGUMENT ........................................................................................................................... 9

    I.     The Search Warrant Evidence Should Not Be Suppressed ................................... 9

         A.    Applicable Law ................................................................................. 9

             1.    Probable Cause ....................................................................... 10

             2.    Particularity / Overbreadth ....................................................... 10

             3.    The Good Faith Exception ....................................................... 11

             4.    Franks Hearing ....................................................................... 12

         B.    Discussion ..................................................................................... 13

             1.    The Search Warrant Was Supported by Probable Cause ............. 13

             2.    The Good Faith Exception Applies ........................................... 17

             3.    The Defendant is Not Entitled to a Franks Hearing ................... 18

             4.    The Defendant's Arguments Regarding the Subpoenas
                  to PayPal and Snap Are Meritless ............................................ 19

    II.    The Defendant's Statements Should Not Be Suppressed ................................... 20

         A.    Applicable Law ............................................................................... 20

         B.    Discussion ..................................................................................... 21

SEALING REQUEST ............................................................................................................ 24

CONCLUSION ...................................................................................................................... 25

i

PRELIMINARY STATEMENT

The defendant's motion to suppress is meritless.  He seeks to suppress (i) all electronic devices seized pursuant to a judicially authorized search of his apartment and person (the "Search Warrant"), and (ii) statements he made at his apartment during a voluntary, post-Miranda interview with the Federal Bureau of Investigation ("FBI") while agents executed the Search Warrant.  See Def.'s Mot. to Suppress, ECF No. 46 ("Mot.").  He also requests a hearing on both issues.

The defendant's requests should be denied.  Contrary to his assertions, the affidavit supporting the Search Warrant (the "Affidavit") set forth overwhelming evidence that the defendant used electronic devices at his apartment to produce, receive, and possess child pornography.  That evidence was more than sufficient to establish probable cause and a clear nexus between the criminal conduct described in the Affidavit and the electronic devices seized from the defendant at his apartment.

The defendant's challenge to his statements during his voluntary interview fares no better.  His assertion that "sleep inertia" rendered his waiver of his Miranda rights and subsequent statements involuntary has no support in the record.  And even if this claim did have factual support, the defendant has not shown—nor cited any authority in this Circuit establishing—that suffering from "sleep inertia" warrants suppression.

Accordingly, the defendant's motion should be denied in its entirety.

RELEVANT BACKGROUND

I.     The Offense Conduct

Since at least 2022, the defendant has used the internet to prey on and sexually abuse young girls—primarily aged 12 to 15 years old—by exploiting their youth and vulnerability and paying them to produce child pornography (commonly referred to, and referred to herein, as

1

"child sexual abuse material").[1]  Over and over again, the defendant preyed on his child victims using the same distinctive and repeated pattern of abusive conduct.  He sought out young girls online via social media and messaging platforms like Reddit, Instagram, and Telegram.  He initiated contact and asked questions about their age, school life, and daily routines to build a false sense of trust and security (while also confirming that they were in fact children).  And then he paid them to produce child sexual abuse material tailored to his own specific sexual desires, frequently by instructing these young girls to film videos of themselves masturbating using unique objects like markers and hairbrushes.

From March to April 2024, the defendant used the same pattern of grooming and abuse to sexually exploit two 13-year-old girls, Jane Doe 1 and Jane Doe 2.  In March 2024, the defendant sought out Jane Doe 1 in a Reddit forum for teenagers called "Am I ugly/teens," where Jane Doe 1 had posted images of herself saying that she was 13 years old ███████████████ ████████████████████████  The defendant responded to Jane Doe 1's post, offered to pay her for naked images of herself, and then steered the conversation off Reddit by persuading her to continue communicating with him on Instagram and iMessage.  The defendant communicated with Jane Doe 1 (and later Jane Doe 2) on Instagram via his Instagram account

---

[1]    The term "child pornography" is defined as set forth in 18 U.S.C. § 2256(8), which, in pertinent part, states that it is "any visual depiction," such as a photograph or video, of "sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct."  The term "sexually explicit conduct" is defined as "actual or simulated . . . (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person."  Id. § 2256(2)(A).

2

spongebobdoodlepants23 and on iMessage via his email account emij.1996@gmail.com, which is subscribed to the Apple ID shane-matt@hotmail.com.[2]

On Instagram and iMessage, the defendant continued grooming Jane Doe 1 by interweaving requests for sexually explicit content with seemingly benign questions about her interests, school, and family life[3]—cultivating an artificial sense of trust and familiarity that he knew he could exploit to get what he ultimately wanted: child sexual abuse material that Jane Doe 1 produced specifically for him. For example, on March 28, 2024, the defendant spent several hours messaging Jane Doe 1 on Instagram and iMessage. After asking whether Jane Doe 1 had pets or siblings, the defendant asked whether she had a "card" on Cash App. When Jane Doe 1 replied that she did, the defendant responded: "Okay. So you're good then." Jane Doe 1 then sent the defendant a video, via iMessage, ███████████████████████

After receiving this video from Jane Doe 1, the defendant said: "How much." When Jane Doe 1 asked the defendant how much he was willing to pay, the defendant said: "Well if you want to make it interesting . . . . If you want to make something special for me. POV video of you riding something, front facing camera. Tell daddy how much you want him to fuck you."

---

[2]    iMessage is a messaging service that allows Apple users to send texts, photos, and videos to other Apple devices over Wi-Fi or cellular data. iMessages can be sent via the user's phone number, Apple ID, or any additional verified email address that is linked to the user's Apple ID. The email address emij.1996@gmail.com is a verified additional email address for the Apple ID shane-matt@hotmail.com, which is subscribed to the defendant at his apartment in Brooklyn, New York.

[3]    For example, the defendant asked about Jane Doe 1's daily activities, ████████████ ████████████████████████████████████████████████ Other topics of conversation employed by the defendant included whether she had any pets and what Jane Doe 1's parents did for a living, since, according to the defendant, it was "[w]ay to early for [Jane Doe 1] to decide" on her own career.

████████████████████████████████████████████████████

████████████████████. The defendant replied: "I give small at a time" and then sent Jane Doe 1 $20 via his Cash App account, which had the display name "A J" and Cash App handle "$olistepha."

A few days later, on March 31, 2024, Jane Doe 1 complied with the defendant's instructions and gave him the child sexual abuse material that he directed her to make, this time by sending it to his Instagram account, spongebobdoodlepants23. ████████████

████████████████████████████████████████████████████

After receiving this video, the defendant said: "Send video on iMessage." ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ defendant responded with even more specific instructions on how to produce the child sexual abuse material that he wanted: "Nope. Was cool. When i said riding i meant like a makeshift dildo. Something like that[.] Also you're fit."

In response to the defendant's new—and more graphic—request, Jane Doe 1 sent the defendant several messages in quick succession, ████████████████████████

████████████████████████████ The defendant replied: "Oh. Thought you were older. You've never tried anything. Does not have to be anything big." ████████

████████████████████████ The defendant then said, "A marker? Its [sic] okay though." About 15 minutes later, Jane Doe 1 gave in to the defendant's pressure, sending him two more videos containing the child sexual abuse material that he instructed her to make. ████████

████████████████████████████████████████████████████

4

██████████████████████████████████████████████████

███████████████████████████████. An hour later, the defendant sent Jane Doe 1 $50 on Cash App.

The defendant mirrored these interactions with Jane Doe 2, another 13-year-old girl whom he met on the internet through Jane Doe 1. On April 12, 2024, ███████████

██████████████████████████████████████████████████

████████████████████████████████████. From at least April 13 to April 18, 2024—after asking Jane Doe 2 whether she was "13 as well"—the defendant groomed and paid Jane Doe 2, via the same "A J" Cash App account, to produce child sexual abuse material. █████████

███████████████████████████████████████, which she sent to the defendant via his Instagram account spongebobdoodlepants23.

II.    The Search Warrant

On November 13, 2024, Magistrate Judge Robert M. Levy issued the Search Warrant, authorizing the search of the defendant's person and apartment in Brooklyn, New York. See Mot., Ex. A. The warrant authorized law enforcement to search for and seize evidence and instrumentalities of violations of 18 U.S.C. §§ 2251(a) (production of child pornography), 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of/access with intent to view child pornography) (the "Subject Offenses"). This included computers and other electronic devices—such as smartphones, laptops, disk drives, and thumb drives—containing electronically stored evidence of the Subject Offenses. See Mot., Exhibit A, JD000451-JD000456. The Search Warrant was supported by the Affidavit, which was submitted by FBI Special Agent Audra Hampsch. See Mot., Ex. A, JD000416-JD000447 ("Aff.").

In the Affidavit, Special Agent Hampsch relied on and summarized a significant amount of evidence establishing probable cause that the defendant violated the Subject Offenses

5

using electronic devices at his apartment. Among other evidence, Special Agent Hampsch summarized (i) iMessages between the defendant and Jane Doe 1, which were obtained from Jane Doe 1's phone, see Aff. ¶¶ 14-20, (ii) Instagram messages between the defendant and Jane Does 1 and 2, which were obtained in response to an earlier judicially-authorized search warrant issued to Meta Platforms, Inc. ("Meta"), see id., and (iii) grand jury subpoena returns from Cash App, Verizon, Google, Apple, and T-Mobile concerning the various online accounts that the defendant used to sexually exploit Jane Does 1 and 2, see Aff. ¶¶ 21-27. As set forth more fully below, this layered evidence—drawn from distinct, corroborating sources—established a direct nexus between the Subject Offenses and the defendant, his apartment, and his electronic devices.

III.    The Execution of the Search Warrant and Defendant's Interview

At approximately 6 a.m. on November 19, 2024, agents from the FBI and New York City Police Department ("NYPD") arrived at the defendant's apartment to execute the Search Warrant.[4] Upon their arrival, one of the defendant's neighbors let them into the apartment building. The agents walked upstairs, knocked on the defendant's door, announced that they were "police" and had a search warrant, and asked the people inside to open the door. Within seconds, the defendant's mother opened the door and the agents directed her to step out of the apartment.[5] Less than 30 seconds later, after the agents instructed any other people in the apartment to come out with their hands up, the defendant walked out of the apartment with his hands up. One of the

---

[4]    The agents, who were wearing body cameras, activated their cameras for roughly the first 10 minutes of the search warrant's execution. After completing their protective sweep of the apartment and determining the apartment was safe to search, they deactivated their cameras in accordance with FBI protocol. The body camera footage has been produced to the defendant at JD001714-JD001727.

[5]    ███████████████████████████████████████████████████████████████████
███████████████████████████████████████ .

agents put the defendant in handcuffs and waited with him outside the apartment while several other agents entered the apartment to do a protective sweep.  While the defendant was handcuffed, he told the agents that no one else was in the apartment but refused to provide his name when asked.

After the agents finished the protective sweep (which only took a few minutes), they removed the handcuffs from the defendant and directed him to wait in one of the apartment's bedrooms with Special Agent Michael Buscemi.  A few minutes later, at approximately 6:15 a.m., Special Agent Hampsch entered the bedroom and advised the defendant that he was not under arrest and did not have to speak to law enforcement, but that she wanted to ask him some questions concerning the search warrant.  Def.'s Interview at 05:10-05:30.[6]   Special Agent Hampsch then read the defendant his Miranda rights from an FBI Advice of Rights form.  Id. at 05:38-06:36; see also Exhibit A (FBI Advice of Rights Form).  After Special Agent Hampsch read the defendant his rights, she handed the defendant the Advice of Rights form and allowed him to read it silently to himself.  Id. at 06:22-06:36.  Special Agent Buscemi then asked whether the defendant understood his rights, and the defendant nodded his head yes.  Id.

Special Agents Hampsch and Buscemi interviewed the defendant inside the bedroom for approximately an hour and 20 minutes.  During the interview, the agents showed the defendant copies of his communications with Jane Does 1 and 2 on iMessage and Instagram, and the defendant admitted that he communicated online with Jane Doe 1 and Jane Doe 2 via the user accounts spongebobdoodlepants23 and emij.1996@gmail.com.  See, e.g., id. at 22:50-23:07 (admitting talking to Jane Doe 1); 48:40-53:03 (admitting talking to Jane Doe 2).  Among other

---

[6]    Citations to the "Def.'s Interview" refer to the audio recording of the defendant's November 19, 2024 interview, which the defendant submitted electronically to the Court on March 30, 2026.  The audio recording was created by Special Agent Hampsch.

things, the defendant also admitted that the agents would find emij.1996@gmail.com logged into his phone once they searched it.  See id. at 52:00-53:00.

Throughout the interview, the agents periodically asked whether the defendant needed anything, including water or a break to use the bathroom.  See, e.g., id. at 54:42-55:20; 1:09:45-1:13:40.  The defendant did not express any discomfort, request a break, or raise any concerns about being tired.  See id.  In fact, at approximately 6:35 a.m., the defendant asked what time it was and informed the agents that he needed to drive to Long Island for work by 9 a.m.  Id. 25:20-25:49.

IV.    The Defendant's Arrest, Charges, and Instant Motion

Following the conclusion of the defendant's interview, the FBI agents arrested him based on probable cause and seized eight electronic devices from his apartment, including three iPhones, three desktop computers, a laptop, and an NVMe solid state drive, which is a type of electronic storage device.

The same day (November 19, 2024), the defendant was presented in this District on a complaint charging him with one count of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a).  See ECF No. 1.  On December 4, 2024, a grand jury sitting in this District returned an indictment charging the defendant with one count of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a) ("Count One"), arising from his abuse of Jane Doe 1.

On March 23, 2026, the grand jury returned a superseding indictment adding one count of access with intent to view child pornography, in violation of 18 U.S.C. § 2252(a)(4) ("Count Two"), arising from the defendant's use of the Instagram account spongebobdoodlepants23 and the Apple ID shane-matt@hotmail.com to view child sexual abuse material depicting Jane Does 1 and 2.

This motion followed.

8

ARGUMENT

I.    The Search Warrant Evidence Should Not Be Suppressed

The defendant contends that the Search Warrant lacked adequate probable cause for two reasons: (i) it did not establish a "factual nexus" between "each [electronic] device and the alleged conduct," Mot. at 9, [7] and (ii) it rested on impermissible "boilerplate" generalizations based on the agent's training and experience with child exploitation crimes. Id. at 11. The defendant further contends that the good faith exception to suppression does not apply because the Affidavit was "facially deficient." Id. at 1. Finally, the defendant requests a hearing without disputing any of the facts in the Affidavit—let alone making the required showing of deliberate or reckless falsity under Franks v. Delaware, 438 U.S. 154 (1978). His arguments fail.

A.    Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., AMEND IV. This right is protected, in part, by the requirement that law enforcement obtain a judicially-authorized warrant before searching for and seizing property, which must be supported by an affidavit establishing "probable cause" and "particularly describing the place to be searched, and the persons or things to be seized." Id.

---

[7]    In portions of his motion, the defendant characterizes this as a "particularity" argument. See, e.g., Mot. at 13-14. But, as described more fully below, this argument is more properly framed as one of overbreadth. That is, the defendant contends the Search Warrant did not establish probable cause to seize all of his electronic devices, rather than that it failed to describe with particularity the offense conduct, the place to be searched, or the devices to be seized. See United States v. Galpin, 720 F.3d 436, 445-46 (2d Cir. 2013).

9

### 1.    Probable Cause

Whether the probable cause requirement of the Fourth Amendment is satisfied depends on the "totality of the circumstances." United States v. Wagner, 989 F.2d 69, 71-72 (2d Cir. 1993).[8] "The issuing judicial officer must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 72. This analysis "is not overly strict." United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005). It requires "only the probability, and not a prima facie showing, of criminal activity." Illinois v. Gates, 462 U.S. 213, 235 (1983).

In considering a challenge to the probable cause determination, the court reviews the search warrant affidavit "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993); accord United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004). This is not de novo review. Gates, 462 U.S. at 236. Instead, a magistrate judge's determination of probable cause is entitled to "[c]onsiderable deference," United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011), and "doubts should be resolved in favor of upholding the warrant," Rosa, 11 F.3d at 326. Indeed, once issued, search warrants are "presumed valid." United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003).

### 2.    Particularity / Overbreadth

The Fourth Amendment's particularity requirement "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another," Marron v. United States, 275 U.S. 192, 196 (1927), by foreclosing a "general, exploratory rummaging in a person's belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). To satisfy the

---

[8]    Unless otherwise noted, all case quotations omit internal quotation marks and citations.

10

particularity requirement, warrants must specify three things: (i) the offenses for which probable cause has been established; (ii) the place or thing to be searched; and (iii) the items to be seized relating to the specified offenses. United States v. Galpin, 720 F.3d 436, 445-46 (2d Cir. 2013); United States v. Purcell, 967 F.3d 159, 178 (2d Cir. 2020).

"[B]readth and particularity are related but distinct concepts." United States v. Ulbricht, 858 F.3d 71, 102 (2d Cir. 2017). "[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." Galpin, 720 F.3d at 446. However, "[a] showing of nexus [between the criminal activity and the thing to be searched] does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." Singh, 390 F.3d at 182. Moreover, "in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast." Purcell, 967 F.3d at 179. Accordingly, "broadly worded categories of items available for seizure" do not necessarily render a warrant deficient. United States v. Riley, 906 F.2d 841, 844 (2d Cir. 1990).

### 3.    The Good Faith Exception

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation" of its terms. United States v. Leon, 468 U.S. 897, 906 (1984). Instead, the exclusionary rule developed as "a prudential remedy, crafted by the Supreme Court," United States v. Raymonda, 780 F.3d 105, 117 (2d Cir. 2015), and it is neither a "personal constitutional right" nor a means "to redress the injury occasioned by an unconstitutional search," Davis v. United States, 564 U.S. 229, 237 (2009). Rather, the "sole purpose" of the exclusionary rule is to deter "future Fourth Amendment violations." Id. at 236. The rule was "designed to deter police misconduct rather than to punish the errors of judges and magistrates." Leon, 468 U.S. at 916. Thus, even where probable cause is lacking or a warrant is overbroad, suppression is

11

a "last resort, not [a] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006). It is appropriate only where it deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Herring v. United States, 555 U.S. 135, 144 (2009).

The Supreme Court has explained that suppression is "an appropriate remedy" for evidence seized pursuant to a search warrant only where (i) "the magistrate . . . was misled by information . . . that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (ii) "the issuing magistrate wholly abandoned his judicial role," such that "no reasonably well trained officer should rely on the warrant," (iii) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (iv) the warrant is "so facially deficient," for example, it "fail[s] to particularize the place to be searched or the things to be seized." Leon, 468 U.S. at 923.

            4.    Franks Hearing

"It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007). Moreover, even where facts are disputed, the Supreme Court has held that a defendant is entitled to a hearing on the issue of probable cause only where he alleges that the affidavit contained deliberately misleading or recklessly false information. Franks, 438 U.S. at 155-56. In particular, "a defendant must make a substantial preliminary showing that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." Salameh, 152 F.3d 88, 113 (2d Cir. 1998); see also Awadallah, 349 F.3d at 64 (noting that "in order to invoke Franks doctrine,

12

a defendant must show that there were intentional and material misrepresentations or omissions in the warrant affidavit.").

The <u>Franks</u> standard is "a high one." <u>Rivera v. United States</u>, 928 F.2d 592, 604 (2d Cir. 1991). "[T]he challenger's attack must be more than conclusory . . . . There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." [9] <u>Franks</u>, 438 U.S. at 171. "Allegations of negligence or innocent mistake are insufficient." <u>Id.</u> "Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." <u>Id.</u>

B.      <u>Discussion</u>

1.      <u>The Search Warrant Was Supported by Probable Cause</u>

The defendant's probable cause arguments fundamentally fail because they rest on an improper, piecemeal reading of the Affidavit, rather than a commonsense assessment of it as a whole. <u>See</u> <u>Wagner</u>, 989 F.2d at 72. They also reflect a misunderstanding of the probable cause standard, which required the Affidavit to establish only a "fair probability" that evidence of the Subject Offenses would be found on the defendant's electronic devices at his apartment. <u>See</u> <u>id.</u> The Affidavit easily meets that standard. Among other things, the Affidavit established the following facts, none of which are undermined by the arguments in the defendant's motion:

- Jane Doe 1 was paid to produce at least four videos containing child sexual abuse material, which she sent to Instagram account spongebobdoodlepants23 and email account emij.1996@gmail.com (via iMessage). Aff. ¶¶ 12, 15-19.

---

[9]      According to the Supreme Court, the defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false . . . accompanied by a statement of supporting reasons." <u>Franks</u>, 438 U.S. at 171. "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." <u>Id.</u>

This tends to show that electronic devices were used to commit the offense conduct.

- Jane Doe 2 was also paid to produce child sexual abuse material, which she sent to someone named "Dewitt" (whom she met through Jane Doe 1) at the same Instagram account (spongebobdoodlepants23).  Aff. ¶¶ 13, 19-20.  This tends to show that someone with the defendant's name used electronic devices to commit the offense conduct.

- Jane Doe 1 and Jane Doe 2 were each paid by the Cash App account "A J" using IP addresses subscribed to the defendant at his apartment. This establishes a direct connection between the defendant and his apartment to the offense conduct.  See Aff. ¶¶ 21, 23.

- Emij.1996@gmail.com—the email account that Jane Doe 1 communicated with on iMessage—is a verified additional email address for the Apple ID shane-matt@hotmail.com.  Not only is this Apple ID is subscribed to the defendant at his apartment (further corroborating the link between the defendant, his apartment, and the Subject Offenses), it has also repeatedly used IP addresses subscribed to the defendant at his apartment.[10]  Aff. ¶¶ 25, 27. This independently corroborates the link between the Subject Offenses and the defendant, his electronic devices, and his apartment.

- The Instagram account spongebobdoodlepants23 similarly used an IP address subscribed to the defendant at his apartment in March and April 2024, when the offense conduct occurred.  This included March 28, 2024—the same day Jane Doe 1 produced and sent one of the videos containing child sexual abuse material described above. Aff. ¶ 27.  This adds yet another layer of corroboration supporting the link between the Subject Offenses and the defendant, his electronic devices, and his apartment.

These facts alone—which independently corroborate one another and link the defendant to the offense conduct in several ways—are more than sufficient to establish probable cause that the defendant used electronic devices at his apartment to sexually exploit Jane Does 1 and 2.

---

[10]    The Affidavit identifies multiple IP addresses used in the offense conduct as being subscribed to the defendant at his apartment.  This tends to show that the defendant used multiple electronic devices to commit the offense conduct at his apartment.  As described in the Affidavit, every electronic device "attached to the Internet must be assigned its own IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination."  Aff. ¶ 8(g).

The defendant argues that because iMessages and Instagram messages are purportedly stored in "the cloud" on "servers"—and not locally on electronic devices (the "end-user device," Mot. at 9)—the Affidavit failed to establish probable cause to support a search of all of his electronic devices. The upshot of the defendant's argument is that there was no probable cause to believe messages with Jane Does 1 and 2 would be found locally on devices at his apartment. As an initial matter, this argument is belied by the record. Jane Doe 1's electronic device alone—an iPhone—contained dozens of locally stored iMessages with the defendant, many of which are described in the Affidavit. And one of the defendant's own iPhones, which was seized pursuant to the Search Warrant, contained several Instagram messages with both Jane Doe 1 and Jane Doe 2. This evidence confirms that such communications are, in fact, stored on "end-user devices"—despite the defendant's claim—including on the electronic devices identified by the Search Warrant.[11]

But even if the defendant were correct that iMessages and Instagram messages are not stored locally on electronic devices and instead on "company[] servers" somewhere else, Mot. at 4, probable cause "does not demand any showing that a good-faith belief" described in an affidavit "be correct or more likely true than false." Walczyk, 496 F.3d at 157. Rather, it requires only a fair probability that evidence of wrongdoing will be found. Id. Common sense dictates that

---

[11]    The defendant also erroneously asserts that iMessages and Instagram messages are only accessible on mobile devices such as cell phones and tablets. Mot. at 4, 12-13. That assertion is incorrect. It is well established that Apple permits users to send and receive iMessages on laptops and desktop computers. See Apple, Use Messages on your Mac, https://support.apple.com/guide/messages/set-up-messages-on-mac-ichte16154fb (last visited Apr. 2, 2026) (explaining that users can send and receive iMessages from a Mac). It is likewise well established that Instagram can be accessed through a web browser on virtually any internet-enabled device. See Instagram, What is Instagram?, https://help.instagram.com/164895810321211 (last visited Apr. 2, 2026) (explaining that Instagram is accessible via the web at instagram.com).

15

when an electronic device is used to commit internet-based crimes, some form of inculpatory evidence will likely be found on that device. See Singh, 390 F.3d at 182. Here, the Affidavit explains that such evidence may include, for example, residual and deleted data, which can persist for months or years and be recovered through forensic analysis, even where no complete files are accessible. See Aff. ¶¶ 42–45. Indeed, even the categories of data the defendant acknowledges are stored locally on electronic devices—such as cache, thumbnails, user authentication data, and message previews, Mot. at 6—can themselves be highly inculpatory evidence. For example, cached images or message previews can reflect sexually explicit communications with a minor where a defendant destroyed—or encrypted—the original messages, and authentication data can link a defendant and his devices to accounts used to commit the offenses, all of which would independently constitute powerful evidence of the offense conduct.

The defendant's arguments about the agent's statements regarding her training and experience with child exploitation crimes also fail. The Supreme Court has repeatedly held that probable cause determinations may properly rely, in part, on an agent's training and experience. See, e.g., United States v. Arvizu, 534 U.S. 266, 273 (2002) (courts may draw on officers' "experience and specialized training" to make inferences from the facts); Ornelas v. United States, 517 U.S. 690, 700 (1996) ("our cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists"); see also United States v. Falso, 544 F.3d 110, 117 (2d Cir. 2008). Moreover, as described above, the Affidavit independently provides more than sufficient information to establish probable cause linking the defendant and his electronic devices to the offense conduct without these paragraphs (which were,

16

in any event, entirely appropriate). See Franks, 438 U.S. at 171–72 (warrant remains valid where the remaining content of the affidavit establishes probable cause); Awadallah, 349 F.3d at 68.[12]

### 2.    The Good Faith Exception Applies

Even assuming the Affidavit lacked probable cause, however, suppression would not be proper because the agents clearly relied on the Search Warrant in good faith. Apparently relying on the fourth Leon factor, the defendant argues that the good faith exception to the exclusionary rule should not apply here because the Affidavit was so "facially deficient" that a reasonable officer could not have relied upon it in good faith. See Mot. at 1. But the fourth Leon factor applies where the warrant "fail[s] to particularize the place to be searched or the things to be seized." Leon, 468 U.S. at 923. In other words, the fourth Leon factor applies when the defendant alleges that the warrant failed to specify (i) the offenses for which probable cause was established; (ii) the place to be searched; or (iii) the items to be seized in relation to those offenses. See Galpin, 720 F.3d at 445–46. The defendant makes no such argument here—nor can he, as the Affidavit describes each thoroughly. See Aff. ¶¶ 5-7 (describing, in detail and with photographs, the defendant and his apartment), 9 (describing the Subject Offenses), and Attachment B at pp. JD000451-JD000456 (describing the specific items that law enforcement may seize in great detail). Instead, the defendant's claim is properly understood as one of overbreadth—namely, that the Affidavit did not establish probable cause to search for electronic evidence —which is distinct from a claim of facial deficiency.

---

[12]    The defendant also argues that "[t]he affiant's assertion that iMessage, Instagram and Cash App can be used from multiple devices and sync across multiple devices is not a statement of criminal activity" and thus cannot establish probable cause. See Mot. at 12-13. But there is no requirement that every factual allegation in a search warrant affidavit be a "statement of criminal activity." See id. Instead, probable cause turns on the "totality of the circumstances"—both criminal and non-criminal—from which reasonable, commonsense inferences may be drawn. See, e.g., Wagner 989 F.2d at 71-72.

17

In any event, to the extent the defendant intended to argue that the good-faith exception should not apply because the Affidavit was so lacking in probable cause that "no reasonably well trained officer" would have relied on it, this argument also fails. See Leon, 468 U.S. at 923. As described above, the Affidavit was supported by detailed factual allegations describing the offense conduct, the investigation, and the extensive electronic and financial records linking the defendant, his devices, and his apartment to the charged crimes. Under these circumstances, the agents' reliance on the warrant was plainly reasonable. See Clark, 638 F.3d at 103 ("At the opposite end of the spectrum are . . . affidavit[s] providing detailed factual allegations in support of probable cause. Such cases almost invariably demonstrate reasonable reliance."); see also Leon, 468 U.S. at 921-22 (finding that searches "pursuant to a warrant will rarely require any deep inquiry into reasonableness," because "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination").

Accordingly, even if the Search Warrant lacked probable cause—which it did not— the good-faith exception would apply, and suppression would be unwarranted. See Clark, 638 F.3d at 99-103 (holding that warrant lacked probable cause to believe evidence of criminal conduct would be found throughout the premises searched, but citing Leon, applying good faith exception, and reversing district court's grant of suppression motion).

### 3.    The Defendant is Not Entitled to a Franks Hearing

The defendant is not entitled to a suppression hearing on this issue. He does not dispute any of the facts set forth in the Affidavit, let alone allege—much less make the substantial preliminary showing required under Franks—that the Affidavit contains deliberate falsehoods or reckless misstatements. Nor does he offer any proof to support such a claim. In the absence of any factual dispute or proffer of evidence, a Franks hearing is both unwarranted and unnecessary.

4.  The Defendant's Arguments Regarding the Subpoenas to PayPal and Snap Are Meritless

In the section of his brief challenging the Search Warrant, the defendant also contends that a grand jury subpoena issued to PayPal Holdings, Inc. ("PayPal") in November 2024 (after the Search Warrant was executed) and two FBI administrative subpoenas to Snap Inc. ("Snap") issued in August and December 2024, respectively, violated the Fourth Amendment. This argument is without merit. It is well established that the grand jury "may compel the production of evidence" without a violating a defendant's constitutional rights, so long as there is any "reasonable probability" that the records will "produce information relevant to the general subject of the grand jury's investigation." United States v. R. Enters., Inc., 498 U.S. 292, 301 (1991). Likewise, "an administrative agency, like a grand jury," can "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." United States v. Constr. Prods. Rsch., Inc., 73 F.3d 464, 470 (2d Cir. 1996).

Here, the subpoenas easily satisfy these standards. The defendant used numerous online and social media accounts to communicate with minors and to pay them to produce child sexual abuse material. He also took steps to obscure his identity by using numerous burner and shell accounts across multiple online platforms. Snap—which is known for its privacy features and popularity among minors—enables users to communicate and exchange messages, images, and videos. PayPal facilitates online payments. In light of the defendant's conduct, there was more than a reasonable probability that the defendant also maintained PayPal and Snap accounts to produce and pay for child sexual abuse material, and that records from those platforms would thus yield information relevant to this investigation.

19

* * *

Accordingly, there is no basis to suppress any electronic devices seized pursuant to the Search Warrant.

## II.     The Defendant's Statements Should Not Be Suppressed

The defendant next argues that his waiver of Miranda rights and subsequent statements to the FBI during the execution of the Search Warrant were involuntary because he was cognitively impaired due to "sleep inertia."  This claim also fails.

### A.     Applicable Law

Statements made "during a custodial interrogation [are] inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [Miranda] rights when making the statement." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010).  "The existence of a knowing and voluntary waiver does not, however, guarantee that all subsequent statements were voluntarily made."  In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 177, 211–12 (2d Cir.2008); see also Dickerson v. United States, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.").  In determining whether a defendant's statements are admissible at trial, courts will first consider whether the defendant knowingly and voluntarily waived his Miranda rights and, if so, whether any statements he made after the waiver were also voluntary.  See United States v. Taylor, 745 F.3d 15, 23-24 (2d Cir. 2014).  The government bears the burden of establishing that the defendant's statements were voluntary by a preponderance of the evidence.  United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011); Colorado v. Connelly, 479 U.S. 157, 168 (1986).

With respect to determining whether the defendant voluntarily waived his Miranda rights, courts "look at the totality of circumstances surrounding [the] Miranda waiver and any

20

subsequent statements to determine knowledge and voluntariness." Taylor, 745 F.3d at 23.  This inquiry has two components.  See Berghuis v. Thompkins, 560 U.S. 370, 382 (2010).  First, the waiver of rights must be "knowing," i.e., "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Plugh, 648 F.3d at 127.  Second, the waiver must be "voluntary," i.e., "that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id.

With respect to whether statements made after a Miranda waiver were themselves voluntary, courts consider whether, notwithstanding the waiver, the statements were made "under circumstances that overb[ore] the defendant's will at the time [they were] given." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).  This inquiry similarly "examine[s] the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." Taylor, 745 F.3d at 23-24.  "An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual." Id.

B.     Discussion

Aside from unsupported assertions in his motion, the defendant cites no authority—factual, medical, or otherwise—establishing (i) that he suffers from "sleep inertia," (ii)  that such a condition results in "cognitive impairment," or (iii) that he was in fact "cognitively impaired," "unresponsive," or "sleep depriv[ed]" during his voluntary FBI interview.  See Mot. at 1–2, 4.  His motion therefore should be denied for this reason alone.

Even if the defendant had made such a showing, however, the record confirms the opposite.  The audio recording of the defendant's interview demonstrates that, far from being cognitively impaired, coerced, or unaware of what was happening, the defendant actively sought to control the course of his interaction with the agents from start to finish.  As the recording reflects,

21

Special Agents Hampsch and Buscemi repeatedly advised the defendant that he could stop the questioning at any time, see, e.g., Def.'s Int. at 05:38–06:22; 13:30–13:45, and that, if he chose to continue speaking, he could decline to answer any particular question after hearing it and ask the agents to move on to the next one.  Id. at 05:38–06:22.  The defendant exercised the latter option repeatedly, frequently directing the agents to "continue" to their next question without answering the question posed.  See, e.g., id. at 13:45–14:06; 15:16–16:00; 34:10–35:38; 37:10–39:20.  And when the defendant did respond to certain questions, his answers reflected a careful effort to be deliberately ambiguous while attempting to assess the evidence that FBI had against him.  For example, the defendant referenced the FBI's ability to use Cellebrite— a digital forensic tool used by law enforcement to extract and analyze data from electronic devices—to access his phone, and he also debated with Special Agent Buscemi about what records are actually retained by online platforms such as Meta and Cash App.  Id. at 26:56–27:25; 30:04–31:47.

The audio recording also establishes that the defendant knowingly and voluntarily waived his Miranda rights.  Prior to asking the defendant any questions, Special Agent Hampsch read him his rights from a short, one-page FBI Advice of Rights form and then provided him with the form to read to himself.  Id. at 05:38–06:36; 06:22–06:36; see also Ex. A (copy of the FBI Advice of Rights form provided to the defendant).  After reading the form,[13] the defendant indicated that he understood his rights by nodding when asked and by subsequently engaging with the agents' questions.  Id. at 06:36.  Courts have long recognized that a waiver of Miranda rights need not be express and may be inferred from a defendant's conduct.  See, e.g., United States v.

---

[13]     The defendant claims the Advice of Rights form was impossible to read in the time allotted to him, which was approximately 30 seconds.  See Mot. at 3-4.  But, as the form consisted of less than half a page of text with well under 100 words, the government submits that this assertion is incredible.  See Ex. A.

Scarpa, 897 F.2d 63, 68 (2d Cir. 1990) ("While merely answering questions after Miranda warnings have been given does not necessarily constitute a waiver, no express statement of waiver is required." (collecting cases)); Plugh, 648 F.3d at 125 ("[O]nce [Miranda] warnings are properly administered . . . a defendant is left to make his own choice as to how best to proceed."). And although the defendant argues that his nonverbal response to his Miranda rights—coupled with his "muffled mumble[s]" throughout the interview—displayed a "lack of alertness," Mot. at 3, the record shows otherwise. The surrounding circumstances, including the defendant's repeated decisions to selectively answer the agents' questions while attempting to gather information about the case against him, demonstrate that he fully understood his rights and deliberately chose to engage with the agents for his own strategic reasons. The fact that he spoke quietly and mumbled while he did this is simply a personal characteristic, not evidence of confusion or impairment.

Finally, the defendant's post-Miranda statements were plainly voluntary. The defendant identifies no facts suggesting that his will was "overborne" during the interview, and none exist. As described above, the defendant's own conduct during the interview reflects comprehension, not cognitive impairment or confusion. Thus, there was no "impairment" for the agents to exploit in any coercive manner. See Mot. at 4. Moreover, the agents' own conduct further underscores the absence of coercion. The interview—which took place in a bedroom at the defendant's home—was conversational and non-threatening. The agents were "relaxed and friendly" throughout, see Scarpa, 897 F.2d at 67, and there is no evidence of threats, promises, or psychological abuse. See Plugh, 648 F.3d at 128; United States v. Haak, 884 F.3d 400, 415 (2d Cir. 2018). Instead, the agents repeatedly checked whether the defendant needed anything and he voiced no concerns. They also made clear that the interview was entirely his to control: he could stop it at any time or choose to hear their questions—and see what evidence they had—without

23

saying anything.  And when the defendant refused to answer their questions or deliberately gave vague responses, the agents largely allowed him to dictate what he was willing to address.

Put simply, the defendant understood his rights and chose to speak with agents on his own terms.  His interaction with the agents was voluntary and deliberate—not coerced—so suppression is unwarranted.

### SEALING REQUEST

The government respectfully requests leave to file this memorandum of law under seal, with a redacted version to be filed on the public docket.   Portions of this brief contain information regarding victims in this case that is subject to the Court's January 21, 2025 protective order.  See ECF No. 15.  Sealing is therefore necessary to protect these individuals' privacy.  As the facts set forth above provide ample support for the "specific, on-the-record findings" required to justify sealing, see Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006), the government respectfully requests that the Court permit this memorandum to be filed under seal.

CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is without merit and should be denied in its entirety.

Dated:    Brooklyn, New York
          April 3, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY

By:    _____/s/_____
       Brooke Theodora
       Assistant U.S. Attorney

       Sarah Elardo
       Special Assistant U.S. Attorney
       718-254-7000

25