UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 24-CR-492(DC)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

DEWITT JOHN, :

May 4, 2026

Defendant. : 9:00 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF JURY SELECTION AND TRIAL
BEFORE THE HONORABLE DENNY CHIN
UNITED STATES CIRCUIT JUDGE, BY DESIGNATION, and a jury.

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
United States Attorney
BY: BROOKE THEODORA
KAITLIN FARRELL
SARAH ELARDO
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, NY 11201

For the Defendant: DEWITT JOHN, Pro Se
- and -
FEDERAL DEFENDERS OF NEW YORK, INC
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
BY: JULLIAN HARRIS-CALVIN, ESQ.
KYLA WELLS, ESQ.

Court Reporter: Andronikh M. Barna
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2178

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE COURTROOM DEPUTY: All rise. The United States District Court for the Eastern District of New York is now in session. The Honorable Denny Chin is now presiding.

Criminal cause for a jury selection and trial on United States versus John, Docket No. 24-CR-492.

May I have the appearances for the Government, please.

MS. THEODORA: Good morning, Your Honor.

Brooke Theodora for the Government. I'm joined by AUSA Kaitlin Farrell, Special AUSA Sarah Elardo, Special Agent Audra Hampsch, and paralegal specialist Elizabeth Reed.

THE COURT: Good morning.

THE COURTROOM DEPUTY: Thank you.

Can I have the appearance for the Defendant.

MS. HARRIS-CALVIN: Yes, Your Honor.

Jullian Harris-Calvin, Kyla Wells, and Dewitt John for the Defense. We are joined at Counsel table by Jessica Hernandez who is a Federal Defenders investigator and Emily Olickllano.

THE COURT: I don't think your microphone is on.

MS. HARRIS-CALVIN: Apologies. Do you need me to reiterate it?

THE COURT: Give me the names again.

MS. HARRIS-CALVIN: Sure. Jullian Harris-Calvin and Kyla Wells for Defendant, Dewitt John, who is also present and

representing himself as hybrid. Jessica Hernandez, Federal Defenders investigator, and Emily Olickllano, who is a paralegal at the Federal Defenders.

THE COURT: Thank you. Please be seated.

Just, I don't think I said, this is hybrid representation, whatever that means. I think what I said was -- whoops. What I said was that Mr. John is representing himself; that for purposes of cross examining Jane Doe 1 and Jane Doe 2's mother, Defense Counsel may conduct that cross-examination. And that's to avoid having Mr. John do it himself. There was a request about closings. I said that my inclination was not to allow it, and so -- but that we could revisit that question depending on how things went. But that's -- I mean, unless things are changing and Mr. John wants to be represented by Counsel, in which case that would be fine with me. But it should be clear. And Mr. John should be presenting the opening statement. He should be cross examining the other witnesses. He should be the one making objections, if there are objections. And for now, he is the one who should be closing. All right? Are we clear?

MS. HARRIS-CALVIN: Yes, Your Honor.

THE COURT: Okay.

Mr. John, are we clear?

MR. JOHN: Yes, Your Honor.

THE COURT: Okay. Now, I understand there was a

guilty plea allocution on Friday and at the end Mr. John changed his mind. That is fine.

There are a lot of stuff -- there was a lot of stuff coming in over the weekend. There are a lot of issues that still need to be resolved. But we will do the best we can.

So, let's see. There was a motion for reconsideration of my order denying Mr. John's motion to admit evidence that Jane Doe 1 created child pornography at the request of someone other than Mr. John. In the letter, which came from Counsel, there is more detail than had previously been presented to me.

MS. THEODORA: Your Honor, sincere apologies for interrupting. Because the Rule 12 requires the evidence to be heard in camera, we would request the Court close the courtroom and ask everybody else who is here to leave, given that the Defendant -- you know, we can't do a sidebar really.

THE COURT: Is there any objection to that?

MS. HARRIS-CALVIN: No, Your Honor.

THE COURT: All right. Then, unfortunately, in the back, I will ask everyone to leave, except for my law clerks. If you wait outside, we will bring them back in as soon as we finish this discussion. Thank you.

MS. GELERNT: Your Honor, I'm Michelle Gelernt, this is Mia Eisner-Grynberg. We're the attorney in charge and the deputy attorney in charge of Federal Defenders. We'd ask that

we be permitted to stay as supervisors of the trial team.

MS. THEODORA: We have no objection to that.

THE COURT: All right.

MS. GELERNT: And we also have an intern who has been working on this case as well.

THE COURT: Any objection to the intern?

MS. THEODORA: No, we do not.

THE COURT: Okay. I see no one else in the courtroom, other than the individuals we just identified.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

THE COURT: Let's see.

I also received a letter from the Government. There was another *Giglio* issue, a law enforcement officer from Texas. Let's see. Apparently there was a -- he had something happen with a prior forensic examination.

Does the Defense wish to cross-examine on that?

MS. HARRIS-CALVIN: No, Your Honor. And I think that was for purposes of this hearing. I don't think that that officer is testifying at trial, if that's correct.

THE COURT: Okay. All right.

I also got -- I have many pieces of paper up here.

I have a list of witnesses that the Defense may call. I will add them to the list of names that I have. And any possible witnesses, potential witnesses are to be excluded right from trial, except for one agent.

MS. THEODORA: I'm sorry, Your Honor. What was the question?

THE COURT: My question was, there was -- I can't find it right now -- a list of names, and I believe one of them was Mr. John's father. And all I am saying was I will include them in the list of possible witnesses when I read out the names to the jury, and I just wanted to make sure that the witnesses are not in the courtroom, other than when they are testifying, with the exception of the case agent.

MS. THEODORA: Yes. And none of -- we don't have any of those witnesses here on our side. We do understand Jessica Hernandez is here, and she has been put on the witness list for the Defense. So we would ask the Court to invoke the rule with respect to her.

THE COURT: I couldn't hear. Who?

MS. THEODORA: Jessica Hernandez, who is an

investigator on the Defendant's witness list with the Federal Defenders.

MS. HARRIS-CALVIN: Your Honor, now that we're closer to trial, I will tell you that we will be taking off Jessica Hernandez and Mr. John's parents, Herlita Clarke and the other Mr. John. We will not be calling them at trial, and so they no longer need to be excluded from the courtroom.

THE COURT: Okay.

I can't find my list. Hold on one second.

MS. HARRIS-CALVIN: I think the only person left is Sasha Hodson who is a different investigator at the Federal Defenders of New York who will not be in the courtroom.

THE COURT: Give me the name again.

MS. HARRIS-CALVIN: Sasha Hodson, H-O-D-S-O-N.

THE COURT: Sasha Hodson?

MS. HARRIS-CALVIN: Yes.

THE COURT: I will add her to the list of names.

MS. HARRIS-CALVIN: And the other names we're removing. Thank you.

MS. THEODORA: Your Honor, we did just want to flag that to the extent that the Defendant seeks to call, I think her last name is Hodson, she's also an investigator, we have not received any 26.2 expert disclosures about her, so we did just want to flag that.

MS. HARRIS-CALVIN: There is no expert disclosure to

give with respect to Sasha Hodson.

MS. THEODORA: And apologies, we also have not received any witness statements under 26.2.

MS. HARRIS-CALVIN: And there is no *Jencks* for her either.

THE COURT: We'll see what happens. In any event, I'm going to mention her name.

I have Dewitt John, Agent Scaramella, Agent Gale, Agent Buscemi, Agent Wang, Herlita Clarke, Bob Wordworth, and now Sasha Hodson.

Do I need to add anyone else?

MS. HARRIS-CALVIN: We're removing Herlita Clarke.

THE COURT: Removing Herlita Clarke.

MS. HARRIS-CALVIN: Yes.

THE COURT: And we have photographs of --

MS. THEODORA: Yes, Your Honor. We've prepared photographs of the victims. It's Jane Doe 1, Jane Doe 2, Jane Doe 2's mother, Jane Doe 2's father, and Jane Doe 1's mother and father.

THE COURT: Do they have numbers?

MS. THEODORA: They've been marked for identification as Government Exhibit 801.

THE COURT: Well, Jane Doe 1 is?

MS. THEODORA: 801.

THE COURT: Yes.

MS. THEODORA: Jane Doe 2 is 802.

THE COURT: Yes.

MS. THEODORA: Jane Doe 2's mother is 803.

THE COURT: All right.

MS. THEODORA: Jane Doe 2's father is 804.

Jane Doe 1's mother is 806.

And Jane Doe 1's father is 805.

THE COURT: Okay.

And just so I know, the location, 86A Hull Street, what is that? Is that his home?

MS. THEODORA: Yes, it is.

THE COURT: Okay.

Now, with respect to -- we've arranged for Judge Gonzalez's courtroom. Did Mr. Joe explain all of that to you?

MS. THEODORA: Yes, he did.

THE COURT: Okay. So once we do the beginning, we're going to shift all the jurors over there. For the individual follow-up, we'll remain in the courtroom. We will bring in individual jurors one by one for the follow-up. And then at some point, we will bring everyone back in here.

Anything else?

And for openings, we have three marshals in the courtroom. I think Mr. John can stand and give his opening right from there, from Counsel table.

MS. HARRIS-CALVIN: I think we decided that we just

-- we have little podiums for both tables, so I think we agreed last week that everyone is going to stay at the two tables, at the podiums for all of the presentations to the jury.

THE COURT: All right.

MS. HARRIS-CALVIN: One question about the logistics.

When the Court says we'll be moving ourselves to Judge Gonzalez's --

THE COURT: No, no, we're moving the jurors.

MS. HARRIS-CALVIN: The jurors. Okay.

And then they'll come in one by one from Judge --

THE COURT: Correct.

MS. HARRIS-CALVIN: Got it. Thank you.

THE COURT: Yes. I think we'll have a few in a witness room out there so that they -- it will be a little faster, but that's the plan.

MS. HARRIS-CALVIN: Thank you.

THE COURT: Anything else?

MS. THEODORA: Just one moment, Your Honor.

THE COURT: Yes.

(Pause in proceedings.)

MS. THEODORA: Nothing from the Government, Your Honor.

MS. HARRIS-CALVIN: I just wanted to flag for the

Court just some logistics that we had worked out amongst ourselves, the parties. The Court had told us to talk about exhibits in advance. What we decided we would do is each day after our proceedings we would talk about what exhibits the Government actually intended to introduce the following day and see if we have any objections and then try to raise that with the Court in the morning.

THE COURT: That's fine with me.

And do you have your exhibits? Well, I don't know how far we're going to get. Ordinarily, it wouldn't be hard to pick a jury for a relatively short trial, but given the nature of the case, I don't know, it might be hard.

But we will be ready to present a witness if we get things done early fast?

MS. THEODORA: Yes, Your Honor.

And I don't think we have -- oh, okay. I think there's just one exhibit that we would like to be heard about. I don't know, does Your Honor want to do that now? Or we can just get straight to jury selection.

THE COURT: Let's do the jury selection and then.

MS. THEODORA: Okay.

THE COURT: So, let's take a recess. My clerks will go find Mr. Joe. And hopefully we've got jurors in the other courtroom waiting and we can bring them in here.

But let's take a recess and my clerks will go find

Victor. Thank you.

MS. THEODORA: Thank you.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please be seated.

Okay. We're going to bring in the jury pool, right? Victor, you're going to bring in the jurors?

THE COURTROOM DEPUTY: Yes.

THE COURT: All right.

(Pause in proceedings.)

THE COURT: Before they come in, let me just make sure I have all the right names here.

We have, on the Government table, Ms. Theodora, Ms. Farrell, Ms. Elardo, Paralegal Specialist Reed, Special Agent Hempsch.

That's it?

MS. FARRELL: Ms. Reed stepped out, but if you want to still read her name because it's relevant.

THE COURT: Yes, okay.

And we have Ms. Wells, Justin Knight.

Mr. Knight, you're going to be at counsel table, that's fine.

Investigator Hernandez and Paralegal -- how do you pronounce your name?

MS. OLICKLLANO: Olickllano.

THE COURT: Olickllano.

I must have just typed this wrong.

Spell it for me.

MS. OLICKLLANO: L-L-A-N-O.

THE COURT: L-L-A-N-O. I do have a typo. Okay. Thank you.

(Pause in proceedings.)

(Prospective jurors enter.)

THE COURTROOM DEPUTY: Thank you.

Do you want me to confirm the jurors first or do you want to do your spiel first?

THE COURT: Confirm.

THE COURTROOM DEPUTY: Confirm who is in the box?

THE COURT: Yes, let's do that.

THE COURTROOM DEPUTY: I'm going to make sure that everyone is in the right seat here.

And everyone else back there, you should be 33 to 60 back there. Right?

So, Juror Number 1, Wing Kam Lau.

Matthew Burnett, Juror Number 2.

Juror Number 3 is Margarita Delgado.

Juror Number 4 is Gina Woods. Gianna Woods. I'm sorry.

Juror Number 5, Myriam Belotte-Poligadu.

Juror Number 6, Daniel Dougherty.

THE PROSPECTIVE JUROR: Dougherty, yes.

THE COURTROOM DEPUTY: Thank you.

Juror Number 7, Alexandra Wagner. Thank you.

Juror Number 8 is Ryan Smith. Thank you.

Juror Number 9 is Seth Mellin. Thank you.

Juror Number 10 is Eileen Duff.

Juror Number 11 is Brian Falkenstein.

Juror Number 12, Thomas Garbarino. Thank you.

Juror Number 13, Jessica Lavides.

Juror Number 14, Jennifer Raskin.

Juror Number 15, I have Damian Wasilewicz.

Juror Number 16, Pamela Magdaleno.

Juror Number 17, Kaymala Deonarine.

Juror Number 18, Robert McGrew.

Juror Number 19, Rajesh Rao. Thank you.

Juror Number 20, Caelin Cacciatore. Thank you.

Juror Number 21, Boris Avakov. Thank you.

Juror Number 22, Jessica Werfel. Thank you.

Juror Number 23, Joseph Palacino. Thank you.

Juror Number 24, Sterna Mockin. Thank you.

Juror Number 25, Suzette Jeudy.

Juror Number 26, George Irizarry. Thank you, sir.

Juror Number 27, in the back row, I have Devorah Mahpour.

(Continued on the next page.)

(Continuing.)

THE COURTROOM DEPUTY: Jury Number 28 -- is that right, you're Juror Number 28.

PROSPECTIVE JUROR: Yes.

THE COURTROOM DEPUTY: Allen Cheriyan?

PROSPECTIVE JUROR: Yes.

THE COURTROOM DEPUTY: Juror Number 29, Thomas Small?

Thank you, sir.

Juror Number 30, David Lew.

Thank you.

Juror Number 31, Joanna Guan.

Juror Number 32, Dorothy Osei-Gyening?

PROSPECTIVE JUROR: Osei-Gyening.

THE COURTROOM DEPUTY: Thank you.

Judge, that is my first 1 through 32 seated.

THE COURT: Thank you.

Good morning, ladies and gentlemen. My name is Denny Chin. I will be presiding over this case, this trial. Welcome to the United States District Court for the Eastern District of New York. Thank you for being here.

I know this may not be the most convenient time for you to be here, but you presence is important. Jury service is one of the most important duties of citizenship and our system of justice depends on citizens who are

willing to meet their civic responsibilities. So we are grateful to all of you for being here.

The case today is a criminal case. It is entitled United States of America versus Dewitt John. Dewitt is D-E-W-I-T-T. I expect the trial to take about three or four days. You can do a lot worse than a four-day trial. We will typically sit from 9:30 until 4:30. On Wednesday, we're going to do a half day.

As jurors your function in the system of justice is to give the parties a fair trial. To do that you must be free from any preconceived notions or sympathies or prejudices that might prevent you from returning a fair and just verdict.

To give the parties in this case some comfort that there is nothing in your backgrounds that might improperly affect you as a juror, I will be asking some questions of you. Although some of the questions may appear personal, the purpose of the questioning is not to embarrass you, but it is simply to develop enough information so that we can determine whether you will sit as a juror in this particular case.

After I ask my questions, some of you may be excused for cause. That just means that a good reason exists as a matter of law for you not to sit as a juror in this case. For example, if one of you is related to one of

the lawyers, you would be excused for cause. Others of you may later be excused based on what we call peremptory challenges. Under our system, through peremptory challenges, the parties have the right to excuse a number of potential jurors without offering any explanation.

So before I begin my questions, I will ask all of the prospective jurors, including the ones in the back, to stand so that the deputy clerk can administer the oath that you respond truthfully and completely to my question.

THE COURTROOM DEPUTY: Will you raise your right hands?

(Jury sworn.)

THE COURTROOM DEPUTY: Please say "yes."

ALL PROSPECTIVE JURORS: Yes.

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT: Okay. So we will have 12 jurors as well as two alternates. We will start the questioning with 32 of you. You have already been randomly selected and you are sitting in the box and in the first row. I will be directing my questions to these first 34. But those of you in the back should be listening carefully anyway, because at some point when and if I excuse any jurors for cause, we will replace them by calling on some of you in the back. And at that time, I will ask you whether you have any

affirmative answers to any of the questions that I ask. Once I have resolved all the challenges for cause, the parties will exercise their peremptory challenges, and then 14 of the 32 will be left and the first 12 will be the jury, and the last two will be the alternates.

All right. So as I said, this is a criminal case. It is entitled United States of America versus Dewitt John.

The defendant has been charged in an Indictment filed by a Grand Jury in this District with the commission of federal crime. An Indictment is not evidence. It simply contains the charges against the defendant and no inference may be drawn against the defendant from the existence of the Indictment. The defendant here has entered a plea of not guilty to the charges against him; and therefore, he is presumed innocent, and the Government must prove the charges in the Indictment beyond a reasonable doubt.

The Indictment contains two counts. First Mr. John is charged in Count 1 with sexual explanation of the child. Second, he is charged in Count 2 with accessing child pornography with an intent to view it.

The Government alleges that between approximately March 2024 and April 2024, the defendant used Internet-based application, including Instagram and iMessage to communicate with minor female victims in committing the charged crimes. Again, Mr. John has pleaded not guilty to all the charges.

He is presumed innocent and the Government must prove his guilt beyond a reasonable doubt.

So again, my questions are directed to the 32 of you in the box. But those of you in the back should listen carefully anyway.

Do any of you know anything about the facts in this case other than what I just said? If so, please raise your hand.

Have any of you heard, read, or seen anything in the media about this case that for any this would render you from entering a fair and impartial judgment in this case?

If so, please raise your hand.

Do any of you feel, for any reason, that you could not view fairly and impartially a case involving charged as I have described?

If so please raise your hand.

Okay.

THE COURTROOM DEPUTY: Juror Number 5.

Anyone else on the first row?

Juror Number 7, Juror Number 8.

Anyone -- Juror Number 3, Juror Number --

THE COURT: Hold on a second.

You said 5 you said 7.

THE COURTROOM DEPUTY: Right.

And 8.

THE COURT: 8.

THE COURTROOM DEPUTY: Juror Number 20.

In the second row, I have 24, 25, as well as 27.

And we already have 3 I believe, correct?

THE COURT: 24, 25, 27, and 3.

THE COURTROOM DEPUTY: And I have 5. Do you have 5?

THE COURT: I have 5.

Okay. Ladies and gentlemen -- well, let's proceed and I may have some -- I will have some individual questions I ask of some of you.

So as I said, the defendant is Dewitt John.

Mr. John, please stand. Face the prospective jurors both in the box and in the back of the courtroom?

Thank you. You may be seated.

Now, Mr. John has decided to represent himself at the trial. He has a constitutional right to do that. His decision to represent himself has no bearing on whether he is guilty or not guilty.

Now, although Mr. John is representing himself, the Court has appointed a lawyer to act as standby counsel to assist. And the lawyer is Jullian Harris-Calvin from the Federal Defender's Office of New York.

And with her is Attorney Kyla Wells, Legal Fellow Justin Knight, Investigator Jessica Hernandez, and Paralegal

Emily Olickllano.

Now, this case is being prosecuted by the United States District Attorney's Office for the Eastern District of New York. The United States Attorney for this District, is Joseph Nocella, Jr. He will be represented at the trial by Assistant United States Attorneys Brooke Theodora. Ms. Theodora?

And Kaitlin Farrell. Ms. Farrell?

As well as Special Assistant United States Attorney Sarah Elardo.

Sitting with them are Special Agent, Agent Audra Hampsch, H-A-M-P-S-C-H of the FBI.

Did you paralegal come back yet? I can't --

MS. ELARDO: No.

THE COURT: There will also have with them Paralegal Specialist Elizabeth Reed, who has stepped out.

Thank you. You may be seated.

Do any of you know the defendant or any of the other individuals I have just identified?

If so, please raise your hand.

Have any of you or to your knowledge any member of your family or close friends had any personal or business dealings dealing directly or indirectly with any of these individuals, including the defendant?

If so, please raise your hand.

Have any of you or any of your family members or close friends had any dealings, business dealings, other dealings with any of the lawyers or other members of the staff of the Federal Defender's Office of New York or the United States Attorney's Office for the Eastern District of New York?

If is so, please raise your hand.

Okay. Now, I have decided that certain witnesses can testify and be identified in open court by pseudonym or the first name only. The full and actual names are known to the Court and the parties and their lawyers and will be disclosed to the jury once the jury is picked to hear the case. Allowing a witness to testify by a pseudonym in court is simply to protect that witness's privacy. You could not draw any inferences as to the defendant's guilt or non-guilt from the fact that certain names are being withheld from the public. So we will have a number of witnesses testifying by first name or pseudonym. But we have photographs just to make sure that you don't know them.

So Jane Doe 1, let's hold up a photo of Jane Doe 1. This is Exhibit 801.

Let's do Jane Doe 1's father. That's Exhibit 805.

And Jane Doe's 1's Mother, Exhibit 806.

In addition, Jane Doe 2, which is Exhibit 802.

And Jane Doe 2's mother, which is Exhibit 803.

And finally, Jane Doe 2's father, Exhibit 804.

Now, these individuals may testify or you will hear about them during the course of the trial. Do any of you recognize any of these individuals?

If so, please raise your hand.

Now, there will be some additional witnesses or potential witnesses testifying in the case. And I'm going to list their names now for you, and I'm going to ask you whether you've had any dealings with any of these individuals or recognize the names:

FBI Special Agent Nina Scarmella, S-C-A-R-M-E-L-L-A.

FBI Special Agent Jeremy Gale, G-A-L-E.

FBI Special Agent Michael Buscemi, B-U-S-C-E-M-I.

Special Agent Eric Wang, W-A-N-G.

Sasha Hodson, H-O-D-S-O-N.

And Bob Wordworth, W-O-R-D-W-O-R-T-H.

Any of you recognize any of these names?

Have you, or to your knowledge, any your family members or close friends had any dealings with any of them?

If so, please raise your hand.

Okay. Some of the evidence in this case will concern the following locations:

86-A Hull Street in Brooklyn, New York, H-U-L-L Street. Are any of you familiar with this location?

If so, please raise your hand.

Okay. All right. Now, I'm going to ask some questions specifically about the case. The law provides that minors cannot consent to be used to produce child pornography. Is there any reason you could not apply that law?

If so please raise your hand.

It is illegal under federal law to knowingly and intentionally employee, use, persuade, induce, entice, or coerce a person who is less than 18 years old to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct. Such activities are not protected by the First Amendment or any other constitutional provision.

If you would have any difficulty following the law, please raise your hand.

It is also illegal under federal law to knowingly and intentionally access with intent to view visual depictions of a person who is less than 18 years old engaging in sexually explicit conduct on the Internet. This is also not protected by the First Amendment or any other constitutional provisions.

If you believe you would have any difficulty following this law, please raise your hand.

Now, as I said, the defendant has chosen to

represent himself. Again, he has the constitutional right to represent himself, but this decision has no impact on whether he is guilty or not guilty. Is there anything about the fact that he is representing himself that would cause you to view him more favorably or less favorably?

If so, please raise your hand.

Now, as I said, certain witnesses may testify under a pseudonym, or a first name only. You may not draw any inference as to the defendant's guilt or non-guilt because of this. Do any of you believe you would have any difficulty following this instruction?

If so, please raise your hand.

Now, have you or any family member or close friend ever been prosecuted, arrested, investigated, or sued for sexual misconduct, including sexual misconduct in the workplace? If so please raise your hand. I will follow up privately with each -- well, when I say "privately," with counsel and the parties, but otherwise privately.

Please raise your hand.

THE COURTROOM DEPUTY: Juror Number 25.

PROSPECTIVE JUROR: (No verbal response.)

THE COURTROOM DEPUTY: Anyone else?

THE COURT: Okay.

THE COURTROOM DEPUTY: That's it.

THE COURT: Now, because of the nature of the

charges, the jury will be required to review sexually explicit evidence involving minors, as well as sexually explicit communication between an adult and one or more minors, including text messages and Instagram messages. You may find this evidence and the related testimony difficult to view and hear. But the process of having to see or hear difficult or unpleasant evidence is not a basis for avoiding the responsibility of jury service; otherwise, the system would not be able the function.

With this in mind if you believe you would have difficulty rendering a fair and just verdict in this case, please raise your hand.

THE COURTROOM DEPUTY: Also Juror Number 5, 7, 8, 20, 27, and 20 -- and 32 -- I'm sorry, and 27.

MS. HARRIS-CALVIN: You missed 25.

THE COURTROOM DEPUTY: And 25.

THE COURT: I've got 25.

Did 32 have a hand up or not?

THE COURTROOM DEPUTY: 32 did.

THE COURT: Yes.

PROSPECTIVE JUROR: As well as 27.

THE COURT: Okay. I will follow up.

Have you or any family member or close friend had any affiliation or professional business, direct or indirect, with any child welfare or sexual-abuse survivor or

similar organization? Have you or any family member or close friend had any dealings directly or indirectly with a child welfare or sexual-abuse survivor of similar organization?

If so, please raise your hand.

THE COURTROOM DEPUTY: Juror Number 14.

THE COURT: Juror Number 14.

THE COURTROOM DEPUTY: Anyone else?

THE COURT: Anyone else?

Okay. Now, have any of you or your family members or close friends ever worked for any law enforcement agency, including any prosecutor's office or any court.

If so, please raise your hand.

THE COURTROOM DEPUTY: I have Juror Numbers 5, 6, and 7, Juror Number 10, Juror Number 20 -- anyone else -- I have Juror Number 23, as well as Juror Number 30.

Did I skip anyone, miss anyone?

THE COURT: Okay. Well, I'm going to do some others right now, so we'll ask again.

Juror Number 5, Ms. Belotte- --

PROSPECTIVE JUROR: Yes.

THE COURT: -- Poligadu?

PROSPECTIVE JUROR: Correct.

THE COURT: What connection?

PROSPECTIVE JUROR: My daughter.

THE COURT: We have a microphone.

PROSPECTIVE JUROR: Okay. Thank you.

I have a -- I'm an educator. I've worked with schools whose family members have experienced sexual abuse. I have also discussed certain information, which I feel and very --

THE COURT: Well, I wasn't -- I was really just asking now --

PROSPECTIVE JUROR: About family?

THE COURT: -- law enforcement.

PROSPECTIVE JUROR: Okay.

THE COURT: Law enforcement.

PROSPECTIVE JUROR: My --

THE COURT: I may come back to this, but I would rather do that part privately --

PROSPECTIVE JUROR: Okay.

THE COURT: -- because of the nature of the charges.

PROSPECTIVE JUROR: Okay.

THE COURT: But what I'm asking you now about law enforcement contact.

PROSPECTIVE JUROR: My daughter is a prelaw major, and she's worked for the Ohio State Children's Affair with -- with children; so therefore -- and she's very like in her --

THE COURT: She in college?

PROSPECTIVE JUROR: She's in law school.

THE COURT: Okay. You said she was a pre-law --

PROSPECTIVE JUROR: She's a -- --

THE COURT: -- major --

PROSPECTIVE JUROR: Yes. She is involved in --

THE COURT: So she's in law school.

PROSPECTIVE JUROR: Yes, she's in law school now.

THE COURT: Okay. Anything about her being in law school that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR: Well, her experience with what she's been --

THE COURT: I'll come back --

PROSPECTIVE JUROR: -- just because with children.

THE COURT: -- to you. Thank you.

Juror Number 6. Mr. Dougherty? And I'm asking now about law enforcement.

PROSPECTIVE JUROR: Yes.

My sister, she's an active lawyer for New York State. My grandfather, he passed, but, you know, he is was a serving judge for the New York State Supreme Court.

THE COURT: And when was he a judge, roughly what time period?

PROSPECTIVE JUROR: I think acting until 2015, I

believe he stepped down.

THE COURT: Okay.

PROSPECTIVE JUROR: And --

THE COURT: And did he do criminal law, any criminal cases?

PROSPECTIVE JUROR: I believe so, but I don't remember any specifics.

THE COURT: And your sister works for what agency in New York?

PROSPECTIVE JUROR: I'm not sure.

THE COURT: Okay.

PROSPECTIVE JUROR: I'd have to check up on that.

THE COURT: That's all right.

Anything about your sister's experiences or your grandfather's experience that would make it difficult for you to be fair and impartial in this case?

PROSPECTIVE JUROR: I -- I don't think so offhand. But I would just say more informed, I suppose, than the average person, but --

THE COURT: But you can be -- you can be fair and impartial?

PROSPECTIVE JUROR: I would say so.

THE COURT: Okay. Thank you.

Juror Number 7, Ms. Wagner, lawsuit contacts?

PROSPECTIVE JUROR: My personal friend is a

retired prosecutor for the Brooklyn DA's office.

THE COURT: All right. And do you know what kind of cases your friend did?

PROSPECTIVE JUROR: He did criminal and he did mostly homicide.

THE COURT: All right. Is there anything about your relationship with him that would make it difficult for you to be fair and impartial in this case.

PROSPECTIVE JUROR: I don't think so.

THE COURT: Thank you.

Who else on the first row?

THE COURTROOM DEPUTY: Juror Number 10.

THE COURT: All right. Ms. Duff?

PROSPECTIVE JUROR: Yes. My mother is a retired probation officer in New Jersey.

THE COURT: And when did she retire?

PROSPECTIVE JUROR: I don't know.

THE COURT: Anything about her experience, her work experience that would make it hard for you to be fair and impartial in this case?

PROSPECTIVE JUROR: Well, she was -- her last office was with the sex crimes division.

THE COURT: All right. And her experience make it difficult --

PROSPECTIVE JUROR: No.

THE COURT: -- for you to be fair and impartial?

PROSPECTIVE JUROR: No, it wouldn't.

THE COURT: All right. Thank you.

Anyone else on the first row, law enforcement connections?

THE COURTROOM DEPUTY: Juror Number 20, on the second row?

THE COURT: All right. Ms. Cacciatore --

PROSPECTIVE JUROR: Yes.

THE COURT: -- law enforcement connection?

PROSPECTIVE JUROR: My aunt's a lawyer in DC, but I'm not sure what type of lawyer she is there.

And my uncle, his son, and my cousin are police officers down in Florida.

THE COURT: And anything about those relationships, their experiences that would make it hard for you to be fair and impartial in this case?

PROSPECTIVE JUROR: Not from their experiences, no.

THE COURT: All right. Thank you.

I'm going to follow up with you about the nature of the charges later.

PROSPECTIVE JUROR: Okay.

THE COURTROOM DEPUTY: And the third row, I have Juror Number 20 --

PROSPECTIVE JUROR: 23.
THE COURTROOM DEPUTY: -- 23?
THE COURT: 23, Mr. Palicino?
PROSPECTIVE JUROR: Yes, sir.
THE COURT: Any law enforcement connections?
PROSPECTIVE JUROR: Yes. I've grow up with a few of my friends and family members are in law enforcement in Staten Island and a couple of detectives in the 120.
THE COURT: Anything about -- do any of them work on child pornography or child explanation cases --
PROSPECTIVE JUROR: Not those --
THE COURT: -- child --
PROSPECTIVE JUROR: Not those cases in particular. But other cases, I'm pretty partial to law enforcement since I have been around it.
THE COURT: You're partial to law enforcement?
PROSPECTIVE JUROR: Yes, sir.
THE COURT: I'll follow up with you later. Thank you.
PROSPECTIVE JUROR: Yes, sir.
THE COURTROOM DEPUTY: Juror Number 3 in the back row?
PROSPECTIVE JUROR: Yeah, my cousin's a police officer.
THE COURT: Your cousin?

PROSPECTIVE JUROR: Yes.

THE COURT: And where is that?

PROSPECTIVE JUROR: I -- I don't know. Presently or --

THE COURT: No, what -- in what city.

PROSPECTIVE JUROR: Oh, in Brooklyn.

THE COURT: In Brooklyn?

PROSPECTIVE JUROR: Yeah.

THE COURT: And you don't know what precinct. But you do you know what -- is he just like a --

PROSPECTIVE JUROR: A regular police officer.

THE COURT: A regular police officer?

PROSPECTIVE JUROR: Yeah.

THE COURT: Is there anything about his experiences that would make it hard for you to be fair and impartial --

PROSPECTIVE JUROR: No.

THE COURT: -- in this case?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

Anyone else on this with law enforcement connections? Did I miss anyone?

Okay. A related question is whether -- not in law enforcement, but rather, whether you or any family members or close friends are lawyers? And if you haven't told me,

then raise your hand. Lawyers in the family, on the first row?

THE COURTROOM DEPUTY: Juror Number 14.

THE COURT: Ms. Raskin.

PROSPECTIVE JUROR: Two of my brothers-in-law are attorneys in Massachusetts. One of my best friends is a corporate law lawyer, but I don't think there's anything that would affect me.

THE COURT: Any of them do criminal law, to your knowledge?

PROSPECTIVE JUROR: Brother-in-law.

THE COURT: In Massachusetts?

PROSPECTIVE JUROR: In Massachusetts.

THE COURT: All right. Is there anything about their experiences that would make it difficult for to be fair in this case?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

Second row, any lawyers, lawyer in the family, close friends, relatives, no?

Third row.

THE COURTROOM DEPUTY: Juror Number 22.

THE COURT: Juror Number 22, Ms. Werfel?

PROSPECTIVE JUROR: Yes. My father was an attorney.

THE COURT: What kind of law does he practice.

PROSPECTIVE JUROR: He worked in a bank.

THE COURT: Has he ever done any criminal law to your knowledge?

PROSPECTIVE JUROR: (No audible response.)

THE COURT: Any experiences as a lawyer in a bank that would make it difficult --

PROSPECTIVE JUROR: Nope.

THE COURT: -- for you to be fair and impartial?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

Anyone else on the -- oh --

THE COURTROOM DEPUTY: I got it.

THE COURT: -- on the second row, Mr. Wasilewicz?

PROSPECTIVE JUROR: Wasilewicz, yeah. Close.

I have a close friend that does corporate law.

THE COURT: All right. Anything about that experience that would make it hard for you to be fair and impartial?

PROSPECTIVE JUROR: No.

THE COURT: All right.

THE COURTROOM DEPUTY: Juror Number 27.

THE COURT: Juror Number 27?

PROSPECTIVE JUROR: My aunt is a criminal lawyer.

THE COURT: And where does she practice?

PROSPECTIVE JUROR: It's either New York or New Jersey.

THE COURT: Either New York or New Jersey.

PROSPECTIVE JUROR: Yeah. I'm not sure.

THE COURT: Is there anything about her -- about your relationship with her or her work that would make it hard for you to be fair?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

THE COURTROOM DEPUTY: Juror Number 28?

PROSPECTIVE JUROR: Yes.

THE COURT: Mr. Cheriyan?

PROSPECTIVE JUROR: Yes. I have a relative whose girlfriend works for the City -- well, is a State lawyer. I'm not entirely sure what she does, but I know that's what she does.

THE COURT: Okay. Is there anything about her experience that would make it hard for you to be fair in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

THE COURTROOM DEPUTY: Juror Number 29?

PROSPECTIVE JUROR: Yes. Two of my good friends are lawyers, criminal law, both in New York.

THE COURT: They both do criminal law?

PROSPECTIVE JUROR: Yes.

THE COURT: In the City or somewhere else in New York.

PROSPECTIVE JUROR: Yes, Long Island.

THE COURT: Long Island.

Is there anything about their experiences that would make it hard for you to be fair and impartial in this case?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

THE COURTROOM DEPUTY: And Juror Number 1.

THE COURT: Juror Number 1, yes, Ms. Lau?

PROSPECTIVE JUROR: Good morning. My father's girlfriend is a lawyer, but she works for the housing courts for evictions.

THE COURT: Okay. Is there anything about her experiences that would make it hard for you to be fair and impartial?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

All right. Now, first, I need a sip of water.

Now, as I said, this case should take three or four days. Do any of you have any physical or personal problems that would prevent you from serving for this period of time?

If so please raise your hand.
THE COURTROOM DEPUTY: On the second row?
THE COURT: Just -- just raise your hand. I'm not going to you to explain right now just.
THE COURTROOM DEPUTY: Okay.
THE COURT: Just if you have a scheduling issue?
Juror Number 19, Mr. Rao?
THE COURTROOM DEPUTY: Juror Number 3.
THE COURT: And Juror Number 3 --
THE COURTROOM DEPUTY: And Number --
THE COURT: -- Ms. Delgado.
THE COURTROOM DEPUTY: -- Juror Numbers 23, 24, 25 and 26 --
THE COURT: Okay. I'm sorry. Number?
PROSPECTIVE JUROR: 17.
THE COURTROOM DEPUTY: 17.
THE COURT: Hold on, hold on. 23, 24, 25.
THE COURTROOM DEPUTY: And 26 --
THE COURT: And 26. And then?
THE COURTROOM DEPUTY: Oh, I'm sorry.
17, 29, 31 --
PROSPECTIVE JUROR: (No verbal response.)
THE COURTROOM DEPUTY: -- and 3.
THE COURT: Now, a lot of you have raised your hands for scheduling issues for a three- or four-day trial.

I will do the best that I can, but, you know, you are expected to do your duty. I'll give you a chance at some point to explain to me what the problem is. But you saw how many people raised their hands and we only have so many replacements, so we'll see. We'll follow up on that.

Do any of you have any difficulty with your sight or hearing that could affect your ability to follow these proceedings?

If so please raise your hand.

THE COURTROOM DEPUTY: No, Judge.

THE COURT: Do any of you have difficulty understanding or reading the English language?

If so please raise your hand.

THE COURTROOM DEPUTY: No one, Judge.

THE COURT: Do any of you have any religious, moral, or ethical beliefs that would prevent you from passing judgment on another person or to determining the credibility of any witness?

If so, please raise your hand?

THE COURTROOM DEPUTY: No, Judge.

THE COURT: Now, it is possible that the case may receive some attention in the media. Will each of you accept the proposition that you should absolutely avoid reading about the case in the effect there are any articles in the newspapers or on the Internet or -- or listening to

or watching anything on the radio or the television about the case until the case is over?

If you think you would have difficulty follow that instruction, please raise your hand.

THE COURTROOM DEPUTY: No, Judge.

THE COURT: Okay.

Will each of you accept the proposition that your verdict must be based solely on the evidence presented in this courtroom or the lack of evidence?

If you cannot accept that proposition, please raise your hand.

THE COURTROOM DEPUTY: No.

THE COURT: I'm just going backup for a moment. I asked about law enforcement connections. But I should have asked another question, as well. And that is, do you think that you would have any difficulty being fair and impartial in listening to testimony from a law enforcement witness? In other words, do you believe that you would more likely accept a law enforcement witness's testimony or that you would be more likely to reject it just because the person is a law enforcement witness? In other words, if you think you would have any biases either for or against law enforcement witnesses, please raise your hand.

And I know that we have a hand up already --

THE COURTROOM DEPUTY: 23.

THE COURT: -- from somebody. But anybody else in the back.

Mr. Lew?

THE COURTROOM DEPUTY: Juror Number 30?

THE COURT: Yes, I've got that, Mr. Lew.

Anybody else?

THE COURTROOM DEPUTY: That's it, Judge.

MS. HARRIS-CALVIN: I'm sorry, Your Honor. Do you have 23?

THE COURTROOM DEPUTY: We do have 23 --

MS. HARRIS-CALVIN: Do you have 23?

THE COURTROOM DEPUTY: -- from before.

THE COURT: Yes, I have 23.

MS. HARRIS-CALVIN: Oh, okay.

THE COURT: All right. I'm going to review some legal principles with you, and I'm going to ask you whether you have any difficulty accepting these. Under the law, the facts are for the jury to decide and the law is for the Court for me. The two areas are separate and distinct. At the end of the case, I will instruct the jury on the law and the jury is required to accept the law as I explain it. In other words, if you are on the jury, you must accept the law as I explain it, as I charge you with it, even if you disagree with my explanation.

If you believe that you would have any difficulty

following this instruction, please raise your hand?

THE COURTROOM DEPUTY: No, Judge.

THE COURT: Now, a defendant in a criminal case has the right not testify. If the defendant here does not testify, the jury may not draw any inference against him based on that decision. The fact that a defendant chooses not to testify may not enter into the jury's deliberations at all.

If you have any difficulty accepting this legal principle, please raise your hand.

THE COURTROOM DEPUTY: No, Judge.

THE COURT: Under the law, a defendant is presumed innocent and cannot be found guilty of the crimes charged in the Indictment unless a jury after having heard all the evidence unanimously decides that the evidence proves his guilt beyond a reasonable doubt.

If you would have any difficult accepting and applying these principles, please raise your hand.

THE COURTROOM DEPUTY: No, Judge.

THE COURT: In a criminal case, as I have suggested, the burden of proof remains with the prosecution. For the jury to return a verdict of guilty the prosecution, the Government, most prove beyond a reasonable doubt the defendant's guilt. A person charged with a crime has absolutely no burden to prove that he is not guilty.

If you would have any difficulty applying theses principles, please raise your hand.

THE COURTROOM DEPUTY: No, Judge.

THE COURT: You are required by law to make your decision based solely on the evidence or the lack of evidence presented in Court and not on the basis of conjecture, suspicion, sympathy, or prejudice.

If you would have any difficulty following this principle, please raise your hand.

And under the law, the question of punishment is for the Court alone, for me, to decide. And thus, the issue of punishment should the defendant be found guilty, it may not enter into your deliberations at all.

Are any of you unable to accept that proposition, and if so, please raise your hand.

Have any of you sat as a juror before in any type of case?

If so, please raise your hand.

THE COURTROOM DEPUTY: Your Number 10 and 14, first row.

THE COURT: All right. Let's go row by row.

Juror Number 10, I want you tell me when you sat; whether it was State or Federal, if you recall; whether it was criminal or civil, if you recall; and whether you reached a verdict. Don't tell me what the verdict is. I

just want to know whether you reached a verdict.

PROSPECTIVE JUROR: It was three years ago here in Federal Court. It was a civil case.

THE COURT: All right. Did you reach a verdict?

PROSPECTIVE JUROR: Yes, we did.

THE COURT: All right. Thank you.

Juror Number 14.

PROSPECTIVE JUROR: It was a criminal case, I believe, in state. It was a long time ago.

THE COURT: And where was it?

PROSPECTIVE JUROR: In Manhattan.

THE COURT: All right.

PROSPECTIVE JUROR: And we did reach a verdict.

THE COURT: You did right a verdict?

PROSPECTIVE JUROR: We did.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR: Oh, there was another one.

THE COURT: Okay.

PROSPECTIVE JUROR: There was another case that I was an alternate. I think it was here, civil.

THE COURT: And --

PROSPECTIVE JUROR: And a verdict was reached. But I think I was actually dismissed the last day, because I wasn't needed anymore.

THE COURT: All right. Thank you.

(Continuing.)

THE COURT: Anybody else, prior jury service?

THE COURTROOM DEPUTY: Juror Number 18.

THE COURT: Juror Number 18.

THE PROSPECTIVE JUROR: The year was 2020, it was a civil case in the state of Maryland. We did reach a decision.

THE COURT: Thank you.

Anybody else, prior jury service?

THE COURTROOM DEPUTY: Juror Number 24 -- I'm sorry 29.

THE COURT: 29.

THE PROSPECTIVE JUROR: I was on the grand jury about eight years ago, I would say.

THE COURT: State or federal?

THE PROSPECTIVE JUROR: State.

THE COURTROOM DEPUTY: Sorry, there's another hand up in the first row.

Juror Number 12.

THE PROSPECTIVE JUROR: Oh, sorry. Yeah, it was also grand jury about 25 years ago, Suffolk County.

THE COURT: All right. Thank you.

Anybody else?

THE COURTROOM DEPUTY: That's it, Judge.

THE COURT: Okay. Now those of you who have had prior jury service or grand jury service, was there anything

about your experiences as a juror or as a grand juror that would make it difficult for you to be fair and impartial in this case? If so, please raise your hand.

THE COURTROOM DEPUTY: No, Judge.

THE COURT: Okay.

All right. Have any of you or a family member or a close friend been the victim of a crime? The victim of a crime.

Let's start with the first row. Anybody? Victim of a crime?

THE COURTROOM DEPUTY: Juror Number 14.

THE COURT: All right. So just tell me briefly what it was, when it happened.

THE PROSPECTIVE JUROR: A good friend was a victim of sexual assault.

THE COURT: For what? A good friend.

THE PROSPECTIVE JUROR: Yeah. And also burglary. I mean, I had lots of -- I feel like several experiences. That was a long time ago. That was probably 25 years ago.

THE COURT: Okay. I will come back to you.

How about any -- you mentioned other experiences. Anything else of significance?

THE PROSPECTIVE JUROR: No.

THE COURT: No. Okay.

Second row. Victim of a crime? Anybody?

Third row. Victim of a crime?

THE COURTROOM DEPUTY: Juror Number 25.

THE COURT: Juror Number 25.

THE PROSPECTIVE JUROR: Family history.

THE COURT: Family history?

THE PROSPECTIVE JUROR: Yes.

THE COURT: I'm going to talk to you, or follow-up anyway, and I will ask you about that.

Anybody else?

Okay. Have any of you or a family member or close friend ever participated in a court case, state or federal, civil or criminal, either as plaintiff, a defendant, a witness? A party or a witness in a court case, civil or criminal?

Juror Number 25. I am going to follow up with you.

Anybody else?

THE COURTROOM DEPUTY: Juror Number 5.

THE COURT: What was that?

THE COURTROOM DEPUTY: Juror Number 5.

THE COURT: Yes.

THE PROSPECTIVE JUROR: A family member.

THE COURT: Okay. I am going to follow up with you anyway.

Anybody else?

THE COURTROOM DEPUTY: Juror Number 9.

THE PROSPECTIVE JUROR: My father, a witness.

THE COURT: When was that?

THE PROSPECTIVE JUROR: 10 or 15 years ago.

THE COURT: What kind of a case?

THE PROSPECTIVE JUROR: Civil.

THE COURT: Anything about his experience as a witness in that case that would affect your ability to be fair and impartial?

THE PROSPECTIVE JUROR: No.

THE COURT: Anybody else?

THE COURTROOM DEPUTY: That's it, Judge.

THE COURT: Okay.

To the extent it's not covered by my prior question, have you or a family member or close friend ever been the subject of any investigation or accusation by any grand jury or other governmental body? If so, please raise your hand.

THE COURTROOM DEPUTY: Juror Number 25.

THE COURT: Okay. I'm going to follow up with you anyway.

Anybody else?

THE COURTROOM DEPUTY: No, Judge.

THE COURT: Okay. So, I think that completes my initial round of questions. Some of you have raised issues. I am going to follow up with you individually. The way we're going to do that is ask all of you, as well as the prospective

jurors in the back, to go to our other courtroom. There are restrooms that Mr. Joe will show you. And then we're going to call in the jurors who raised their hands in response to some of the questions one by one and I will ask you some follow-up questions.

Thank you for your patience. You can follow Mr. Joe.

THE COURTROOM DEPUTY: Don't leave the floor. Just stay in the room they were in before?

THE COURT: Oh, yes.

First of all, don't discuss the case with anyone, not even with each other while you're waiting. Its really important that you not discuss the case.

Do they have their phones?

THE COURTROOM DEPUTY: No they don't.

THE COURT: Okay. Well, don't go do any investigation or research. Keep an open mind. You haven't heard anything.

If you see the lawyers or court staff in the hallways, they will not talk to you. They're not permitted to talk to you. They're not being rude; they just are not permitted to talk to you.

Thanks very much.

THE COURTROOM DEPUTY: Let's go back to courtroom 6A, as in apple. 6A.

MS. THEODORA: Your Honor, would you mind if I went to the restroom?

THE COURT: No, that's fine. But let them walk out first. We'll take a short break.

(Prospective jurors exit.)

THE COURT: Okay. Let's take a five-minute break and then we'll do the individual follow-up.

MS. HARRIS-CALVIN: You said five minutes? Five?

THE COURT: Five minutes.

MS. HARRIS-CALVIN: Okay.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

Permission to bring Juror Number 3 in.

THE COURT: Yes.

THE COURTROOM DEPUTY: Please be seated.

THE COURT: Thank you. Be seated.

THE COURTROOM DEPUTY: Juror Number 6 is where he is going to sit.

THE COURT: Okay, good?

Did you say 6?

THE COURTROOM DEPUTY: 3.

THE COURT: Got it, got it.

(Pause in proceedings.)

THE COURTROOM DEPUTY: Juror Number 3.

(Prospective juror enters.)

THE COURT: Ms. Delgado, thank you for coming in. Just have a seat right there.

So you raised your hand in response first to a question about the nature of the case. Was there something there that would make it difficult for you to be fair and impartial?

THE PROSPECTIVE JUROR: Yes. I am the survivor of childhood sexual abuse. But I do believe that he has the right to a fair trial and I don't want to interfere with that. And it happened, the man who did it happened to have passed away a year ago last week, so it has been something I've been particularly struggling with.

THE COURT: When did the abuse take place?

THE PROSPECTIVE JUROR: Between the ages of 7 and 12.

THE COURT: Went on for five years? Yes? You need to say yes or no.

THE PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

You have a scheduling issue?

THE PROSPECTIVE JUROR: No. Well, there is a crisis staffing at work. I work at a daycare, and if we aren't sufficiently staffed, we can't lock the doors, and then the children just can't attend for that day.

THE COURT: How old are the children?

THE PROSPECTIVE JUROR: Between 2 and 4.

THE COURT: Okay. You can have your seat back in the courtroom. Thank you. Just leave the microphone on the chair.

And thank you. We will discuss it. Thank you.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 5.

(Prospective juror enters.)

THE COURT: See where the microphone is? Just have a seat there and speak microphone. Thank you.

THE PROSPECTIVE JUROR: Where?

THE COURT: You just walked by it. The seat with the microphone.

There you go. Thank you.

So you raised your hand a few times. Do you think you would have difficulty being fair and impartial in this case?

THE PROSPECTIVE JUROR: Well, let me give you a bit of background.

I have my bachelor's degrees in forensic psychology. One of my daughters, her minor is criminal justice. My oldest daughter is in law school and have worked for the Department of -- specifically for the State of Ohio Department of Children Services.

I am an educator, and I've heard students coming to

me where their family members have experienced horrible things with sexual harassment. So I kind of feel that I don't think I am the right person to sit on these seats.

THE COURT: Well, do you --

THE PROSPECTIVE JUROR: I don't know.

THE COURT: As I said during my remarks, you know, the nature of the crime, these are difficult crimes. The evidence is difficult evidence. But, you know, sometimes citizens have to do their duty even if it's an unpleasant duty. The question is if -- I mean, if you're -- I would think that if your, you know, your daughter in law school, forensic psychiatry, you would want to get at the right answer, whatever the right answer is.

Do you think if you were to be on the jury and to take the oath to decide the case fairly and honestly, you could honor the oath?

THE PROSPECTIVE JUROR: Well, I don't know. I also have an underaged daughter who -- maybe. I don't know if I can give you my full -- I guess I don't know. I really don't know.

THE COURT: You don't know?

THE PROSPECTIVE JUROR: I don't know if I can be fair. I don't know if I can be fair, morally fair to this whole thing. It's hard for me to sit here and hear this type of case when I have three daughters and hear cases similar to

that in my experiences. I don't know.

THE COURT: Well, I mean, do you think you would have trouble applying the concepts that I described? Presumption of innocence?

THE PROSPECTIVE JUROR: I don't know.

THE COURT: Okay. Leave the microphone. We will think about it.

THE PROSPECTIVE JUROR: Thank you.

(Prospective juror exits.)

(Prospective juror enters.)

THE COURTROOM DEPUTY: Have a seat right here.

THE COURT: The seat with the microphone. Thank you.

THE COURTROOM DEPUTY: This is Juror Number 7.

THE COURT: Yes, Ms. Wagner.

THE PROSPECTIVE JUROR: Hi.

THE COURT: Hi.

Now, you raised your hand in response to the question about whether you might have difficulty with respect to the nature of the crimes charged, the nature of the evidence.

Can you elaborate?

THE PROSPECTIVE JUROR: When my parents divorced, I don't know all of the details, but I know that my father was investigated for similar charges. I don't believe he -- much

came of it. I wasn't exactly surprised to learn that, though.

THE COURT: Well, when you say you weren't surprised to learn that, why?

THE PROSPECTIVE JUROR: Nothing ever happened to me personally. I was pretty young, like 12. I just -- I had had suspicions.

THE COURT: Well, do you think -- and in the end, he was never -- was he ever arrested, charged?

THE PROSPECTIVE JUROR: Not to my knowledge. We've had no contact since like 2010, 2011.

THE COURT: Okay. Now, do you think you would have difficulty being fair and impartial in this case? Do you think you could render a verdict based solely on the evidence against the defendant, or the lack of evidence?

THE PROSPECTIVE JUROR: Honestly, I don't think so, just because I do believe my father is guilty and I believe that -- I think people investigating these types of crimes, it's not easy, and I think they understand how high the stakes are and they don't issue indictments without having enough evidence, usually.

THE COURT: All right. You can have a seat in the other courtroom. We will think about it.

THE PROSPECTIVE JUROR: Thank you.

(Prospective juror exits.)

THE COURTROOM DEPUTY: This is Juror Number 8.

(Prospective juror enters.)

THE COURT: Juror Number 8, Mr. Smith.

Can you just sit where the microphone is and speak to the microphone, please? Thank you.

You raised your hand in response to questions about the nature of the charged crimes, the nature of the evidence. Can you -- do you think you would have difficulty being fair in this case?

THE PROSPECTIVE JUROR: Definitely.

I also think I should have raised my hand to a couple of the other questions as well. But, yeah, to elaborate I'm assuming is what you want me to do?

THE COURT: Yes.

THE PROSPECTIVE JUROR: My close high school teacher is a convicted pedophile. That was a whole experience.

My aunt was a -- before I was born was a victim of assault, so that whole area of my -- I was raised, like, by a blood-thirty mother when it comes to this, so I'm very predispose today that. Combined with the -- I'm a gay guy, and the stereotype of us being, like, predators and that nature, it's just a very triggering subject area for me, and I just cannot be impartial in this department.

THE COURT: Have a seat in the other courtroom. Thank you.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 10.

(Prospective juror enters.)

THE COURT: Yes, Ms. Duff. Thank you.

You raised your hand in response to, there was a question about sex crimes.

THE PROSPECTIVE JUROR: Yes.

THE COURT: Do you want to tell me what that was?

THE PROSPECTIVE JUROR: Oh. It was just my mother's job. She was a probation officer.

THE COURT: Right. And where was that?

THE PROSPECTIVE JUROR: In Essex County, in Jersey.

THE COURT: How long was she a probation officer?

THE PROSPECTIVE JUROR: 25 years.

THE COURT: And did she -- so she supervised individuals who have already been convicted?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Did she have any defendants who had been convicted of child abuse or child pornography cases, to your knowledge?

THE PROSPECTIVE JUROR: I don't think so.

THE COURT: Was there anything about her experience as a probation officer that would make it hard for you to be fair and impartial in this case?

THE PROSPECTIVE JUROR: No, I don't believe so.

THE COURT: Thank you. You can put the microphone

down and go back to the other courtroom. Thank you.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 14.

(Prospective juror enters.)

THE COURTROOM DEPUTY: This is Juror Number 14.

THE COURT: Pull that chair out a little bit so people can see. Thanks.

Ms. Raskin, thank you for coming in.

THE PROSPECTIVE JUROR: Sure.

THE COURT: Someone works for a sexual abuse or similar organization?

THE PROSPECTIVE JUROR: It's not really exactly that. I am a documentary film producer, and I have produced quite a number of films on that topic and worked closely on impact campaigns to raise awareness to that.

THE COURT: And some of the organizations you worked with?

THE PROSPECTIVE JUROR: So one of the films is called *Another Body*, and I worked with several organizations, but it's about intimate image abuse online. I've worked on several films about sexual abuse and sexual assault, a film called *The Hunting Ground*, a film called *Allen v. Farrow*. Just been an area I've worked on as a producer.

THE COURT: And did those documentaries have a particular bend or leaning?

THE PROSPECTIVE JUROR: They're definitely about, you know, highlighting abuse that goes either unprosecuted or, you know, unrecognized in its kind. But, yeah. But not a particular -- they're journalistic films.

THE COURT: Journalistic films.

THE PROSPECTIVE JUROR: Yeah.

THE COURT: All right.

Do you think you would have difficulty being fair and impartial in this case because of that?

THE PROSPECTIVE JUROR: No, I don't.

THE COURT: I think you mentioned you had a friend who was the victim of sexual abuse.

THE PROSPECTIVE JUROR: Yeah. I can't believe more people didn't raise their hand, to be honest. But, yeah, I mean, a good friend, yeah, was sexually assaulted. This was 20 years ago. And she pressed charges.

THE COURT: She was an adult?

THE PROSPECTIVE JUROR: She was an adult, yeah; like 21, 22.

THE COURT: Anything about her experience that would make it hard for you to be fair and impartial in this case?

THE PROSPECTIVE JUROR: I don't think so.

THE COURT: Thank you. You can go back to the other courtroom.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 17.

(Prospective juror enters.)

THE COURT: Hi, Juror Number 17.

THE PROSPECTIVE JUROR: Yes.

THE COURT: Ms. Deonarine.

THE PROSPECTIVE JUROR: Yes.

THE COURT: You had a scheduling issue?

THE PROSPECTIVE JUROR: Yeah, for my kids. I just don't want to have any conflict. They have after school practices, which normally starts around 5:45 they have to be at school. In the morning, as early as 7:00 in the morning they have to be there. I just don't want it to conflict with me getting here on time or leaving in time.

THE COURT: We're going to sit 9:30 to 4:30. We're going to end at 4:30 sharp. I don't keep going. I tell the jurors 4:30; I end at 4:30.

THE PROSPECTIVE JUROR: Perfect. So that should be fine.

THE COURT: Okay, thank you. You can go back to the other courtroom.

(Prospective juror exits.)

THE COURT: Vic, let's do two more and then stop.

(Prospective juror enters.)

THE COURT: Mr. Rao, just have a seat and grab the microphone please.

You have a scheduling issue?
THE PROSPECTIVE JUROR: Yeah. So I'm graduate student at Columbia and I have finals this week.
THE COURT: You have finals this week?
THE PROSPECTIVE JUROR: Yes.
THE COURT: How many finals do you have?
THE PROSPECTIVE JUROR: One.
THE COURT: When is the final?
THE PROSPECTIVE JUROR: Friday.
THE COURT: Okay. Thank you. You can go back to the other courtroom.
(Prospective juror exits.)
THE COURTROOM DEPUTY: I know you said one more. Can I bring two more? Because I have them in the back.
THE COURT: Yes, two more.
THE COURTROOM DEPUTY: Juror Number 20.
THE COURT: Yes.
(Prospective juror enters.)
THE COURT: Ms. Cacciatore, thank you for coming in.
THE PROSPECTIVE JUROR: Mm-hm.
THE COURT: You raised your hand in response to the question about the nature of the charges, whether you might have any difficulty being fair. Is that still the case? You still have some questions?
THE PROSPECTIVE JUROR: Yes, that would be. I don't

think I could be impartial. I did raise my hand about close friends having past sexual abuse in their childhood and in their family, so I had experience dealing with their traumas.

THE COURT: You don't need to tell me their names, but just describe who are they, how old were they, if you know.

THE PROSPECTIVE JUROR: They were kids.

THE COURT: How many?

THE PROSPECTIVE JUROR: One case is a friend of mine, and it started in childhood, so, like, when she was young, a couple of years when she was young by her father.

And my other is an older, she had -- it was a coworker who touched her inappropriately when drinking.

So those are two close friends that experienced this.

And I am also in online spaces for cartoons and comics, and so I'm in those spaces on social media where this type of thing occurs and I am aware of how it happens.

THE COURT: If you are put on the jury and take the oath to decide the case fairly and impartially, do you think you would have trouble honoring your oath?

THE PROSPECTIVE JUROR: I think I would listen to the evidence provided and try, but I'm not sure.

THE COURT: Okay. You can go back to the other courtroom. Thank you.

THE PROSPECTIVE JUROR: Thank you so much.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 23.

(Prospective juror enters.)

THE COURTROOM DEPUTY: This is Juror Number 23.

THE COURT: Yes.

Mr. Palacino, thank you for coming in.

First, you have a scheduling issue?

THE PROSPECTIVE JUROR: Yes, I do.

THE COURT: What's that?

THE PROSPECTIVE JUROR: May 7th I have an oral surgery scheduled. I have three extractions planned. I am dealing with that pain right now, actually.

THE COURT: That's Thursday?

THE PROSPECTIVE JUROR: That's Thursday, May 7th.

THE COURT: And you also thought you might have difficulty being fair because of -- you have relationships with law enforcement officers?

THE PROSPECTIVE JUROR: Yes, very close. My best man at my wedding is a detective. I've been engulfed in it my whole life. I'm not a cop, but I feel like I am half the time.

THE COURT: Do you think that cops will -- some cops will lie from time to time?

THE PROSPECTIVE JUROR: Of course; absolutely.

THE COURT: You wouldn't be able to sit here and evaluate the witnesses fairly and see whether these particular law enforcement officers were lying or telling the truth?

THE PROSPECTIVE JUROR: I could absolutely do my very best, yes.

THE COURT: Okay. You can have a seat. Thank you. We will talk about it.

THE PROSPECTIVE JUROR: Okay. Thank you.

(Prospective juror exits. )

THE COURT: I thought we should go through and do some applications for cause while things are fresh in our minds.

Juror Number 3 I would be inclined to excuse because she was sexually abused from the time she was 7 to 12.

Any objection?

MS. THEODORA: No, Your Honor.

MS. HARRIS-CALVIN: No. Thank you.

THE COURT: I will excuse Juror Number 3, Ms. Delgado.

(Prospective juror is excused.)

THE COURT: Juror Number 5, I don't know that she's being completely honest with us, but in light of what -- at least her statements, I'm inclined to excuse her for cause.

Any objection?

MS. THEODORA: No, Your Honor.

MS. HARRIS-CALVIN: No. Thank you.

THE COURT: Juror Number 5 is excused.

(Prospective juror is excused.)

THE COURT: Juror Number 7, she thinks her father was guilty of sexual abuse and she can't be fair. Again, who knows if it's really true, but in light of what she said, I will be inclined to excuse her.

Any objection?

MS. THEODORA: No, Your Honor.

MS. HARRIS-CALVIN: No.

THE COURT: I will excuse Juror Number 7, Ms. Wagner.

(Prospective juror is excused.)

THE COURT: Juror Number 8, what are your thoughts? It's a closer call. Request to excuse him for cause?

MS. HARRIS-CALVIN: Yes, Your Honor. I think we think he should be excused for cause. He talked about his mother being blood-thirsty, raised in that home with respect to people who have committed sex crimes, his high school teacher being a pedophile, he called him, and it being some kind of difficult experience for him, and then the stereotype about gay men.

THE COURT: What's the Government's view?

MS. THEODORA: We have no objection.

THE COURT: Okay. Juror Number 8 is excused.

MS. HARRIS-CALVIN: Thank you.

(Prospective juror is excused.)

THE COURT: I'm fine with Number 10. I'm fine with 14.

Any applications?

MS. HARRIS-CALVIN: Actually, in terms of Number 14, she said she was involved in several sex assaults-related documentary films, including the one about Woody Allen and Mia Farrow, and that movie is about him being with his adopted daughter. You know, films called *Hunting Ground* and *Another Body*, it just sounds like a pretty --

THE COURT: The request is denied. She was doing it as a journalist and she didn't hesitate, she said she could be fair. Application denied.

Juror Number 17 is fine.

Juror Number 19 is the graduate student who has got an exam, one exam this week on Friday. I am inclined to deny his request.

Any objection to my denying it?

MS. HARRIS-CALVIN: Only that, you know, he might, one, be distracted because he's studying for his finals.

THE COURT: Plus he's got a half day on Wednesday.

MS. HARRIS-CALVIN: And might rush to a verdict.

THE COURT: Is that an application or is that just a comment?

MS. HARRIS-CALVIN: It's an application for cause.

THE COURT: The application is denied. You can -- I don't think that's a sufficient basis.

Let's see what happens. If we have a lot of people left over, maybe I will reconsider. But for now, denied.

Juror Number 20?

MS. HARRIS-CALVIN: I would say that this person, Caelin, said that they couldn't be impartial because of sex abuse of friends and such, and she struggled.

THE COURT: She said she would try.

What's the Government's view?

MS. THEODORA: We don't have an objection to striking her for cause.

THE COURT: Okay. I'll excuse her, Number 20.

(Prospective juror is excused.)

We have about 28 in the back, thereabouts?

THE COURTROOM DEPUTY: I lost one. I lost Juror Number 58. She went somewhere.

THE COURT: We have 27. Just keep that in mind.

THE COURTROOM DEPUTY: Okay.

THE COURT: I would be inclined to excuse Juror Number 23 if he's got oral surgery scheduled on Thursday.

Any objection?

MS. THEODORA: No, Your Honor.

MS. HARRIS-CALVIN: No. Thank you.

THE COURT: Okay. I will excuse Juror Number 23.

Let's do the rest of them. We have 24, 25, 26, 27, 29, 30. A lot of them. 31, 32.

(Prospective juror enters.)

THE COURTROOM DEPUTY: Your Honor, Juror Number 24.

THE COURT: Thank you.

Ms. Mockin, just the seat that's pulled out, and there's a microphone there for your use.

(Continued on the next page.)

(Continuing.)

THE COURT: All right. So we have a scheduling issue?

PROSPECTIVE JUROR: Yes. Because I'm having a -- my brother's having his last *bar mitzvah* for his last son and he's from a divorced family, so it's a big mess.

THE COURT: Where is the --

PROSPECTIVE JUROR: It's in Montreal.

THE COURT: Where is -- when is it?

PROSPECTIVE JUROR: Friday morning.

THE COURT: When were you planning on traveling?

PROSPECTIVE JUROR: Wednesday night.

THE COURT: Wednesday night?

PROSPECTIVE JUROR: (No verbal response.)

THE COURT: Okay. You can have your seat in the other room.

Thank you.

(Prospective juror exits.)

THE COURT: Vic, just one second.

THE COURTROOM DEPUTY: Sorry about that.

THE COURT: Just I want to -- is there any objection to excusing Juror Number 25 who raised her hand about eight times?

MS. THEODORA: No, Your Honor.

MS. HARRIS-CALVIN: No, Your Honor.

THE COURT: Just tell her she can go back to the other courtroom.

THE COURTROOM DEPUTY: Do you want 26?

THE COURT: Yes, I'll take 26.

(Prospective juror enters.)

THE COURT: Juror Number 26, have a seat.

Mr. Irizarry have a seat please. And there's a microphone -- you just sat on the microphone.

Okay. Thank you. You said you have a scheduling issue?

PROSPECTIVE JUROR: Yes.

THE COURT: What's the scheduling issue?

PROSPECTIVE JUROR: I'm going on vacation May 17th.

THE COURT: That's the scheduling issue?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. You are -- you can have your seat in the other courtroom.

PROSPECTIVE JUROR: Thank you.

THE COURT: Thank you.

(Prospective juror exits.)

(Prospective juror enters.)

THE COURT: Ms. Mahpour, take a seat right there. Grab the microphone please.

Thank you.

You raise your hand about the nature of the charges, the nature of the evidence?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you think you would have difficulty being fair and impartial in this case.

PROSPECTIVE JUROR: I think so --

THE COURT: Can you --

PROSPECTIVE JUROR: -- yeah.

THE COURT: -- tell us why?

PROSPECTIVE JUROR: I think the subject matter is really difficult, and I think -- that, like, when I heard the charges, I was holding back tears. So I think I'm going to be too emotional, and it's going to be really hard for me to keep an opened mind.

THE COURT: So you don't think you would be able to listen to the evidence and hold judgment until after you heard all the evidence?

PROSPECTIVE JUROR: I don't think so. I don't think so. I mean --

THE COURT: Is there anything in your background, in your experiences that would cause you to be particularly sensitive? And as I said, these are difficult matters for everyone.

PROSPECTIVE JUROR: Yeah.

I mean, there was -- there is stuff from my

childhood. I don't know, like, how much detail I have to go into, I mean...

THE COURT: You can have a seat in the other courtroom. We'll think about it. Thank you.

You can just leave the microphone in your chair.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 29 coming in.

(Prospective juror enters.)

THE COURT: Yes. Mr. Small, this chair right up here that's been pulled out and there's the microphone. Please grab the microphone.

PROSPECTIVE JUROR: Sure.

THE COURT: Thank you.

You have a scheduling issue? Tell us what that is.

PROSPECTIVE JUROR: I do, yes. I have vacation on Wednesday, I won't be back until Sunday.

THE COURT: All right. Where are you going roughly?

PROSPECTIVE JUROR: The Bahamas.

THE COURT: Who are you going with?

PROSPECTIVE JUROR: My wife.

THE COURT: Okay. You can have your seat in the other jury room.

PROSPECTIVE JUROR: Thank you.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 30?

(Prospective juror enters.)

THE COURTROOM DEPUTY: Have the seat that's pulled out.

THE COURT: Right. Keep walking Mr. Lew, the seat with the -- there's a microphone in it.

Thank you.

You have a cousin who was a police officer?

PROSPECTIVE JUROR: Yes, yes.

THE COURT: And you said you might have difficulty with respect to law enforcement witnesses?

PROSPECTIVE JUROR: I guess. I watch a lot of crime --

THE COURT: Crime?

PROSPECTIVE JUROR: -- movies.

THE COURT: All right. You can't believe everything you see on TV right.

PROSPECTIVE JUROR: Yeah. So I watch a lot of TV.

THE COURT: Okay. You understood what I said about the --

PROSPECTIVE JUROR: Yes --

THE COURT: -- Government having --

PROSPECTIVE JUROR: -- and actually I don't mind.

THE COURT: -- and the Government has to prove --

PROSPECTIVE JUROR: Right.
THE COURT: -- beyond a reasonable doubt?
PROSPECTIVE JUROR: Right.
THE COURT: One of us has to speak at a time. Only one of us can speak at a time.
PROSPECTIVE JUROR: All right, sir.
THE COURT: And if you even watched TV, you see sometimes on TV cops lie, right on TV?
PROSPECTIVE JUROR: Yes.
THE COURT: And sometimes they tell the truth.
PROSPECTIVE JUROR: Yes.
THE COURT: And do you believe that you would be able to evaluate the testimony of law enforcement officers fairly and impartially? You would listen to them, see how they do on direct, see how they do on cross-examination, consider their testimony with all of the other evidence in the case, and then be able to make a decision on whether they are lying or telling the truth?
PROSPECTIVE JUROR: Yes.
THE COURT: Do you think you could do that?
PROSPECTIVE JUROR: Yes. I think, yeah.
THE COURT: And if you take the oath to decide the case fairly and impartially, do you believe you can honor the oath?
PROSPECTIVE JUROR: Yeah.

THE COURT: All right. You can have a seat in the other courtroom.

PROSPECTIVE JUROR: Thank you.

THE COURT: Thank you.

(Prospective juror exits.)

(Prospective juror enters.)

THE COURT: Ms. Guan, thank you for coming in. Have a seat. Grab the microphone.

Do you have a scheduling issue?

PROSPECTIVE JUROR: Yeah. I'm on my Master's course, so right now it's final season and right now I have a lot of presentation and finals to prepare for this week and next week.

THE COURT: When are your exams?

PROSPECTIVE JUROR: They're scheduled to be next week.

THE COURT: Next week.

How many do you have?

PROSPECTIVE JUROR: I have three.

THE COURT: And you're a Master's student, you said?

PROSPECTIVE JUROR: Yeah.

THE COURT: What year is this that you're in?

PROSPECTIVE JUROR: First year.

THE COURT: Okay. We'll think about it.

PROSPECTIVE JUROR: Thank you.

THE COURT: You can have your seat.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Juror Number 32. This is 32.

(Prospective juror enters.)

THE COURTROOM DEPUTY: Yes, Juror Number 32.

THE COURT: You can have a seat there pulled out. There's a microphone is it.

This is Ms. Osei-Gyening.

You said you had a scheduling issue, what is that?

PROSPECTIVE JUROR: I do have appointment with a doctor on for tomorrow, my knee.

And also my religion is -- does not permit me to serve.

THE COURT: And what -- can you describe that?

PROSPECTIVE JUROR: I'm Pentecostal, Christian.

THE COURT: And you cannot serve because you can't --

PROSPECTIVE JUROR: In terms of judging, I'm not -- you know. My religion doesn't really allow me to.

THE COURT: Okay. You can put the microphone down. Have a seat in the other courtroom. We'll think about it.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Return back to 6A. Thank you.

THE COURT: Apparently Juror Number 9 has raised an issue with Mr. Joe, so we're going to bring him in.

(Prospective jurors enters.)

THE COURTROOM DEPUTY: Have a seat there.

This is Juror Number 9.

THE COURT: Mr. Mellin.

There's a microphone right there. Just grab that seat.

Thank you.

You apparently have a question?

PROSPECTIVE JUROR: Yes -- yeah. You asked about law enforcement but not about EMTs in the family, and I do have a nephew who is an EMT in New Jersey and has responded to calls for alleged abuse of minors.

THE COURT: All right. How long has he been an EMT?

PROSPECTIVE JUROR: About three years now.

THE COURT: Has he talked to you about these cases?

PROSPECTIVE JUROR: He's told me, like, the impact of going and seeing those things.

THE COURT: All right. Do you think you would have trouble be fair and impartial in this case because of

his experiences?

PROSPECTIVE JUROR: I think so. Seeing what its impact on a person, it could affect --

THE COURT: Well --

PROSPECTIVE JUROR: -- because of bias.

THE COURT: -- the Government has to prove -- do you understand --

PROSPECTIVE JUROR: No, I understand. I just wanted --

THE COURT: -- the Government has to --

One at a time -- only one of us can talk at a time.

The Government has to prove that Mr. John did the crimes he is charged with.

Do you understand that, right?

PROSPECTIVE JUROR: I do understand that.

THE COURT: Do you understand that he is presumed innocent?

PROSPECTIVE JUROR: I do understand that.

THE COURT: And the Government, therefore, has to prove he is guilty beyond a reasonable doubt, and I will explain all of that.

Do you think that?

PROSPECTIVE JUROR: Yes.

THE COURT: And if you are a juror in the case and

you take the oath to decide the case fairly and impartially, do you think you would have any difficulty honoring your oath?

PROSPECTIVE JUROR: No, I would honor my oath.

THE COURT: Okay. You can go back to the other courtroom.

Thank you.

(Prospective juror exits.)

THE COURTROOM DEPUTY: That's it.

THE COURT: Applications for cause on the additional prospective jurors? Let's see, Juror Number 24, *bar mitzvah* in Montreal. She's leaving on Wednesday. I'm going to excuse her.

Any objection?

MS. THEODORA: No objection.

MS. HARRIS-CALVIN: No, Your Honor.

THE COURT: Juror Number 26, vacation is March -- I mean, May 17th. That's not a problem.

Juror Number 27, I guess if she was tearing hearing the description. Any objection to me excusing her?

MS. THEODORA: No objection.

MS. HARRIS-CALVIN: No, Your Honor. Thank you.

THE COURT: I'll excuse Juror Number 27. I think she was being genuine.

Juror Number 29, Mr. Small is going on vacation on

Wednesday. These should be screened out downstairs, but I'll excuse him. Number 29.

Juror Number Juror Number 31, the Master's graduate student, I'm not inclined to excuse her in light of the other -- it's next week, and I think she'll have a half day Wednesday and hopefully, you know, so I'm inclined not to. But if anybody wants to make that application, you can.

MS. HARRIS-CALVIN: I guess I would say that I know it's been awhile since any of us have been in school, but I think the week before finals is pretty intense. I imagine both of those jurors are going to be very distracted and will crash the verdict.

THE COURT: The application's denied. I'm going to keep here.

And then I would be inclined to excuse Juror Number 32. She's got both a doctor's appointment and it's against her religious. I'm not sure I buy it.

But any objection to my excluding Juror Number 32?

MS. HARRIS-CALVIN: No, Your Honor.

MS. THEODORA: Your Honor, we do have one additional application for cause.

THE COURT: Oh, yes.

MS. THEODORA: The -- Number 18, the man who said not guilty when he walked in.

THE COURT: I did not hear it. He apparently said

that right when their names were being stated, and it -- it sounds like it was a joke.

I would bring him in if you want me to bring him in and ask me about it?

MS. THEODORA: Yes, Your Honor.

THE COURT: Okay.

MS. THEODORA: Thank you.

THE COURT: Vic, Juror Number 18, Robert McGrew.

THE COURTROOM CLERK: And Number 30?

THE COURT: Oh, and there was 30, but I don't think there is a basis for excusing Number 30, Mr. Lew, in light of his answers to my questions.

I'm going to try to finish this and then break for lunch. I think we should be able to do that.

(Prospective juror enters.)

THE COURTROOM DEPUTY: Go down and have a seat. There's the microphone on the chair, okay?

Thank you.

THE COURT: Mr. McGrew, I just -- have a seat in that chair, and there's the microphone. Please grab it.

Now, when the prospective jurors were being put into the box and Mr. Joe confirmed that you were who you were and in seat Number 18, some heard you say "Not guilty."

Did -- did you say that and if so, did you mean anything by it?

PROSPECTIVE JUROR: Yeah, it was said -- and I did say it, but it was said in jest.

THE COURT: Okay. That's the way most people took it.

But do you think you would have any difficulty being fair and impartial in this case?

PROSPECTIVE JUROR: No, not at all.

THE COURT: All right. Thank you. You can go back to the another courtroom.

PROSPECTIVE JUROR: Thank you.

(Prospective juror exits.)

THE COURTROOM DEPUTY: Thank you.

THE COURT: All right. To the extent there is a request from the Government to excuse Mr. McGrew, it is denied.

So I think we should bring all of the new jurors into the box. I can ask them questions as a group, and then if there is, which there will be more follow-up, we'll send them back out again and then bring the additional ones in one by one, all right?

So we need a new -- let's see...

THE COURTROOM DEPUTY: So we need a replacement for Juror Number 3, Number 5, Number 7, Number 8, Number 20, 23, 24, and 25, Number 27, 29, and 32.

THE COURT: All right. So we'll just follow the

same procedure.

And so we were -- we'll start with 33, right, on the list?

THE COURTROOM DEPUTY: Yes.

THE COURT: So the first one will be Erin Reilly, will be the new 23.

THE COURTROOM DEPUTY: And you only want those particular jurors, right?

THE COURT: Well, let's bring them all in.

THE COURTROOM DEPUTY: Okay.

THE COURT: No, no, I'm sorry.

THE COURTROOM DEPUTY: Okay.

THE COURT: Put them all in their right seats, and then I'm going to ask them questions as a whole group.

THE COURTROOM DEPUTY: And the one who are excused, do you want me to excuse them now or have them come in first?

THE COURT: Wait a while.

THE COURTROOM DEPUTY: Okay.

THE COURT: Otherwise, we'll encourage others to change their answers.

(Prospective jurors enter.)

THE COURTROOM DEPUTY: All right. The following jurors have been excused, and I will have you report back to the Central Jury Room: Juror Number 3, Juror Number 5,

Juror Number 7, Juror Number 8, please report back to the Central Jury Room.

Juror Number 10, Juror Number 14, Juror Number 17, Juror Number --

THE COURT: Wait, wait, wait.

MS. ELARDO: Not 10.

THE COURTROOM DEPUTY: I'm sorry. Not 10 and 14. I'm sorry.

Juror Number -- and 17, you're also staying.

PROSPECTIVE JUROR: All right.

THE COURTROOM DEPUTY: Juror Number 20, Juror Number 23, Juror Number 24, Juror Number 25, Juror Number 27 -- no, no, no, I'm sorry.

MS. THEODORA: Yes, that's right.

PROSPECTIVE JUROR: Am I leaving?

THE COURTROOM DEPUTY: Yes.

THE COURT: 27 is excused.

THE COURTROOM DEPUTY: Juror Number 29 and 32.

(Prospective jurors exits.)

THE COURT: So we're going to replace those jurors with additional jurors -- prospective jurors.

All right. Replacing Juror Number 3, I'm going to ask Juror Number 33 to come forward.

THE COURT: Erin Reilly.

THE COURTROOM DEPUTY: Juror Number 33, Erin

Reilly?

PROSPECTIVE JUROR: Yes.

THE COURTROOM DEPUTY: You're going to sit in Seat Number 3.

Juror Number 34, you are going to replace Juror Number -- Seat Number 5.

THE COURT: Aram Parsehian or Parsehian.

THE COURTROOM DEPUTY: Juror Number 35, you are replacing Juror Number 7. So can I have you in Seat Number 7?

THE COURT: Tasha Phuntsok.

THE COURTROOM DEPUTY: Replacing Juror Number 8, can I have Juror Number 36 come forward? And that's Wendy Sandoval?

And you're going to be Juror Number -- right here.

Replacing -- Seat Number 20, I need Ms. Maria Pierides, Juror Number 37. And you are going to Seat Number 20.

Replacing Juror Number 23, can I have Juror Number 38 come forward, Jerry Brito?

THE COURT: You're Seat 23.

PROSPECTIVE JUROR: Thank you.

THE COURTROOM DEPUTY: Replacing Juror Number 24, can I have Juror Number 39 come forward? It's Paolo Barone?

PROSPECTIVE JUROR: Barone, Paolo Barone.

THE COURTROOM DEPUTY: Replacing Juror Number 25, can I have Juror Number 40 come forward, Dawa Lhamo?

PROSPECTIVE JUROR: Lhamo.

THE COURTROOM DEPUTY: Lhamo.

Replacing Juror Number 27, can I have Juror Number 51 come forward? It's Benjamin Irvine.

THE COURT: Wait, no, no.

THE COURTROOM DEPUTY: I'm sorry. No -- yes, that's --

MS. ELARDO: 41.

THE COURTROOM DEPUTY: I'm sorry.

THE COURT: 41 is now 27. 41 is Kirsten Romeo.

THE COURTROOM DEPUTY: I'm sorry, I'm sorry. This thing is out of order.

THE COURT: Yes.

THE COURTROOM DEPUTY: So Juror Number 41, Kirsten Romeo.

Replacing Juror Number 28 --

THE COURT: 29.

THE COURTROOM DEPUTY: -- 29, I'm sorry -- is Juror Number 42, Clara Latham.

THE COURT: Ms. Lathum, yes.

THE COURTROOM DEPUTY: And then replacing Juror Number 32, I need 40- -- Juror Number 43, Delfino Marin.

And that completes the --

THE COURT: Thank you.

THE COURTROOM DEPUTY: All right. Am I missing -- right, I'm still missing -- no, that's right.

THE COURT: Mr. Delfino, you're Juror Number 32 in the back there -- oh, yes, thank you.

THE COURTROOM DEPUTY: Yes.

THE COURT: Okay. Ladies and gentlemen, this does not mean you're on the jury. We're still proceeding with the process, although this means that you may be on the jury, but we'll see what happens.

So the individuals that we just added, starting with -- we added Ms. Reilly, Mr. Parsehian, Ms. Phuntsok, Ms. Sandoval, Ms. Pierides, Mr. Brito, Mr. Barone -- let me see -- Ms. Lhamo, Ms. Romeo, Ms. Lathum, and Mr. Marin.

So I'm going to ask you now whether you have any affirmative answers to any of the questions that I asked earlier today? And I trust you were listening carefully. I'll just remind you of the topics: Whether you or any family members or close friends know or had dealing with the parties, the lawyers, the organizations? I read the list of witnesses. We showed the photographs of some of the witnesses. I mentioned the locations.

Whether there -- you would have any difficulty being fair and impartial in this case because of the nature

of the charges; the nature of the evidence; whether you or any family members or close friends have had any such incidents in your lives; whether you had any participation overall in any court proceedings, any investigations; whether you served as a jury -- as a juror before; whether there is -- is any reason you might have difficulty being fair and impartial in this case.

So let me do it this way: Ms. Reilly, any --

PROSPECTIVE JUROR: No.

THE COURT: -- answers -- no.

All right. Mr. Parsehian, any affirmative answers to any questions?

PROSPECTIVE JUROR: I have friends who are attorneys, but not criminal attorneys.

THE COURT: Okay. We need a microphone.

THE COURTROOM DEPUTY: Yes.

THE COURT: Anything about your friends who are lawyers --

PROSPECTIVE JUROR: No.

THE COURT: -- their experiences that would make it hard for you to be fair and impartial?

PROSPECTIVE JUROR: No.

THE COURT: Okay.

Mr. Phuntsok, any affirmative answers to any of my questions?

PROSPECTIVE JUROR: No -- no.

THE COURT: Ms. Sandoval, any affirmative answers to any of my questions?

PROSPECTIVE JUROR: No.

THE COURT: Ms. -- in the second row, Mr. Pierides, any affirmative answers to any of my questions?

PROSPECTIVE JUROR: No.

THE COURT: All right.

Mr. Brito, any affirmative answers to any of my questions?

PROSPECTIVE JUROR: So my -- my wife's an attorney.

THE COURT: What kind of law does she practice?

PROSPECTIVE JUROR: She's a court attorney for like the New York State Criminal Court.

THE COURT: How long has she been doing that.

PROSPECTIVE JUROR: Eighteen, I think --

THE COURT: A long time.

PROSPECTIVE JUROR: A long time.

THE COURT: Eighteen years or so?

PROSPECTIVE JUROR: Yeah -- well, actually, it's over 18 years.

THE COURT: Okay. Is there anything about her experiences that would make it hard to be fair and impartial

in this case?

PROSPECTIVE JUROR: No.

THE COURT: Any other affirmative answers to any of the questions I asked?

PROSPECTIVE JUROR: And I was on a criminal -- a New York State Criminal Court case, I would say '21.

THE COURT: As a juror?

PROSPECTIVE JUROR: As a juror.

THE COURT: And did you reach a verdict in that case?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. Any other affirmative answers to my questions?

PROSPECTIVE JUROR: No.

THE COURT: Thank you.

Mr. Barone, any affirmative answers to any questions I asked?

PROSPECTIVE JUROR: No.

THE COURT: Ms. Lhamo, any affirmative answers to any questions I asked?

PROSPECTIVE JUROR: No. Thank you.

THE COURT: Ms. Romeo, any affirmative answers to any questions I asked?

PROSPECTIVE JUROR: No.

I have friends and family member whose are in law

enforcement and lawyers, but none of them ever share anything with me. So I don't think it would impact me any for this case.

THE COURT: Okay. So the family members who are law enforcement, just tell us what they are doing or where they are doing it.

PROSPECTIVE JUROR: My brother-in-law's an MTA cop.

THE COURT: Okay.

PROSPECTIVE JUROR: And the rest are attorneys.

THE COURT: All right.

PROSPECTIVE JUROR: A sergeant in Suffolk County.

THE COURT: All right.

PROSPECTIVE JUROR: And that's about it.

THE COURT: I'm sorry?

PROSPECTIVE JUROR: The lawyers are both -- they both work for the State in Long Island, and I actually don't know much of what they do.

THE COURT: All right. Is there anything about the experiences of any of those individuals that would make it difficult --

PROSPECTIVE JUROR: No.

THE COURT: -- for you to be fair and impartial?

PROSPECTIVE JUROR: I don't think so, no.

THE COURT: All right. Thank you.

Are there any other affirmative answers to any of my questions?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

Then, Ms. Lathum, any affirmative answers to the questions I asked?

PROSPECTIVE JUROR: No.

My wife worked in the DNA lab. She's a medical examiner there.

THE COURT: Is there anything about that experience that would make it hard for you to be fair and impartial?

PROSPECTIVE JUROR: No.

THE COURT: Okay.

And then Mr. Marin, any affirmative answers to the questions I asked?

PROSPECTIVE JUROR: No.

THE COURT: All right.

And just to be clear, is there any reason why you think you might have any difficulty being fair and impartial in this case, whether I ask the question before or not?

If so, please raise your hand.

THE COURTROOM DEPUTY: No one, Judge.

THE COURT: All right.

Then what I'm going to do now is I'm going to ask

each of you some individual questions so you can tell us a little bit more about you. And this is so that the lawyers can exercise their peremptory challenges. It will be the same set of questions for each of you. There may be a little bit of a follow-up and we will go in order.

Ms. Lau, what county do you live in?

PROSPECTIVE JUROR: Staten Island.

THE COURT: Staten Island.

For how long?

PROSPECTIVE JUROR: Probably -- maybe ten years.

THE COURT: All right. And before that, where did you live?

PROSPECTIVE JUROR: Brooklyn.

THE COURT: Okay. Your highest level of schooling?

PROSPECTIVE JUROR: Associate's Degree.

THE COURT: In what area?

PROSPECTIVE JUROR: Educational study.

THE COURT: All right. Current employment, are you presently employed?

PROSPECTIVE JUROR: Yeah. I'm working in the school as a paraprofessional helping students with specialties.

THE COURT: Okay. And how long have you been doing that?

PROSPECTIVE JUROR: Over nine years.

THE COURT: Marital status?

PROSPECTIVE JUROR: I'm married.

THE COURT: And does your spouse work outside the household?

PROSPECTIVE JUROR: Any husband is an MTA engineer.

THE COURT: And do you have any children?

PROSPECTIVE JUROR: Two, two daughters.

THE COURT: How old are they?

PROSPECTIVE JUROR: One is 21, the other one is 19.

THE COURT: What types of magazines, newspapers, books, websites do you read on a regular basis?

PROSPECTIVE JUROR: Facebook.

THE COURT: You do Facebook?

PROSPECTIVE JUROR: Yeah.

THE COURT: All right.

Any other social media, besides Facebook?

PROSPECTIVE JUROR: No.

THE COURT: Do you watch any television programs on a regular basis?

PROSPECTIVE JUROR: No.

THE COURT: Do you belong to any associations, clubs, unions?

PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

PROSPECTIVE JUROR: Oh, stay home. Usually -- I usually stay home and watch movies.

THE COURT: Any particular type of movies that you like to watch?

PROSPECTIVE JUROR: Oh, it's from Hong Kong, Hong Kong movies.

THE COURT: All right. Thank you.

Juror Number 2, Mr. Burnett, what county do you live in?

PROSPECTIVE JUROR: Kings County.

THE COURT: For how long?

PROSPECTIVE JUROR: Five years.

THE COURT: Before that, where did you live?

PROSPECTIVE JUROR: Suffolk County.

THE COURT: Highest level of schooling.

PROSPECTIVE JUROR: I have a Master's in public policy.

THE COURT: Current employment?

PROSPECTIVE JUROR: Administrative.

THE COURT: And for what type of a company?

PROSPECTIVE JUROR: Merchant cash advance.

THE COURT: And how long have you been doing that?

PROSPECTIVE JUROR: One and a half years.

THE COURT: One and a half?

PROSPECTIVE JUROR: (No verbal response.)

THE COURT: And what did you do before that?

PROSPECTIVE JUROR: I worked at a university.

THE COURT: All right. Marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Is there anyone else living in your household?

PROSPECTIVE JUROR: Just my father?

THE COURT: And does your father work, and if so, what does he do?

PROSPECTIVE JUROR: Retired.

THE COURT: Last employment, what did he do?

PROSPECTIVE JUROR: Accountant.

THE COURT: All right.

Newspapers, magazines, books, websites, social media.

PROSPECTIVE JUROR: *The Atlantic*, YouTube.

THE COURT: YouTube?

PROSPECTIVE JUROR: (No verbal response.)

THE COURT: All right. And how about, other television programs?

PROSPECTIVE JUROR: We don't have a television at home.

THE COURT: Okay.

Do you think belong to any associations, clubs, unions?

PROSPECTIVE JUROR: No.

THE COURT: And what do you like to do in your spare time?

PROSPECTIVE JUROR: Cycle.

THE COURT: I'm sorry?

PROSPECTIVE JUROR: Cycle.

THE COURT: Cycle.

PROSPECTIVE JUROR: (No verbal response.)

THE COURT: Okay. Thank you.

Juror Number 3, Ms. Reilly, what county do you live in?

PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

PROSPECTIVE JUROR: Twenty years.

THE COURT: Highest level of schooling?

PROSPECTIVE JUROR: High school.

THE COURT: And current employment.

PROSPECTIVE JUROR: Client relations, for a treating firm.

THE COURT: How long have you been in client relations?

PROSPECTIVE JUROR: Four years.

THE COURT: Four years?

PROSPECTIVE JUROR: Uh-huh.

THE COURT: Before that, what did you do?

PROSPECTIVE JUROR: I was a district manager for corporate food service company.

THE COURT: Marital status?

PROSPECTIVE JUROR: I have a domestic partner.

THE COURT: And does your partner work, and if so, doing what?

PROSPECTIVE JUROR: Freelance counter person for movie and film.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Magazines, newspapers, websites, social media, books?

PROSPECTIVE JUROR: I'm on social media, but very rarely. I read a lot of Reddit, and that's about it.

THE COURT: All right. Television programs, if any?

PROSPECTIVE JUROR: No, not particularly.

THE COURT: Do you belong to any associations, clubs, or unions.

PROSPECTIVE JUROR: No.

THE COURT: And what do you like to do in your spare time?

PROSPECTIVE JUROR: Anything sports or travel related.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR: You're welcome.

THE COURT: All right. Juror Number 4, Ms. Woods, what county do you live in?

PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

PROSPECTIVE JUROR: Eighteen years.

THE COURT: Highest level of schooling?

PROSPECTIVE JUROR: High School. I'm attended college now.

THE COURT: You're attending college now?

PROSPECTIVE JUROR: Uh-huh.

THE COURT: Are you majoring in any particular area?

PROSPECTIVE JUROR: Business administration.

THE COURT: All right.

Marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household.

PROSPECTIVE JUROR: My mom.

THE COURT: Does your mom work, and if so, what does she do?

PROSPECTIVE JUROR: Yes, she's a teacher.

THE COURT: Any magazines, newspapers, websites, social media, books?

PROSPECTIVE JUROR: All social media.

THE COURT: You do a lot of social media?

PROSPECTIVE JUROR: Yeah.

THE COURT: All right.

Anything else that you read on a regular basis?

PROSPECTIVE JUROR: No.

THE COURT: Do you watch any television programs on a regular basis?

PROSPECTIVE JUROR: No.

THE COURT: And any associations or clubs, unions?

PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

PROSPECTIVE JUROR: Teach dance.

THE COURT: All right. Thank you.

All right. And Juror Number 5, Mr. Parsehian, what county do you live in?

PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

PROSPECTIVE JUROR: Fifty years.

THE COURT: Highest level of schooling?

PROSPECTIVE JUROR: Bachelor's.

THE COURT: In what area?

PROSPECTIVE JUROR: Film and TV.
THE COURT: Current employment?
PROSPECTIVE JUROR: USPS, letter carrier.
THE COURT: All right. And how long have you been a letter carrier?
PROSPECTIVE JUROR: Nineteen years.
THE COURT: Marital status?
PROSPECTIVE JUROR: Single.
THE COURT: Anyone else living in your household?
PROSPECTIVE JUROR: My parents.
THE COURT: And if they work, what do they do?
PROSPECTIVE JUROR: They're both retired.
THE COURT: What did they do?
PROSPECTIVE JUROR: My mom was a seamstress. My dad had a -- worked for a taxi.
THE COURT: Thank you.
Newspapers, magazines, social media --
PROSPECTIVE JUROR: Facebook and Instagram.
THE COURT: All right. Television programs that you watch on a regular basis?
PROSPECTIVE JUROR: That's it -- well, Big Bang Theory.
THE COURT: All right. Thank you.
Associations, clubs, unions?
PROSPECTIVE JUROR: I'm a church board member.

THE COURT: All right. Thank you.
And what do you like to do in your spare time?
PROSPECTIVE JUROR: Mostly sports.
THE COURT: All right. Thank you.
You're a Yankee fan?
PROSPECTIVE JUROR: Yes, sir.
THE COURT: All right.
Juror Number 6, Mr. Dougherty?
PROSPECTIVE JUROR: Yes.
THE COURT: What county do you live in?
PROSPECTIVE JUROR: Now Nassau County.
THE COURT: For how long?
PROSPECTIVE JUROR: Nineteen years.
THE COURT: Highest level of schooling?
PROSPECTIVE JUROR: BMA.
THE COURT: And current employment?
PROSPECTIVE JUROR: Work in sales operation for a rep company.
THE COURT: How long have you been in sales?
PROSPECTIVE JUROR: Twelve years.
THE COURT: Marital status?
PROSPECTIVE JUROR: Single.
THE COURT: Is there anyone else living in your household?
PROSPECTIVE JUROR: Yes, my partner.

THE COURT: And does your partner work; if so, doing what?

PROSPECTIVE JUROR: Yeah, she works, doing retail.

THE COURT: All right.

Any children?

PROSPECTIVE JUROR: No.

THE COURT: Newspapers, magazines, books, social media?

PROSPECTIVE JUROR: Just Twitch, YouTube, Reddit occasionally.

THE COURT: And television programs, if any?

PROSPECTIVE JUROR: Yeah. A lot of sci-fi.

THE COURT: And do you belong to any associations, or clubs, or unions?

PROSPECTIVE JUROR: No, not currently.

THE COURT: Okay. And what do you do in your spare time?

PROSPECTIVE JUROR: Theater when I can. Otherwise, video games or watch television.

THE COURT: When you're watching television, what are you watching?

PROSPECTIVE JUROR: A lot of sci-fi on Apple TV or *For All Mankind*, or shows like that.

THE COURT: Okay. Thank you.

Juror Number 7, Mr. Phuntsok, county of residence?

PROSPECTIVE JUROR: Queens.
THE COURT: How long in Queens?
PROSPECTIVE JUROR: Twenty-eight years.
THE COURT: Your highest level of schooling?
PROSPECTIVE JUROR: High school.
THE COURT: And are you presently employed?
PROSPECTIVE JUROR: I'm an Uber driver.
THE COURT: How long have you been doing that?
PROSPECTIVE JUROR: Twelve years.
THE COURT: All right.
Marital status?
PROSPECTIVE JUROR: I'm married.
THE COURT: Does your spouse work outside the household?
PROSPECTIVE JUROR: No.
THE COURT: Any children?
PROSPECTIVE JUROR: Two kids.
THE COURT: How old are they?
PROSPECTIVE JUROR: Seven and eleven.
THE COURT: All right.
And what types of magazines, newspapers, websites, social media do you do?
PROSPECTIVE JUROR: I watch a little bit of YouTube, *Netflix*. That's about it.
THE COURT: Okay. Do you belong to any

associations or clubs or unions?

PROSPECTIVE JUROR: No.

THE COURT: And what do you like to do in your spare time?

PROSPECTIVE JUROR: I spend time with my family when I'm free.

THE COURT: Okay.

Juror Number 8, Ms. Sandoval, what county do you live in?

PROSPECTIVE JUROR: Suffolk.

THE COURT: I'm sorry, Suffolk?

PROSPECTIVE JUROR: Yes.

THE COURT: For how long.

PROSPECTIVE JUROR: Six years.

THE COURT: And before that, where did you live?

PROSPECTIVE JUROR: In my country of El Salvador.

THE COURT: And what is your highest level of schooling?

PROSPECTIVE JUROR: University in my country.

THE COURT: Okay. And are you currently working?

PROSPECTIVE JUROR: Yes.

THE COURT: What do you do?

PROSPECTIVE JUROR: I operate robots.

THE COURT: Say that again. I'm sorry.

PROSPECTIVE JUROR: Operate the robot.

THE COURT: Oh, you operate a robot?

PROSPECTIVE JUROR: Yes.

THE COURT: What kind of a robot?

PROSPECTIVE JUROR: For the PC.

THE COURT: In some kind of manufacturing, a manufacturing robot?

PROSPECTIVE JUROR: In process.

THE COURT: Processing?

PROSPECTIVE JUROR: Yeah.

THE COURT: And how long have you been doing that?

PROSPECTIVE JUROR: Two years, three months.

THE COURT: All right.

Your marital status?

PROSPECTIVE JUROR: Single.

THE COURT: And is there anyone else living in your household?

PROSPECTIVE JUROR: My son and my mother.

THE COURT: If -- do you -- how old is your son?

PROSPECTIVE JUROR: He's 13.

THE COURT: And does your mother work?

PROSPECTIVE JUROR: Yes.

THE COURT: What does she do?

PROSPECTIVE JUROR: She's an operator of a machine.

THE COURT: All right.

And do you -- oh, what magazines, newspapers, websites, books, social media do you do?

PROSPECTIVE JUROR: Instagram TikTok, and sometimes Facebook.

THE COURT: Do you watch any television programs --

PROSPECTIVE JUROR: No.

THE COURT: -- on a regular basis?

PROSPECTIVE JUROR: No.

THE COURT: And what do you like to do in your spare time?

PROSPECTIVE JUROR: I go to the gym, and sometimes I walk to the park.

THE COURT: All right. Thank you.

Juror Number 9, Mr. Mellin, what county do you live in?

PROSPECTIVE JUROR: Kings.

THE COURT: For how long?

PROSPECTIVE JUROR: Twelve years.

THE COURT: Your highest level of schooling.

PROSPECTIVE JUROR: Bachelor's.

THE COURT: In what area?

PROSPECTIVE JUROR: Communications.

THE COURT: Current employment?

PROSPECTIVE JUROR: Freelance consultant project

working in pharmaceutical advertising.

THE COURT: All right. And how long have you been doing that.

PROSPECTIVE JUROR: Fifteen years.

THE COURT: Marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Is anyone else living in your household?

PROSPECTIVE JUROR: No.

THE COURT: What types of magazines, newspapers, books, et cetera, do you read?

PROSPECTIVE JUROR: Mainly industry magazines.

THE COURT: All right.

Any social media?

PROSPECTIVE JUROR: Facebook, Instagram LinkedIn, a little bit of Reddit.

THE COURT: Do you watch any television programs on a regular basis?

PROSPECTIVE JUROR: A lot of history and Discovery channel.

THE COURT: And associations or clubs or unions?

PROSPECTIVE JUROR: No.

THE COURT: Okay. And what do you do in your spare time.

PROSPECTIVE JUROR: I spend time with friend

cooking, wandering the park.

THE COURT: All right. Thank you.

Juror Number 10, Ms. Duff, what county do you live in?

PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

PROSPECTIVE JUROR: Thirty-two years.

THE COURT: Highest level of schooling?

PROSPECTIVE JUROR: A BMA.

THE COURT: And current employment?

PROSPECTIVE JUROR: Designer.

THE COURT: Designer of what?

PROSPECTIVE JUROR: Fashion, accessories.

THE COURT: All right. And how long have you been doing that?

PROSPECTIVE JUROR: About 32 years.

THE COURT: All right.

Marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Is anyone else living in your household?

PROSPECTIVE JUROR: No, just me.

THE COURT: Newspapers, magazines, books that you read on a regular basis, social media.

PROSPECTIVE JUROR: *The Times*, Instagram,

Substack.

THE COURT: Television programs?

PROSPECTIVE JUROR: No.

THE COURT: Associations, clubs, unions?

PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

PROSPECTIVE JUROR: Paint, read, travel.

THE COURT: Thank you.

PROSPECTIVE JUROR: Thank you.

THE COURT: Juror Number 11, Mr. Falkenstein, what county do you live in?

PROSPECTIVE JUROR: Kings.

THE COURT: How long?

PROSPECTIVE JUROR: Three years.

THE COURT: Before that, where did you live?

PROSPECTIVE JUROR: Pittsburgh.

THE COURT: And what's your highest level of schooling?

PROSPECTIVE JUROR: I have a Master's in computer science.

THE COURT: Current employment?

PROSPECTIVE JUROR: Head of machine learning in a biotech startup.

THE COURT: How long have you been doing that?

PROSPECTIVE JUROR: Eight years.

THE COURT: And marital status?

PROSPECTIVE JUROR: Engaged.

THE COURT: Does your fianceé work, and if so, doing what?

PROSPECTIVE JUROR: Yes. She works at the Barclays Center.

THE COURT: Any children?

PROSPECTIVE JUROR: No.

THE COURT: Newspapers, magazines, social media?

PROSPECTIVE JUROR: Instagram, Reddit, and the Majority Report.

THE COURT: Television programs?

PROSPECTIVE JUROR: Nothing in particular, no.

THE COURT: And do you belong to any associations or clubs or unions?

PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

PROSPECTIVE JUROR: I'm in a band.

THE COURT: All right. Thank you.

Juror Number 12, Mr. Garbarino?

PROSPECTIVE JUROR: Yes.

THE COURT: What county do you live?

PROSPECTIVE JUROR: In Suffolk.

THE COURT: For how long?

PROSPECTIVE JUROR: Fifty-eight years.

THE COURT: Highest level of schooling?

PROSPECTIVE JUROR: High school.

THE COURT: Current employment?

PROSPECTIVE JUROR: I work maintenance for a school district.

THE COURT: How long have you been doing maintenance?

PROSPECTIVE JUROR: About 35 years.

THE COURT: Marital status?

PROSPECTIVE JUROR: Single.

THE COURT: Is anyone else living in your household?

PROSPECTIVE JUROR: No.

THE COURT: And what types of magazines, newspapers, websites, books, or social media do you do?

PROSPECTIVE JUROR: Facebook and X.

THE COURT: All right.

And television programs?

PROSPECTIVE JUROR: I like On Patrol: Live. I watch a lot of news and a lot of games.

THE COURT: All right.

Okay. And associations, clubs, unions.

PROSPECTIVE JUROR: I'm in a union through work,

but I'm not really involved.

THE COURT: All right.

And what do you like do in your spare time?

PROSPECTIVE JUROR: Play my guitar and watch a lot of sports.

THE COURT: Thank you.

PROSPECTIVE JUROR: Thank you.

(Continued on the next page.)

(Continuing.)

THE COURT: Juror Number 13, Ms. Lavides, what county do you live in.

THE PROSPECTIVE JUROR: I live in Richmond County.

THE COURT: For how long?

THE PROSPECTIVE JUROR: My whole life except for when I went to college Upstate and graduate school Upstate.

THE COURT: And so what did you study in in graduate school?

THE PROSPECTIVE JUROR: I have my master's in public admin.

THE COURT: Currently employment?

THE PROSPECTIVE JUROR: I work for a public health nonprofit as a grants major.

THE COURT: How long have you been doing that.

THE PROSPECTIVE JUROR: Almost six years.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your home?

THE PROSPECTIVE JUROR: My two parents who are retired and my younger brother.

THE COURT: When your parents last worked, what did they do?

THE PROSPECTIVE JUROR: My father was an engineer for the City and my mother worked in human resources.

THE COURT: And how old is your brother?

THE PROSPECTIVE JUROR: He is 35.

THE COURT: What does he do?

THE PROSPECTIVE JUROR: He works in -- he works as a teacher.

THE COURT: Okay.

Newspapers, magazines, social media, books?

THE PROSPECTIVE JUROR: I'm on Instagram, TikTok. I look at Reddit. I like to read the *New York Times*, watch YouTube.

THE COURT: And television -- oh, programs. Anything other than YouTube?

THE PROSPECTIVE JUROR: Not really.

THE COURT: And associations or clubs or unions?

THE PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

THE PROSPECTIVE JUROR: I like to travel. I like to watch Broadway shows, spend time with family and friends.

THE COURT: Thank you.

Juror Number 14, Ms. Raskin. What county do you live in?

THE PROSPECTIVE JUROR: Kings.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Twenty-four years.

THE COURT: Your highest level of schooling?

THE PROSPECTIVE JUROR: A master's.

THE COURT: In what area.

THE PROSPECTIVE JUROR: In media.

THE COURT: And you told us about your work making films. How long have you been doing that?

THE PROSPECTIVE JUROR: Um, 30 years.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: Does your spouse work outside the house? If so, doing what?

THE PROSPECTIVE JUROR: He also works in film. He's an editor.

THE COURT: Any children?

THE PROSPECTIVE JUROR: Yes.

THE COURT: How old?

THE PROSPECTIVE JUROR: Twenty-one year-old twins.

THE COURT: Okay. And newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: I don't have social media. I read a lot of books, novels. I read *The Times*, *The Guardian*. Yeah, watch movies.

THE COURT: Any television programs?

THE PROSPECTIVE JUROR: Many. I think I'm the only person who watches television.

THE COURT: Well, what kinds of shows do you like? I don't know what it tells the lawyers, but they always ask this question.

THE PROSPECTIVE JUROR: Yeah. I watch dramas. I work in documentaries. I watch documentary films, yeah.

THE COURT: Any associations or clubs or unions?

THE PROSPECTIVE JUROR: Just professional organizations.

THE COURT: And what do you like to do in your spare time?

THE PROSPECTIVE JUROR: Um, exercise, cook, spend time with friends.

THE COURT: Thank you.

Okay. Moving along.

Juror Number 15, Mr. Wasilewicz. You told me before and I didn't get it, but what county do you live in?

THE PROSPECTIVE JUROR: Kings County.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Whole life except for college.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: Bachelors of Science.

THE COURT: In what area?

THE PROSPECTIVE JUROR: Computer science.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: Software engineer.

THE COURT: How long have you been a software engineer?

THE PROSPECTIVE JUROR: Three years.

THE COURT: Marital status.

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: Two roommates, also software engineers.

THE COURT: Okay. Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: *The Atlantic* and magazines in general.

THE COURT: Any television programs that you watch regularly?

THE PROSPECTIVE JUROR: No.

THE COURT: Belong to any associations, clubs or unions?

THE PROSPECTIVE JUROR: Just sports clubs.

THE COURT: And what do you like to do in your spare time?

THE PROSPECTIVE JUROR: To run and to play guitar.

THE COURT: All right. Thank you.

Juror Number 16, Ms. Magdaleno, what county do you live in?

THE PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Five years.

THE COURT: Before that, where did you live?

THE PROSPECTIVE JUROR: Like Mount Vernon.

THE COURT: I'm sorry, where?

THE PROSPECTIVE JUROR: Mount Vernon.

THE COURT: Mount Vernon?

And your highest level of schooling?

THE PROSPECTIVE JUROR: Some college.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: Teacher at a daycare.

THE COURT: All right. And how long have you been doing that?

THE PROSPECTIVE JUROR: Five years.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: Does your spouse work outside of the household?

THE PROSPECTIVE JUROR: Disability.

THE COURT: All right. Any children?

THE PROSPECTIVE JUROR: Two.

THE COURT: How old were they?

THE PROSPECTIVE JUROR: Thirty-nine and 37.

THE COURT: And what do they do for work, if they

work?

THE PROSPECTIVE JUROR: Right now, the youngest one, she is staying home because one of her grand -- my grandchild is diagnosed with autism, so she is home with that child. But she have her bachelor degree in accounting.

THE COURT: Okay.

And the other child?

THE PROSPECTIVE JUROR: Ex-military.

THE COURT: I'm sorry. Oh.

THE PROSPECTIVE JUROR: Ex-military.

THE COURT: Newspapers, magazines, books social media?

THE PROSPECTIVE JUROR: Right now, I'm reading more about the autism to help my granddaughter.

THE COURT: All right. Do you watch any television programs on a regular basis?

THE PROSPECTIVE JUROR: No.

THE COURT: Any associations or clubs, unions?

THE PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

THE PROSPECTIVE JUROR: Travel.

THE COURT: Thank you.

Juror Number 17, Ms. Deonarine. What county do you live in?

THE PROSPECTIVE JUROR: Nassau.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Four years.

THE COURT: And before that, where did you live?

THE PROSPECTIVE JUROR: Queens.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: Some college.

THE COURT: Present employment?

THE PROSPECTIVE JUROR: I am a recruiter.

THE COURT: And how long have you been doing that?

THE PROSPECTIVE JUROR: I've been doing that for one year.

Prior to that, I worked in aviation.

THE COURT: All right. What did you do in aviation?

THE PROSPECTIVE JUROR: I was in human resource, staff recruiting.

THE COURT: All right. Marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: Does your spouse work outside the household?

THE PROSPECTIVE JUROR: Yes, he is in TLC.

THE COURT: Any children?

THE PROSPECTIVE JUROR: Yes.

THE COURT: How old?

THE PROSPECTIVE JUROR: Fifteen and 9.

THE COURT: Magazines, newspapers, books, social media?

THE PROSPECTIVE JUROR: Social media? Yes. Facebook, Instagram, TikTok.

THE COURT: Television programs, if any?

THE PROSPECTIVE JUROR: I do watch a lot of television. Mainly I like CSI Criminal Minds, shows like that.

THE COURT: All right. And associations, clubs, unions?

THE PROSPECTIVE JUROR: No, no.

THE COURT: Spare time, what do you like to do?

THE PROSPECTIVE JUROR: I just hang out with the family.

THE COURT: All right. Thank you.

Juror Number 18, Mr. McGrew. What county do you live in?

THE PROSPECTIVE JUROR: Kings County.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Four months.

THE COURT: And before that, where did you live?

THE PROSPECTIVE JUROR: Queens County.

THE COURT: How long were you in Queens County?

THE PROSPECTIVE JUROR: Three years.

THE COURT: Okay. And your highest level of

schooling?

THE PROSPECTIVE JUROR: Master's in Fine Arts.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: I am a paid corporate trainer.

THE COURT: All right. And how long have you been doing that?

THE PROSPECTIVE JUROR: With my current organization, about four years.

THE COURT: All right. Marital status?

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: No.

THE COURT: Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: Social media, LinkedIn, Instagram, Facebook.

Books, I read performance-based books as well as African spirituality books.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: No.

THE COURT: And associations, clubs, unions?

THE PROSPECTIVE JUROR: Mostly performance-based clubs, associations. Actors Equity Association, Screen Actors Guild.

THE COURT: And what do you like to do in your spare time?

THE PROSPECTIVE JUROR: Anything performance-based, live music, acting, theater. I also am into fitness, Zumba, yoga.

THE COURT: All right. Thank you.

Juror Number 19, Mr. Rao. What county do you live in?

THE PROSPECTIVE JUROR: Queens County.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Twenty-eight years.

THE COURT: You're in school right now, graduate school?

THE PROSPECTIVE JUROR: So part-time graduate school, completed undergrad.

THE COURT: What are you studying in graduate school?

THE PROSPECTIVE JUROR: Operations research.

THE COURT: All right. Marital status?

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: Yeah. Mother, aunt and a cousin.

THE COURT: If any of them work, tell us what they do.

THE PROSPECTIVE JUROR: My mom is an accountant. My aunt is retired. And cousin is unemployed currently.

THE COURT: Magazines, books, newspapers, social media?

THE PROSPECTIVE JUROR: Social media, Instagram, I believe. YouTube, I guess.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: Not really, apart from the news.

THE COURT: And do you belong to any associations or clubs or unions?

THE PROSPECTIVE JUROR: Professional associations, I guess.

THE COURT: And what do you do in your spare time?

THE PROSPECTIVE JUROR: Run, video games, maybe.

THE COURT: What are the professional associations, what type of?

THE PROSPECTIVE JUROR: FINRA, so like financial.

THE COURT: Thank you.

Juror Number 20, Ms. Pierides. What county do you live in?

THE PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Twenty-four years.

THE COURT: Your highest level of schooling?

THE PROSPECTIVE JUROR: High school.

THE COURT: Current employment.

THE PROSPECTIVE JUROR: I'm a housewife.

THE COURT: And you're married?

THE PROSPECTIVE JUROR: Yes, I'm married.

THE COURT: And does your spouse work outside the household?

THE PROSPECTIVE JUROR: He's a landscaper architect.

THE COURT: All right. Any children?

THE PROSPECTIVE JUROR: One. 16 years old.

THE COURT: Newspapers, magazines, books, social media.

THE PROSPECTIVE JUROR: I just watch a little bit of YouTube and watch cooking show, tennis channel, gardening.

THE COURT: Do you belong to any associations, clubs, unions?

THE PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

THE PROSPECTIVE JUROR: Play tennis and gardening and organizing.

THE COURT: Thank you.

Juror Number 21, Mr. Avakov. What county do you live in?

THE PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

THE PROSPECTIVE JUROR: My whole life.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: Some college.

THE COURT: And your current employment?

THE PROSPECTIVE JUROR: Medical billing.

THE COURT: How long have you been doing medical billing?

THE PROSPECTIVE JUROR: Five years.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: No.

THE COURT: Newspapers, magazines, social media, books?

THE PROSPECTIVE JUROR: YouTube.

THE COURT: YouTube?

THE PROSPECTIVE JUROR: Yes.

THE COURT: And any other television that you watch on a regular basis?

THE PROSPECTIVE JUROR: Not really.

THE COURT: Associations, clubs, unions?

THE PROSPECTIVE JUROR: No.

THE COURT: And what do you like to do in your spare time?

THE PROSPECTIVE JUROR: Gym.

THE COURT: All right. Thank you.

Juror Number 22, Ms. Werfel. What county do you live in?

THE PROSPECTIVE JUROR: Suffolk.

THE COURT: For how long?

THE PROSPECTIVE JUROR: My whole life besides college.

THE COURT: And your highest level of schooling?

THE PROSPECTIVE JUROR: Bachelor's.

THE COURT: In what area?

THE PROSPECTIVE JUROR: Public relations.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: I work at a PR agency.

THE COURT: For how long have you been doing that?

THE PROSPECTIVE JUROR: Five months.

THE COURT: And before that what did you do?

THE PROSPECTIVE JUROR: I -- nothing. I graduated college and this is my first job.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: Yeah. My parents and my sister.

THE COURT: If they work, tell us what they do.

THE PROSPECTIVE JUROR: My dad is an attorney at a bank. My mom is a para in elementary school, and my sister works in advertising.

THE COURT: Newspapers, magazines books social media?

THE PROSPECTIVE JUROR: Yes. TikTok, Instagram.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: Yeah. Reality TV, so like Bravo, Survivor, stuff like that.

THE COURT: Associations, clubs, unions?

THE PROSPECTIVE JUROR: No.

THE COURT: What do you like to do in your spare time?

THE PROSPECTIVE JUROR: Spend time with friends and family.

THE COURT: Thank you.

Juror Number 23 Mr. Brito. What county do you live in?

THE PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Twenty-nine years.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: Masters.

THE COURT: In what area?

THE PROSPECTIVE JUROR: Educational leadership.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: Deputy Superintendent for the New York City Public Schools.

THE COURT: And how long have you been in education?

THE PROSPECTIVE JUROR: Twenty-two years. Will be -- this is my twenty-third year.

THE COURT: All right. Marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: Does your spouse work outside the household.

THE PROSPECTIVE JUROR: Yes.

THE COURT: Doing?

THE PROSPECTIVE JUROR: She was a court attorney for the New York State.

THE COURT: All right. Any children?

THE PROSPECTIVE JUROR: Three.

THE COURT: And how old are they?

THE PROSPECTIVE JUROR: Twenty-one, 19, and one is about to turn 17.

THE COURT: All right. Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: *The New York Times*, a bit of *The Atlantic*.

You asked about social media?

THE COURT: Yes.

THE PROSPECTIVE JUROR: TikTok, Instagram, a little bit of Facebook.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: Comedies, maybe some British dramas.

THE COURT: Associations, clubs, unions?

THE PROSPECTIVE JUROR: No.

THE COURT: And what do you do in your spare time?

THE PROSPECTIVE JUROR: Exercise and spend time with my family.

THE COURT: Thank you.

Juror Number 24, Mr. Barone. County of residence?

THE PROSPECTIVE JUROR: Queens.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Thirty-four years.

THE COURT: And what is your highest level of schooling?

THE PROSPECTIVE JUROR: Fashion design.

THE COURT: Did you get a degree?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Yes?

And current employment?

THE PROSPECTIVE JUROR: I'm not working at the moment.

THE COURT: When you last worked, what did you do?

THE PROSPECTIVE JUROR: Visual merchandise.

THE COURT: All right. And marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: Does your spouse work outside the household?

THE PROSPECTIVE JUROR: He does.

THE COURT: What does she do?

THE PROSPECTIVE JUROR: He is a bartender.

THE COURT: Okay. And any children?

THE PROSPECTIVE JUROR: No.

THE COURT: Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: Books. No social media. I don't like it.

THE COURT: What kind of books do you read?

THE PROSPECTIVE JUROR: Italian books. I am learning Italian. And different books about fashion.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: YouTube only.

THE COURT: All right. Associations, clubs, or unions?

THE PROSPECTIVE JUROR: I go to church twice a week.

THE COURT: And what do you do in your spare time?

THE PROSPECTIVE JUROR: Cooking, watching podcasts, watching NetFlix.

THE COURT: All right. Thank you.

THE PROSPECTIVE JUROR: You're welcome.

THE COURT: Juror Number 25, Ms. Lhamo. What county do you live in?

THE PROSPECTIVE JUROR: Queens.

THE COURT: How long?

THE PROSPECTIVE JUROR: Seventeen years.

THE COURT: And your highest level of schooling?

THE PROSPECTIVE JUROR: High school.

THE COURT: And your current employment?

THE PROSPECTIVE JUROR: No. Housewife.

THE COURT: All right. Does your spouse work outside the household?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Doing what?

THE PROSPECTIVE JUROR: Maintenance in a building.

THE COURT: Children?

THE PROSPECTIVE JUROR: Three.

THE COURT: How old?

THE PROSPECTIVE JUROR: Twenty-nine, 26 and 21.

THE COURT: If they work, tell us what they do.

THE PROSPECTIVE JUROR: My son is an EMT, my daughter is still in college.

THE COURT: And newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: No. No social media, just Facebook.

THE COURT: And television programs?

THE PROSPECTIVE JUROR: Just YouTube.

THE COURT: Associations or clubs or unions?

THE PROSPECTIVE JUROR: No.

THE COURT: What do you do in your spare time?

THE PROSPECTIVE JUROR: Just cooking with my family, and go to church.

THE COURT: All right. Thank you.

Juror Number 26, Mr. Irizzary. What county do you live in?

THE PROSPECTIVE JUROR: Queens County.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Ten years.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: High school.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: I work with the Marriott.

THE COURT: And what do you do for the Marriott?

THE PROSPECTIVE JUROR: Security.

THE COURT: How long have you been doing that?

THE PROSPECTIVE JUROR: Thirty-six years.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: Does your spouse work outside the household?

THE PROSPECTIVE JUROR: No. She's retired.

THE COURT: All right. When she last worked, what did she do?

THE PROSPECTIVE JUROR: She worked for the New York State -- New York City Stock Exchange.

THE COURT: And children?

THE PROSPECTIVE JUROR: One.

THE COURT: How old?

THE PROSPECTIVE JUROR: Thirty-six.

THE COURT: What does he or she do?

THE PROSPECTIVE JUROR: He works for the MTA. He is a train operator.

THE COURT: All right. Newspapers magazines, books, social media?

THE PROSPECTIVE JUROR: Just on Facebook.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: Law and Order and 48 Hours.

THE COURT: All right.

Associations, clubs or unions?

THE PROSPECTIVE JUROR: Hotel, Hotel Association.

THE COURT: And what do you do in your spare time?

THE PROSPECTIVE JUROR: I like to travel and spend time with my grandson.

THE COURT: Thank you.

Juror Number 27, Ms. Romeo. What county do you live in?

THE PROSPECTIVE JUROR: Suffolk.

THE COURT: How long?

THE PROSPECTIVE JUROR: Thirty-eight years.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: Masters in Education.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: An art teacher.

THE COURT: And how long have you been teaching?

THE PROSPECTIVE JUROR: Fifteen years.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: And does your spouse work outside the household?

THE PROSPECTIVE JUROR: Yeah, director of facilities at a different school district.

THE COURT: Children?

THE PROSPECTIVE JUROR: Three.

THE COURT: How old are they?

THE PROSPECTIVE JUROR: Nine, 8, and 6.

THE COURT: Newspapers, magazines, books social media?

THE PROSPECTIVE JUROR: Social media? Facebook and

Instagram.

I have all the streaming services, so NetFlix, like K-dramas and Euphoria.

THE COURT: All right. Associations or clubs or unions?

THE PROSPECTIVE JUROR: I'm in the teacher's union.

THE COURT: And what do you like to do in your spare time?

THE PROSPECTIVE JUROR: Watch my kids play lacrosse.

THE COURT: Okay.

Juror Number 28, Mr. Cheriyan. What county do you live in?

THE PROSPECTIVE JUROR: Richmond County.

THE COURT: For how long?

THE PROSPECTIVE JUROR: My whole life.

THE COURT: And your highest level of schooling?

THE PROSPECTIVE JUROR: Trade school.

THE COURT: In what area?

THE PROSPECTIVE JUROR: Electrical.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: MTA.

THE COURT: What do you do at the MTA?

THE PROSPECTIVE JUROR: I'm a licensed trainer-electrician.

THE COURT: How long have you been doing that?

THE PROSPECTIVE JUROR: Almost three years now.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: Yes, my parents and brother and his wife.

THE COURT: If they work, any of them work, tell us what they do.

THE PROSPECTIVE JUROR: My father retired. He's a former MTA bus operator. My mother is a nurse practitioner. My brother is an IT specialist. And my sister-in-law is a nurse case manager.

THE COURT: Thank you.

Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: Instagram and YouTube mostly.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: Most recently, Star Trek.

THE COURT: And associations or clubs or unions?

THE PROSPECTIVE JUROR: I am associated with the Union Local 100 through my employment.

THE COURT: All right. And what do you do in your spare time?

THE PROSPECTIVE JUROR: A little bit of video games and exercise.

THE COURT: All right. Thank you.

Juror Number 29, Ms. Latham. What county do you live in?

THE PROSPECTIVE JUROR: Kings.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Twenty years.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: Ph.D.

THE COURT: In what area?

THE PROSPECTIVE JUROR: Music education.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: I'm a music professor at The New School.

THE COURT: All right. How long have you been a music professor?

THE PROSPECTIVE JUROR: Ten years.

THE COURT: Marital status?

THE PROSPECTIVE JUROR: Married.

THE COURT: Does your spouse work outside the household?

THE PROSPECTIVE JUROR: Yes, she teaches forensics at John Jay.

THE COURT: All right. Any children?

THE PROSPECTIVE JUROR: Yeah. A nine-year old daughter and 14-year old son.

THE COURT: Newspapers, magazines, books, social media.

THE PROSPECTIVE JUROR: No social media. I read *The New Yorker* and *The New York Times*.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: Sure. Just nothing regular. Comedy, courtroom dramas.

THE COURT: Associations, clubs or unions?

THE PROSPECTIVE JUROR: No.

THE COURT: And what do you like to do in your spare time?

THE PROSPECTIVE JUROR: Play music or spend time with my kids.

THE COURT: Thank you.

Juror Number 30, Mr. Lew. What county do you live in?

THE PROSPECTIVE JUROR: Kings.

THE COURT: For how long?

THE PROSPECTIVE JUROR: Thirty.

THE COURT: Highest level of schooling?

THE PROSPECTIVE JUROR: Associates.

THE COURT: In what area?

THE PROSPECTIVE JUROR: Radiologic energy.

THE COURT: Current employment?

THE PROSPECTIVE JUROR: Current? I'm an MTA

conductor.

THE COURT: All right. How long have you been an MTA conductor?

THE PROSPECTIVE JUROR: About three years.

THE COURT: And what did you do before that?

THE PROSPECTIVE JUROR: I was in imaging.

THE COURT: Okay. Marital status?

THE PROSPECTIVE JUROR: Single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: Parents.

THE COURT: And if they worked, tell us what did they do.

THE PROSPECTIVE JUROR: Retired.

THE COURT: When they last worked, what did they --

THE PROSPECTIVE JUROR: My father was a doorman.

THE COURT: Okay. Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: Facebook, some Instagram. That's it.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: Seinfeld, Married with Children, Dateline, 48 Hours.

THE COURT: All right. And associations, clubs, unions?

THE PROSPECTIVE JUROR: No, no.

THE COURT: What do you do in your spare time?

THE PROSPECTIVE JUROR: Gym, running, and sports.

THE COURT: All right. Thank you.

Juror Number 31, Ms. Guan. What county do you live in?

THE PROSPECTIVE JUROR: Kings.

THE COURT: For how long?

THE PROSPECTIVE JUROR: My whole life.

THE COURT: And you told us you're getting your masters. In what area?

THE PROSPECTIVE JUROR: Of finance.

THE COURT: Are you working besides being in school?

THE PROSPECTIVE JUROR: Oh, yeah. I work part-time in the food industry for 40 years.

THE COURT: What do you do?

THE PROSPECTIVE JUROR: Just like a team member.

THE COURT: Okay. Marital status?

THE PROSPECTIVE JUROR: I'm single.

THE COURT: Anyone else living in your household?

THE PROSPECTIVE JUROR: My parents and my two younger brothers.

THE COURT: If any of them work, tell us what they do.

THE PROSPECTIVE JUROR: My Two brothers are in college and my parents, one of them is an Uber driver and my

mom works in a supermarket.

THE COURT: Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: I have TikTok and Instagram.

THE COURT: Television programs?

THE PROSPECTIVE JUROR: No.

THE COURT: Associations or clubs or unions?

THE PROSPECTIVE JUROR: No.

THE COURT: What do you do in your spare time?

THE PROSPECTIVE JUROR: Photography or spend time with my friends.

THE COURT: All right. Thank you.

Juror Number 32, Mr. Marin. What county do you live in?

THE PROSPECTIVE JUROR: Brooklyn.

THE COURT: Brooklyn? For how long?

THE PROSPECTIVE JUROR: Thirty-five years.

THE COURT: All right. Your highest level of schooling?

THE PROSPECTIVE JUROR: High school in my country.

THE COURT: And are you presently working?

THE PROSPECTIVE JUROR: Yes.

THE COURT: What do you do?

THE PROSPECTIVE JUROR: I'm a waiter.

THE COURT: A waiter?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay. How long have you been a waiter?

THE PROSPECTIVE JUROR: Twenty-five years.

THE COURT: All right. Marital status?

THE PROSPECTIVE JUROR: Divorced.

THE COURT: Any children?

THE PROSPECTIVE JUROR: Three.

THE COURT: How old are they?

THE PROSPECTIVE JUROR: One is 35, one is 32 and 29.

THE COURT: And if they work, what do they do?

THE PROSPECTIVE JUROR: One is on unemployment right now.

THE COURT: All right.

THE PROSPECTIVE JUROR: And one is an Uber driver.

THE COURT: All right.

THE PROSPECTIVE JUROR: And one works in a pharmacy.

THE COURT: Okay.

Newspapers, magazines, books, social media?

THE PROSPECTIVE JUROR: TikTok or -- and also YouTube and that's it. Facebook.

THE COURT: Okay. Any television programs that you watch regularly?

THE PROSPECTIVE JUROR: No.

THE COURT: Do you belong to any associations or clubs or unions?

THE PROSPECTIVE JUROR: No.

THE COURT: And what do you like to do in your spare time?

THE PROSPECTIVE JUROR: Cook at home. Cooking. Cook. Cook something at home.

THE COURT: Cook something at home?

THE PROSPECTIVE JUROR: Yeah.

THE COURT: Okay. Thank you.

Okay. Let's do this. I think we are very close to being done.

I think those of you in the back are probably off the hook, but we have to see.

We have to give the parties, the lawyers a chance to think about and then exercise their peremptory challenges. But I do think we'll be done in, you know, 15 minutes or so and we will know who is on our jury. The rest of you will be released.

Those who are on the jury plus the two alternates, we will take a lunch break, and then after lunch, we will begin the trial. So, that's the schedule.

As I said earlier, there are 32 of you in the box, 12 of you will be on the jury, two will be alternates.

And what I'm going to ask is for all of you to go back into the other courtroom for a few minutes so that we can discuss the peremptory challenges with the lawyers. Thank

you.

THE COURTROOM DEPUTY: Please don't leave this floor. Stay on this floor.

THE COURT: And again, don't discuss the case with anyone, not even with each other. Keep an open mind.

(Prospective jurors exit.)

THE COURT: Please be seated.

We're going to do five rounds. Defendant gets two each round. Defendant goes first each round. The government gets two the first round and then one in each of the subsequent rounds. That adds up to 10 and 6.

As for alternates, you each get one peremptory. The defendant will go first.

Any issues, questions? You can have a few minutes to review the matter and we will reconvene and then we'll exercise the peremptory challenges.

If you need, if you can do it without seeing them again, fine. If not, we will have to bring them back in. But in the meantime, you can -- ordinarily, we would do this in the robing room, but under the circumstances, we will do it right here.

Thanks.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

Thank you. Please be seated.

THE COURT: Please be seated.

And once defendants appealed on the basis that I didn't give them enough time to consider their peremptory challenges, but I was affirmed.

So in any event, I understand the parties are ready to exercise their peremptory challenges. So, let's do that now and then we will bring everyone back in and we will excuse the jurors who are being excused.

Who is going to do this? Mr. John or counsel can do it if you want.

MS. HARRIS-CALVIN: I think it would be more efficient if I do it.

THE COURT: Yes. Go ahead.

MS HARRIS-CALVIN: We get to go first?

THE COURT: Defendant goes first. Two, your first two.

MS. HARRIS-CALVIN: Okay. Our first two will be -- out of the whole panel, is that correct?

THE COURT: Out of the whole panel.

But just be mindful that the last two will be the alternates.

MS. HARRIS-CALVIN: So I think we'll go with 14 and 16.

THE COURT: The defendant excuses Juror Number 14, Jennifer Raskin, and 16, Pamela Magdaleno.

The government's first peremptory challenge is?

MS. THEODORA: Number 11.

THE COURT: Juror Number 11, Brian Falkenstein is excused.

I'm sorry. You get two the first round.

MS. THEODORA: And 15.

THE COURT: Juror Number 15 is Damian Wasilewicz is excused.

Defendant's second round, two.

MS. HARRIS-CALVIN: We'll do 23 and 27.

THE COURT: Twenty-three is Mr. Brito.

Twenty-seven is Ms. Romeo.

The government's next challenge?

MS. THEODORA: Eighteen, Your Honor.

THE COURT: Eighteen, Robert McGrew, is excused.

Defendant's next two?

MS. HARRIS-CALVIN: We'll do 3 and 7.

THE COURT: Three is Erin Reilly. Seven is Tashi Phuntsok. They are excused.

The government's next challenge is?

MS. THEODORA: I'm sorry, Your Honor. Number 4, Seat No. 4.

THE COURT: Juror Number 4, Gianna Woods, is excused.

MS. HARRIS-CALVIN: Number 8, please.

THE COURT: Juror Number 8 is Wendy Sandoval.

MS. THEODORA: 21, Your Honor.

THE COURT: What? Did we get to...

MS. THEODORA: I'm sorry.

THE COURT: We didn't get to defense's second one.

MS. THEODORA: Sorry. I'm so sorry.

MS. HARRIS-CALVIN: Apologies.

Nine, Your Honor.

THE COURT: Juror Number 9, Seth Mellin, is excused.

That completes the Defendant's fifth round.

And now the government's fifth round.

MS. THEODORA: 21, Your Honor.

THE COURT: Juror Number 21, Boris Avakov is excused.

And the Defendant's last round?

MS. HARRIS-CALVIN: 10, Your Honor.

THE COURT: Juror Number 10, Eileen Duff, is excused.

You get one more, last one.

MS. HARRIS-CALVIN: And 20.

THE COURT: Juror Number 20, Maria Pierides, is excused.

MS. THEODORA: The government strikes 6.

THE COURT: Juror Number 6, Daniel Dougherty is excused.

So I get for the first twelve, Juror Number 1, Lau; Juror Number 2, Burnett; Juror Number 5, Parsehian; Juror Number 12, Garbarino; Juror Number 13, Lavides; Juror Number 17, Deonarine; Juror Number 19, Rao; Juror Number 22, Werfel; Juror Number 24, Barone; Juror Number 25, Lhamo; Juror Number 26, Irizzary; and 12, Allen Cheriyan.

Agreed?

MS. THEODORA: Just a moment, Your Honor.

THE COURT: Yes.

MS. THEODORA: That's correct, Your Honor.

THE COURT: The defense agrees?

MS. HARRIS-CALVIN: Yes. Yes.

THE COURT: All right. The last four jurors, each side gets one peremptory. Defense goes first.

MS. HARRIS-CALVIN: Twenty-nine, Your Honor.

THE COURT: Clara Latham, Juror Number 29, is excused.

The government?

MS. THEODORA: Number 31, Your Honor.

THE COURT: Juror Number 31, Guan is excused.

So the two alternates are 30, David Lew, and 32, Delfino Marin.

So at this point, we'll bring everyone back in. We'll excuse the jurors who have been excused. We will excuse everyone else. I will chat with the jury for a couple of

minutes. Mr. Joe will show them the jury room. And then we will break for lunch. Yes?

MS. THEODORA: I'm sorry, Your Honor. I may have misheard you. Did you say Joanna Guan, 31?

THE COURTROOM DEPUTY: Correct.

THE COURT: I thought that's what you said. I said Juror Number 31, Guan, was excused.

MS. THEODORA: Got it. I'm sorry.

THE COURT: Which is what I think you said.

MS. THEODORA: It is, yes. It's lunchtime.

THE COURT: Almost.

Okay. We will bring everyone back in.

Does anyone care whether I swear the jury in now or after lunch?

MS. HARRIS-CALVIN: We have no preference, Your Honor.

MS. THEODORA: Can you swear them in now from our perspective.

THE COURT: Okay. That's what I'll do.

(Prospective jurors enter.)

THE COURT: We're missing -- there's one empty seat there. Juror Number 4.

THE COURTROOM DEPUTY: Four.

THE COURT: Well, I don't think it matters.

THE COURTROOM DEPUTY: I do have one issue with...

(Pause in proceedings. )

THE COURTROOM DEPUTY: Let me find Juror Number 4. Actually, we can start without --

THE COURT: Yes, we can do without Juror Number 4.

We've completed the process, ladies and gentlemen. The parties have exercised their peremptory challenges. If we call out your name, that means you are excused. Do not leave until I tell you you can go.

And by the way, it is possible that you will be sent down to another case. It doesn't mean that your jury service is over. It depends on what's happening with other cases. There are other cases going on.

But among the 32, if your name is not called, that means you're on the jury and we ask you to remain and in a few minutes, we'll send you to lunch. But we're going to proceed and we will have opening statements and evidence right after lunch.

Mr. Joe?

THE COURTROOM DEPUTY: The following jurors are excused:

Juror Number 3, Erin Reilly, you're excused and report back to the Central Jury Room.

THE COURT: Just wait and we'll get you all.

THE COURTROOM DEPUTY: You did say that. I'm sorry.

Juror Number 4 is not here is Gianna Woods, you are

excused.

THE COURT: Is this Juror Number 4?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Your name has just been called and you will be excused, but just have a seat for a moment until we complete the process.

THE COURTROOM DEPUTY: Juror Number 6, Daniel Dougherty, you're excused.

Juror Number 7, Tashi Phuntsok, you're also excused.

Juror Number 8, Wendy Sandoval, you are excused.

Juror Number 9, Seth Mellin, you have been excused.

Juror Number 10, Eileen Duff, also excused.

Eleven, Brian Falkenstein, you are excused.

Juror Number 14, Jennifer Raskin, you are excused.

Damian Wasilewicz. I'm sorry. You have been excused.

Juror 16, Pamela Magdaleno, you're excused.

Juror Number 18, Robert McGrew, you have been excused.

Juror Number 20, Maria Pierides, you have been excused.

Juror Number 21, Boris Avakov, you have been excused.

Juror Number 23, Jerry Brito, you've been excused.

(Continued on the next page.)

(Continuing.)

THE COURTROOM DEPUTY: Juror Number 27, Kirsten Romeo -- I'm sorry, Romeo, you have been excused.

Juror Number 29, Clara Latham, you've been excused.

And lastly, Juror Number 31, Joanne Guan, you've been excused.

THE COURT: All right. Before you leave, let me just say who has not been excused, be sure that you remain: Juror Number 1, Ms. Lau; Juror Number 2, Mr. Burnett; Juror Number 5, Mr. Parsehian; Juror Number 12, Mr. Garbarino; Juror Number 13, Ms. Lavides; Juror Number 17, Ms. Deonarine; Juror Number 19, Mr. Rao; Juror Number 22, Ms. Werfel; Juror Number 24, Mr. Barone; Juror Number 25, Ms. Lhamo; Juror Number 26, Mr. Irizarry; Juror Number 28, Mr. Cheriyan, the 12 of you are our jury in this case.

Or two alternates are Juror Number 30, Mr. Lew and Juror Number 32, Mr. Marin.

So you 14 shall remain. Everyone else, including those prospective jurors in the back are excused, and you are to report back downstairs to jury selection room.

Thank you very much for your patience.

(Prospective jurors exit the courtroom.)

THE COURTROOM DEPUTY: Thank you.

THE COURT: Okay. Ms. Lau?

JUROR: Yes.

THE COURT: You should take the first seat -- please be seated in the second row; then Mr. Burnett, second seat -- we're going to put you back in the box now so you know where you're --

THE COURTROOM DEPUTY: If you don't mind coming out, everyone that's in the box?

THE COURT: Yes, everyone come out. I'm sorry. We'll do it in order.

THE COURTROOM DEPUTY: Would it make sense to do it in reverse order?

THE COURT: Yes, we'll do it in reverse order.

THE COURTROOM DEPUTY: We can do the alternates first in the back.

THE COURT: Okay.

The alternates, Mr. Marin? You can take a seat in the third row.

And Mr. Lew, just take the first two seats.

Okay. Then Mr. Cheriyan, you're Juror Number 12 now, the last seat in the second row.

Mr. Irizarry, you're next.

Ms. Lhamo, you're next.

Mr. Barone, you're next.

Ms. Werfel, you're next.

One, two, three, four -- Mr. Rao, you would be next.

And then in the first row, Ms. Deonarine, you're in the last seat, first row.

Ms. Lavides next -- there's only one entrance.

Mr. Garbarino. You're next.

Mr. Parsehian, you're next.

Mr. Burnett.

And then Ms. Lau.

Okay. Ladies and gentlemen, so the fortunate 12 of you are our jury. The second two are our alternates. I'm going to ask you to stand and Mr. Joe will swear you in as our jury panel.

THE COURTROOM DEPUTY: Please stand and raise your hand.

(Jury sworn.)

THE COURTROOM DEPUTY: If so say, "I do."

THE JURY: I do.

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT: Please be seated.

So Mr. Joe's going to show you the jury room, and we're going to break for lunch. When you come back, you'll go right to the jury room. And once you all are assembled and gathered, we'll come out and we'll start with the

opening statements and the taking of the evidence.

So let's say we'll resume at 2:45. Please be back and ready to go at 2:45. We will run until 4:30. We will end at 4:30 sharp, no later than 4:30.

And don't be late. If any one of you is late, all of these people waiting in the courtroom, including your fellow jurors, are going to have to wait until you get here. We can't start until all of you are present. The same thing for tomorrow morning. We're going to start tomorrow morning at 9:30. So please allow time to get here on time. You can relax in the jury room. Again, once everyone is here, we will start. I want to be taking evidence between 9:30 and 4:30.

We'll usually take one mid-morning break. We'll take one afternoon break. This afternoon, because we're starting at 2:45, we probably won't take a break. We'll go from 2:45 until 4:30, and then we'll call it a day.

We'll give you pads. You can take notes. We'll let you take note if you want.

When we come back before we start, I'll give you a few more instructions. But in the meantime -- and you're going to hear me say this over and over again: Do not discuss the case with anyone. Don't go doing any investigation or research. Don't go jumping on the Internet and looking up these things and reading -- or looking up

information about any of the people involved. You can do all of that after the case. If we don't -- for us to be done in the three or four days that I have told you, we need for all of you to be -- to be on time.

Keep an open mind. In every trial there are ups and downs, and it's -- until you get all the evidence and you've heard my instructions on the law, you can't start discussing the case or, you know, making up your mind. Wait until everything is all done.

Typically what will happen is once the evidence is done, the lawyers will get to sum up. I'll give you my instructions on the law, and then at that point you'll get to deliberate.

And so Mr. Joe will show you where to go. He'll give you some cards and things. And we will see you at 2:45 sharp.

Thank you very much.

THE COURTROOM DEPUTY: Thank you.

All rise.

(Jury exits.)

THE COURT: Please be seated.

Now, in addition to my usual instructions, I'll say something again about Mr. John representing himself.

He's still --

Mr. John, do you still want to represent yourself?

MR. JOHN: Yes, Your Honor.

THE COURT: Okay. I'll -- the defense had submitted a request, and I'll give you some -- in addition to what I had said earlier.

Were there any other things to discuss?

MS. THEODORA: Just a few housekeeping things, Your Honor --

THE COURT: Yes.

MS. THEODORA: -- before our first witness.

THE COURT: Yes.

MS. THEODORA: For the child pornography exhibits for her, we plan to have her authenticate and identify herself.

THE COURT: Who is the first witness?

MS. THEODORA: Kahliah.

THE COURT: Okay.

MS. THEODORA: And then we would ask Your Honor to allow her to step off the stand. We will play them for the jury, and then she can step back for cross-examination.

THE COURT: She's stepping off the stand to point things out or to do what?

MS. THEODORA: So we have the videos on a thumb drive --

THE COURT: Yes.

MS. THEODORA: -- that she will identify just

physically because she signed the thumb drive when we watched them yesterday.

THE COURT: Yes.

MS. THEODORA: And then we would ask to have her step off the stand while we play them for the jury, and then we will --

THE COURT: She can just sit somewhere, is that what you're saying?

MS. THEODORA: Outside of the courtroom.

THE COURT: Oh, okay.

She'll step outside of the courtroom?

MS. THEODORA: Yeah -- yes, I'm sorry. Step out of the courtroom, and then --

THE COURT: Yeah, I can understand that.

MS. THEODORA: -- so --

THE COURT: And that's so she doesn't have to watch them again; is that the idea?

MS. THEODORA: Yes, Your Honor.

THE COURT: Okay.

MS. HARRIS-CALVIN: Your Honor, is there a reason why they can't just turn off the screen so she won't be able to see it?

MS. THEODORA: It's incredibly difficult for her the watch these videos in a room full of people. We did it with her yesterday, and it's incredibly uncomfortable.

THE COURT: Is there an objection?

MS. HARRIS-CALVIN: Yeah. I think we can turn her off screen off. She is over there in the corner --

THE COURT: Your objection's overruled.

MS. HARRIS-CALVIN: Okay.

THE COURT: She can step out of the courtroom, and then we'll retrieve her after the -- is it -- how many are we talking about? Are we all going to show them all at once or what?

MS. THEODORA: We plan to just show the four of them -- I mean, isn't that what we plan to do, is just the four of them --

MS. ELARDO: Yes.

MS. THEODORA: At the end -- at the very end.

THE COURT: At the very end?

MS. THEODORA: --of testimony.

THE COURT: And then we'll bring her back for cross --

MS. THEODORA: Yes.

THE COURT: -- is that the idea?

MS. THEODORA: That was the idea.

THE COURT: Okay.

MS. THEODORA: And then the same thing for the image.

And Jane Doe 2's mother is going to identify her

in. I think we had her similarly review it yesterday, sign it, and then we would ask the same thing for her, for her to be able to step off the stand while this room views --

THE COURT: All right.

MS. THEODORA: -- the images of her daughter.

THE COURT: I don't have a problem with that.

And, Ms. Harris-Calvin, will be conducting the cross of both witnesses?

MS. HARRIS-CALVIN: No. I'll be doing the cross of Kahliah; and Ms. Wells will be doing the cross of Jane Doe's 2's mother.

THE COURT: Okay.

MS. HARRIS-CALVIN: Also -- well, I'm sorry.

THE COURT: Well, you know, it's becoming much more of a hybrid trial than I envisioned -- is there any objection to that?

It's not what I had in mind, but is there any objection to that --

MS. THEODORA: No, Your Honor.

THE COURT: -- to letting counsel split it?

MS. THEODORA: No, Your Honor.

THE COURT: Okay. That's fine.

MS. THEODORA: Just a last question. We have a physical board that we would like to use as a demonstrative because the defendant has so many identifier and screen

names in his address. We have a board that we would like to use, and each time a witness identifies an identifier, we would like to put it on the board just as a demonstrative for the jury.

THE COURT: That's pretty standard.

Any objection?

MS. HARRIS-CALVIN: I assume it would be counsel or someone from the Government's team putting the identifiers up on the board, correct?

MS. THEODORA: Yes.

MS. HARRIS-CALVIN: Okay.

THE COURT: Whoever is conducting the examination --

MS. THEODORA: Yes.

THE COURT: --can put it up.

MS. THEODORA: Yes.

THE COURT: All right. That's fine.

MS. HARRIS-CALVIN: I will raise one other issue.

THE COURT: Yes.

MS. HARRIS-CALVIN: There's one exhibit for Jane Doe 1, Kahliah, that we had an objection to.

Do you want us to raise it now or during the break?

THE COURT: Sure. Now, that's fine.

MS. HARRIS-CALVIN: It was Government Exhibit 105.

I'll give you time so you can take a look.

MS. THEODORA: Okay.

MS. HARRIS-CALVIN: This is -- so I think it goes to Government Exhibit's 104 --

THE COURT: I'm sorry. One -- I don't know if this other computer is going to be set up -- I don't have 1056, so I don't know -- I mean, some of them are really voluminous.

MS. THEODORA: Your Honor, we prepared hard copies. And apologies, I had understood Your Honor to say he didn't want any hard copies, but --

THE COURT: Well --

MS. THEODORA: -- we did -- that was a misunderstanding on my part.

THE COURT: No, no, no, no. It wasn't a misunderstanding.

I usually like hard copies, but I was told that some of them were really voluminous, and so, I mean, if --

MS. THEODORA: So we have -- my understanding is we have two binders for you all that should be ready by now.

THE COURT: Okay.

MS. THEODORA: So maybe we can just go to lunch and --

MS. HARRIS-CALVIN: Yeah.

THE COURT: Yes, that's fine. Otherwise, we'll

figure something out.

I mean, I -- my law clerks both have laptops, and if they have it up on their laptops, I believe I should be able to do it.

MS. THEODORA: Okay.

THE COURT: What's the objection?

MS. HARRIS-CALVIN: It's simply -- if I could describe it? It's very simple.

104 is Kahliah's post, original Reddit post, after which she started speaking with Mr. John.

105 is a screenshot of the main page of Reddit post that doesn't have Kahliah on it. It's just -- I think the Government's going to use it just to give the jury an understanding of what the Reddit thread looked like once she logging onto it. But it has a photograph of another young girl who is unrelated to this case, and so --

THE COURT: That's -- we're talking about 105 --

MS. HARRIS-CALVIN: 105.

THE COURT: -- S -- well, no, there's -- I have inh front of me 105R, which I assume means redacted.

MS. HARRIS-CALVIN: Yes.

THE COURT: Which one is the Government going to offer?

MS. HARRIS-CALVIN: 105-S is going to go back to the jury. 104-R is there and redacted. I object to the

jury seeing it or taking it back with them, the unredacted version that has a photo of a girl that has nothing to do with this case.

MS. THEODORA: Your Honor, this is relevant to the defendant -- it's relevant to both Count 1 and 2. It's relevant to the defendant seeking out minor girls to produce child pornography. This is the forum that it would have -- that the witness will say it's what it looked like in March of 2024 and this was the forum he was lurking on to identify his victims.

It's also relevant to Count 2 to the extent it shows that he knew Kahliah was 14 and underaged, because he was looking specifically for her on this forum.

THE COURT: What does 14 F mean?

MS. HARRIS-CALVIN: 14 year old females, I believe.

MS. THEODORA: It's a forum in which these children identified themselves by their age and their gender and ask other whether they thought they were ugly.

THE COURT: 14 F is the age?

MS. THEODORA: Yes.

THE COURT: Yes. It seems to me this is relevant because it shows, you know, why people are going into this.

MS. HARRIS-CALVIN: I'm fine with the portion of it that doesn't have this unrelated --

THE COURT: No I understand that.

But it seems to me having a photograph of the young woman that's in this picture is also relevant.

MS. HARRIS-CALVIN: I think it might be relevant, but I think it's -- in terms of the *403* balancing, given all the *404* evidence that's coming in --

THE COURT: The objection's overruled.

MS. HARRIS-CALVIN: Okay.

THE COURT: I'm allowing -- I'm going to allow Government's Exhibit 105-S as -- and it's not necessarily going to go back to the jury. I don't send in the exhibits with the jury.

I mean, are there -- they aren't being given copies, right?

MS. THEODORA: We would request that they be given a laptop with the copies of the sealed and the redacted version, everything except for the --

THE COURT: Do you mean --

MS. THEODORA: -- the child pornography.

THE COURT: -- during deliberations.

MS. THEODORA: During deliberations, yes, Your Honor.

THE COURT: Okay. But they're not getting it now.

And we'll -- well, it's not my usual practice just to send in exhibits. My usual practice is to let the jury

ask for them. But we can cross that bridge when we get there.

But you're not trying to get things presented to them now for them to custody of?

MS. THEODORA: No, Your Honor.

THE COURT: Okay.

The objection to 105-S is overruled.

You don't need to repeat your objections, preserved for appeal. And as for what the jury gets to see at the end, we can talk about it as we get closer to the end.

Anything else right now?

MS. THEODORA: Just one last thing, Your Honor.

Because I understand counsel doesn't have any other objections, I believe to the rest of the exhibits that we'll be offering with Kahliah and Jane Doe '2's mother, would Your Honor just like us to move them in and offer them --

THE COURT: I would --

MS. THEODORA: -- or.

THE COURT: I would like you at the beginning to say, the Government offers the following exhibits. Defense counsel -- or Mr. John can say, No objection, or No further objection, whichever he wants.

His -- his objection to 105 is reserved, but --

and then they can be received at that point. That's the idea, to make things go faster and then you don't have to lay a foundation with every document, particularly if there is no objection.

MS. THEODORA: Understood.

MS. HARRIS-CALVIN: Your Honor, just to be clear: For the witnesses that Ms. Wells and I are crossing, you do not want us to do the -- be the people who object? You still want Mr. John to object?

THE COURT: Oh, all right. No, that's fine. You can stand up and say No objection in light of the fact that one or both of -- the two of you will be cross-examining these witnesses. That's fine.

MS. HARRIS-CALVIN: Okay. Thank you.

THE COURT: Okay. Thank you.

Anything else?

MS. THEODORA: No, Your Honor.

THE COURT: So we'll start at 2:45, and unless someone has to have a break, we'll go until 4:30, okay?

MS. THEODORA: Thank you.

THE COURT: Thank you.

MS. THEODORA: Thank you, Judge.

(Luncheon recess taken.)

(Continued on the next page.)

AFTERNOON SESSION

(In open court.) (Parties present.)

THE COURTROOM DEPUTY: All rise.

Please be seated.

THE COURT: The jury is all here?

THE COURTROOM DEPUTY: Yes.

THE COURT: So we will start.

Now, the one video, does the government agree that I should give a limiting instruction on that first?

And what should I say? The government is not -- do we have like a number, exhibit number?

MS. THEODORA: They're all on Government Exhibit 106, but we can identify them by subletter, if that would be preferable.

THE COURT: Well, shouldn't there be a subletter, so that we know -- if I am going to give an instruction, I want to be able to say as to this or I can just say the first video. How do I -- how do we know what we're talking about?

MS. THEODORA: Yeah, I think you can say 106-A.

The file name of that one is IMG 5473.MOV.

THE COURT: 5473-dot --

MS. THEODORA: MOV.

THE COURT: MOV?

So there's this one video that ends in 547.MOV. The government is not offering that video to prove that Mr. John

committed the crime charged in Count One. It is being offered as background?

Also as to Count Two, I guess?

MS. THEODORA: Yeah, it's being offered for Count Two.

And the last four is 5473.

THE COURT: 5473?

MS. THEODORA: Yeah.

THE COURT: Count One, is it -- we call it the production count? What's the -- is that the right term for it?

MS. THEODORA: You can call it sexual exploitation of a child is what it's called in the statute.

THE COURT: Right. Right. Okay.

All right. And Mr. John, just a reminder, when you are giving an opening statement, you are not testifying.

Understood?

MR. JOHN: Yes. Yes, Your Honor.

THE COURT: Okay. And make sure your microphone is on and that the jury and everyone else in the courtroom can hear you. All right?

Okay. We will bring the jury out.

I am going to give a few general instructions first.

THE COURTROOM DEPUTY: Mr. John, I could provide you a lapel mic. Would you like that on?

THE COURT: You want that on?

THE DEFENDANT: Okay.

THE COURTROOM DEPUTY: Judge, permission to bring the jurors in?

THE COURT: Yes.

(Pause in proceedings. )

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: You can be seated.

THE COURT: Please be seated.

All right. Good afternoon, ladies and gentlemen.

First of all, thank you for being on time. I appreciate that. I am going to give you a few instructions now and then we will start the trial.

So, first of all, as I said earlier this morning, Mr. John is acting as his own lawyer. He has the right to do that.

So, you will hear him speak at various times during the trial. He will give an opening statement. He will cross-examine some of the government's witnesses -- not all of them -- and he is acting as counsel.

And, as you heard, I have appointed standby counsel, Jullian Harris-Calvin and Kyla Wells of the Federal Defenders of New York. They will assist him. I am going to let them cross-examine two of the witnesses rather than Mr. John

himself.

And so the government will make an opening statement, Mr. John will make an opening statement.

The opening statements are not evidence. They are not argument. When the lawyers speak, they are not testifying, they are not giving evidence because they are lawyers.

When Mr. John is speaking as a lawyer, that is, during the opening statement or asking questions on cross-examination, his statements, his questions also are not evidence.

His statements become evidence only if he chooses, on the defense case, to testify in his own defense. And again, he has the right not to testify, he has the right not to present any evidence, he doesn't have to present any evidence if he doesn't want to.

If he chooses not to testify, you cannot hold that against him in any way because under our Constitution, a defendant has the right to remain silent and is presumed innocent. But when -- so when he is speaking as a lawyer, he is not testifying, he is not giving evidence, he is acting as a lawyer.

The government will present its case. It will call its first witness right after the opening statements. As each witness testifies on direct examination, the defense will have

the opportunity to cross-examine.

After the cross, there may be what we call redirect. The government can ask a few more questions to try to explain. There may be some recross limited to what the government brought out on redirect. That will likely be the end of it.

Once the government presents all of its proof, the government will rest.

The defense may put on a case if it wants to, but again, it is under no obligation to present any evidence, to present any case.

But so we'll see whether Mr. John elects to present a defense case. And if he wishes, we will follow the same procedure in reverse: He will call his witnesses on direct, the government would get to cross, there might be some redirect or there might be some recross.

After the evidence is completed and both sides have rested, the government will give its summation, Mr. John will give his summation.

And after that, I will give you my instructions on the law. You will then retire to begin your deliberations.

Just a word on the evidence. The evidence from which you will decide the case will consist of the testimony of witnesses, documents and other things such as videos, photographs that may be received into the record as evidence.

Some things are not evidence and must not be

considered by you as evidence. As I said, statements and arguments and questions of the lawyers are not evidence. Objections to questions are not evidence.

Lawyers have an obligation to object when they believe that evidence that is being offered is improper under our rules of evidence and you should not be influenced by the objection or my ruling on it.

If I say that an objection is sustained, sustained, that means the witness will not be permitted to answer that question and you should disregard the question. If I say that the objection is overruled, that means that the witness will be permitted to answer the question and you should treat that answer like any other.

There may be times when I give you an instruction where evidence is being offered for a limited purpose only and you must follow that instruction.

If at any time I strike an answer or I instruct you to disregard an answer, then you may not consider that testimony. It is not evidence because I've stricken it and it must not be considered by you.

And again, as I have said, you may -- anything that you may see or hear outside the courtroom is not evidence and must be disregarded, for your verdict must be based on what is presented here, what the evidence is presented here or the lack of it.

Now, one of your most important tasks is that you evaluate the credibility of the witnesses, who do you believe, which witnesses do you believe, how much of their testimony to accept or reject.

I will give you some guidelines for helping you evaluate the credibility of witnesses at the end of the case. In the meantime, please listen carefully to the witnesses as they testify.

And finally, we've given you some pads, as I said. You can take notes. Write your name on the cover of the pad so that we know it's yours.

Remember that any notes that you take are for your use only and they are only to be used as an aid to your memory. Your memory controls. If you do take notes, don't get so caught up in taking notes you're not listening to the witnesses.

Once you are in your deliberations, if there is a disagreement between one juror's notes and another juror's notes or if there is a disagreement between one juror's notes and another juror's memory, then you will write us a note and we will have our court reporters read back the transcript. It's the actual court transcript that will control, not any particular juror's notes.

Exhibits will be offered and received into evidence. If there is an exhibit that you are particularly interested in

and you want to see it in your deliberations, write down the number. And when you get into your deliberations, you can ask for it.

There will be some evidence that we need to control how it is presented, but we will deal with that at the end.

And with that, I think we can begin. We will hear from the government.

MS. ELARDO: Thank you, Your Honor.

"I really don't want to. Do I have to? I don't feel comfortable with that. I'm only 13."

Those are the words that Kaliah, a seventh grader, wrote to the defendant, Dewitt John, an adult man using the internet to convince a 13-year-old girl to send him sexually-explicit videos of herself in exchange for money.

He knew Kaliah was a child and that she was uncomfortable with his requests, but he pressured her and she gave in.

So Kaliah sent the defendant graphic sexual videos of herself and the defendant paid her in exchange for those videos. And as you will hear, Kaliah was not the Defendant's only child victim.

You will learn over the course of the trial that between March 2024 and April 2024, the defendant, who was 31 years old, used the internet to find children and persuade them to send him sexual images of themselves.

This is includes Kaliah, who was 13 years old, and Jane Doe, who was also only 13 years old.

From his apartment right here in Brooklyn, the defendant used the internet and the insecurities of middle school girls to target his victims, who were in another state.

The evidence will show the defendant sought out young girls on social media and offered to pay them if they sent him pornographic videos of themselves masturbating and inserting objects into their vagina. Child pornography. And when they resisted, he pressured them. Provided explicit instructions to send them what he wanted: Child pornography.

A few moments ago, I spoke to you about Kaliah, who was actually in seventh grade when the defendant began messaging her online.

You will learn that Kaliah, who was having normal middle school insecurities about her appearance, used a social media website called Reddit to post photos of herself in a forum called am I Ugly/Teens.

The defendant responded to Kaliah's posts. You will learn he told Kaliah he will send her money for sexually-explicit photos of herself. He transitioned from messaging her on Reddit to Instagram, using a screen name that would surely resonate with a child: Spongebobdoodlepants23.

After building a connection with this child and confirming that she was in middle school, the defendant

started sending Kaliah small amounts of money: $20 on one day, $50 on another. Later on, he sent Kaliah detailed instructions on how to produce sexual videos of herself. The defendant instructed Kaliah to make and send him pornographic videos, which she did.

You will learn that in the beginning, the videos that Kaliah sent the defendant were less graphic. But then the defendant started telling Kaliah exactly how to film the child pornography he wanted her to create. He instructed her: Make a POV video of you riding something, front-facing camera.

You will learn he even gave Kaliah explicit instructions on what to say while she filmed herself doing that.

You will learn Kaliah tried to follow the Defendant's instructions. She filmed herself masturbating. And she sent the video to the defendant. But when Kaliah sent the defendant what she thought he wanted, you will learn the Defendant told this 13-year-old girl that she didn't do it right. You will learn the Defendant told her: When I said riding something, I meant like a make-shift dildo.

It was at this point that Kaliah said, and you'll learn: "I really don't want to. Do I have to? I don't feel comfortable with that. I'm only 13."

In the end, the Defendant got what he wanted. You will learn the Defendant convinced Kaliah to make more videos

of herself, including one where she used a green vibrator in another graphic masturbation video.

And right after Kaliah created and sent these videos to the Defendant, you learn he sent her more money.

The evidence will also show that after the Defendant used Kaliah to make explicit videos, he moved onto chatting with her best friend, who we will refer to throughout the course of this trial as Jane Doe. Jane Doe was another 13-year-old girl that the Defendant convinced to send him child pornography online.

You will learn that in April of 2024, the Defendant was introduced to Jane Doe through Kaliah. The Defendant then took advantage of Jane Doe just like he did with Kaliah. You will learn the Defendant persuaded Jane Doe to send him sexually-explicit photos of herself in exchange for money. And the defendant used the same online accounts to message and pay Jane Doe as he did with Kaliah.

For his conduct, the Defendant is charged with two crimes. The first crime, or count, relates to Kaliah only. The Defendant is charged with sexual exploitation of a child, for using Kaliah to make child pornography. The evidence will show he solicited her to make the videos I described earlier.

The second crime, or count that the defendant is charged with is accessing child pornography online with the intent to view it. This count relates to both Kaliah and Jane

Doe. Throughout the course of this trial, the evidence will show that the Defendant used his online accounts on Instagram and iMessage to view child pornography showing Kaliah and Jane Doe.

Over the next couple of days, you will see and hear the evidence relating to these charges. This evidence will come from several different places, including witnesses, videos, pictures, and messages.

As I said before, you will hear directly from Kaliah, who is still a minor today. She is going to testify in her own words about what happened. She will tell you how the defendant sought her out on social media and how the defendant asked her to send graphic sexual videos for money.

Now, Jane Doe has chosen to remain anonymous and will not be testifying. But you are going to hear directly from her mother about what happened.

You will also hear testimony from law enforcement witnesses, who will tell you how they were able to identify the Defendant as the person behind these online accounts. The law enforcement witnesses will also tell you about what the Defendant said to them and about their searches of the Defendant's apartment right here in Brooklyn, New York, his iPhone and his online accounts.

You will see photos and videos. Some of the sexually-explicit videos of these minors that were saved and

found on the Defendant's online accounts.

And finally, you will read for yourselves some of the Defendant's messages with his victims. You will see how the defendant, in his own words, preyed on these young girls.

At the conclusion of this trial, after you have seen and heard all of the evidence, we will have another opportunity to speak with you. At that time, we will ask that you reach the only verdict that is consistent with the evidence and the law: A verdict of guilty on both counts.

THE COURT: All right.

Mr. John, you can give your opening statement.

MR. JOHN: The defense reserves opening statements.

THE COURT: I'm sorry. The defense waives?

MR. JOHN: Reserves.

THE COURT: Reserves. I don't know what you mean by that. You can't reserve your opening statement. If you want to give it, you can give it now. Otherwise, you waive it.

MR. JOHN: Waive it.

THE COURT: All right. Okay. You have no obligation to give an opening statement.

Ladies and gentlemen, as you heard, Mr. John has elected not to give an opening statement. He's not required to give one. And so, the government may call its first witness.

MS. THEODORA: Thank you, Your Honor.

The government calls Kaliah.

THE COURT: All right.

And ladies and gentlemen, as I said to you earlier this morning, I am allowing Kaliah to testify using only her first name.

THE COURTROOM DEPUTY: Good afternoon ma'am. May I ask you to raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Thank you. Please be seated.

THE COURT: Why don't you spell Kaliah for us, for the record, please.

THE WITNESS: K-A-L-I-A-H.

THE COURT: All right.

MS. THEODORA: Thank you, Your Honor.

Before we begin, the government offers a number of exhibits: 100-R, 100-S, 101-R, 101-S, 102-R, 102-S, 103, 104-R, 104-S, 105-R, 105-S, 106-S, 107-S, 108-S, 109-S, 110-S, 111, 112, and 113.

THE COURT: Is there any objection, Mr. John, to any of those exhibits other than what we had discussed earlier today?

MR. JOHN: No, Your Honor.

THE COURT: All right. Then I will receive into evidence Government Exhibits 100-R, 100-S, 101-R, 101-S, 102-R, 102-S, 103, 104-R, 104-S, 105-R, 105-S, 106-S, 107-S,

108-S, 109-S, 110-S, 111, 112, and 113.

Ladies and gentlemen, those exhibits are received in evidence and the government will present them at some point.

(Government Exhibits 100-R, 100-S, 101-R, 101-S, 102-R, 102-S, 103, 104-R, 104-S, 105-R, 105-S, 106-S, 107-S, 108-S, 109-S, 110-S, 111, 112, and 113.)

MS. THEODORA: And, Your Honor, just one more housekeeping note from the government's end: The exhibits that are ending in S are being offered under seal.

THE COURT: All right. That's fine.

MS. THEODORA: May I proceed?

THE COURT: Yes, you may.

Kaliah, after having been duly sworn/affirmed, testified on her oath as follows:

DIRECT EXAMINATION

BY MS. THEODORA:

Q Good afternoon, Kaliah.

A Good afternoon.

Q How old are you?

A Fifteen.

Q What grade are you in?

A Ninth.

MS. THEODORA: Ms. Reed, can we pull up for the witness, the court, and the defendant only what has been marked for identification -- or what is in evidence as

Government Exhibit 100-S?

And the jury can see this as well, actually, I believe.

THE COURT: It's in evidence?

MS. THEODORA: Yes.

THE COURT: Ladies and gentlemen, it's in evidence.

If you have any trouble with the screen, just let us know. You should be able to see it on your screen and as you can see, the exhibit is marked with an exhibit sticker and this is how we keep track of the exhibits.

And this one -- is it just the one page?

MS. THEODORA: Yes, it is.

THE COURT: It's a cover page of some kind?

MS. THEODORA: Yes.

(Exhibit published.)

THE COURT: Okay.

Q Kaliah, without reading this out loud, what is this?

A My first and last name.

MS. THEODORA: Ms. Reed, can we pull up for the witness, the court, counsel and the jury only what is in evidence as Government Exhibit 101-S?

Q Kaliah what is this?

A My birth certificate.

Q I'm going to ask you to look at line 2, where it says date of birth.

Do you see that?
A Yes.
Q Is that your date of birth?
A Yes.
Q Without reading the whole thing out loud, what is your year -- what is the year that you were born?
A 2011.
MS. THEODORA: Thank you, Ms. Reed.
THE COURT: And just we should explain.
Ordinarily, Government exhibits that come into evidence are publicly available. But for the privacy concerns that we talked about in this case, these exhibits are being sealed, except that they are made available to the defense, to the jury for the jury to see, and the court. The folks in the back don't get to see it. But that's what we mean by being sealed.
Okay. Go ahead.
MS. THEODORA: Thank you.
Ms. Reed, you can take this down.
Q Kaliah, I want to take you back to the first part of 2024. What state were you living in then?
THE COURT: Is there a way to put the microphone up on there? I don't know, is that or not? Or bring it closer? Because I don't think it's actually picking you up.
MS. THEODORA: Is that better?

THE COURT: Oh, yes.

MS. THEODORA: Is that better?

THE COURT: Yes.

Q Kaliah, in the first part of 2024, what state were you living in?

A Texas.

Q And what grade were you in?

A Seventh.

Q How old were you?

A 13.

Q Without telling us the exact day, what month did you turn 13 in 2024?

A January.

Q Did you have a cellphone around that time?

A Yes.

Q What kind of cellphone did you have?

A A pink iPhone 15.

Q How long had you had a working cellphone that you could call and text people on at that time?

A About a year.

Q What kind of online messaging or social media applications, if any, did you use on your iPhone?

A TikTok, Instagram, iMessage.

Q What about Reddit?

A Yes.

Q What is Reddit?
A An app where you can view and post in online forums.
Q And what have you used Reddit form?
A To post, comment and direct message.
Q Around the time you turned 13, at the end -- at the beginning of 2024, did you make any posts on Reddit?
A Yes.
Q What Reddit forum, if any, did you post in?
A R/Am I Ugly Teens.
Q Approximately when did you post in that forum?
A March 2024.
Q What is the R/Am I Ugly Teens Reddit forum?
A It is a forum where you would post photos of yourself and other people in the forum would comment and rate you and tell you if you were attractive or not.
Q Why did you make this post in that forum at that time?
A At the time, I wanted a sort of confidence boost.
MS. THEODORA: Ms. Reed, can we pull up what's in evidence as Government Exhibit 105-S?
Q Kaliah, what is this?
A The Reddit forum I mentioned before.
Q And is this a fair depiction of what it looked like in March 2024, that forum?
A Yes.
Q Where is the forum name in this post?

A At the top above the number of members.
Q That's where it says "R/Am I Ugly Teens"?
A Yes.
Q What, if anything, did you observe about how other users in this forum were posting about and identifying themselves?
A And attach to your photo in the caption or description, you would put your age and your gender indicated by F or M, and that's it for identification.
Q Did you do that in your post?
A I did.
Q What did you put in your post?
A 13 F. Or F 13.
MS. THEODORA: Ms. Reed, can you pull up what's in evidence as Government Exhibit 104-S?
Q Kaliah, what is this?
A The Reddit post I made in March of 2024.
Q And can you circle for the jury where it says your age in this post?
A Yes.
THE COURT: Is it working?
I don't see.
Q Is it where it says F 13?
A Yes.
Q And what does it say after that?
A "Be brutally honest."

Q Why did you write that?
A Because I wanted the other people in the forum to be honest about how I looked.
THE COURT: Is that you, by the way, in the photograph?
THE WITNESS: Yes, it is.
Q And, Kaliah, do you see on the photograph of you where it says 1/15?
A Yes.
Q What does that mean?
A That that is the first picture out of a 15-picture carousel.
MS. THEODORA: And if we could scroll to the bottom of this?
Q Do you see on the bottom right where there's an arrow that says 829?
A Yes.
Q What does that mean?
A The number of shares the post has.
Q And do you see the comment bubble?
A Yes.
Q What does that indicate?
A The number of comments on the post.
Q Kaliah --
THE COURT: Can I just --

I see the comments. How many comments were there? Tell me what bubble it is.

THE WITNESS: 280.

THE COURT: Okay. Thank you.

Q Kaliah, after you posted this, did you receive any direct messages?

A Yes.

Q Are you familiar with the username Spongebobdoodlepants?

A Yes.

Q Whose username is that?

A It's the username of a user that direct messaged me on Reddit.

Q And approximately --

THE COURT: Can you just pull the microphone closer to you a bit?

Yes. That's better. Thank you.

Q And when you say he direct messaged -- or Spongebob direct messaged you on Reddit, was that in -- what was that in response to, if anything?

A In response to my post.

Q The post in Government Exhibit 104-S?

A Yes.

Q Approximately when did Spongebobdoodlepants respond to this post?

A Around the same time of me posting it, March 2024.

Q Okay. And what did he say in response in his direct message to you?
A He offered me money in exchange for nude photos of myself.
Q And did you send him nude photos of yourself or images of yourself?
A I did.
Q Did you start chatting with Spongebobdoodlepants, too?
A I did.
Q What online platforms did you message with him on?
A Reddit, Instagram, and iMessage.
Q Okay. And which one did you message with him on first?
A Reddit.
Q Okay. Did you ever meet Spongebobdoodlepants in person?
A No.
Q Did you ever learn his real name?
A No.
Q Did you ever see a picture of him?
A No.
Q And what, if any, money, Kaliah, did Spongebobdoodlepants send you online?
A He sent me money through Cash App.
Q What is Cash App?
A A bank app where you can transfer money from user-to-user.

Q And in sum and substance, did Spongebobdoodlepants tell you why he paid you on Cash App?
A Yes.
Q And what did he say to you?
A That it was in exchange for nude photos of myself.
MS. THEODORA: Ms. Reed, can we pull up for the witness, court, defendant and the jury what's in evidence as Government Exhibit 503b-1-S?
Q Kaliah, did you review this exhibit in advance of your testimony today?
A Yes.
Q What is it?
A Instagram messages between me and Spongebobdoodlepants.
Q And did you see the participants row at the top?
A Yes.
Q Where, if anywhere, is your username?
A At the top, the first one under "participants."
Q Is that the one that says "777"?
A Yes.
Q Was that your username?
A It was my display name.
Q And who is the other participant in this conversation?
A Spongebobdoodlepants.
MS. THEODORA: Ms. Reed, if we can scroll down a little bit?

Actually, Ms. Reed, let's pull up the redacted version of this exhibit and the entire gallery can see this.

(Exhibit published.)

Q Kaliah, do you see the green messages and the blue messages?

A Yes.

Q Whose messages are in green on this exhibit?

A Spongebobdoodlepants.

Q And whose messages are in blue?

A Myself.

Q So I'm not going to review this whole exchange with you, but I do want to ask you questions about some of the messages. Okay?

A Okay.

MS. THEODORA: Ms. Reed, can we navigate to the bottom of page 3?

THE COURT: And just, I think I can tell from looking at the top, but this is a 60-page document, thereabouts?

MS. THEODORA: Yes, it is, Your Honor.

THE COURT: Okay.

Q Kaliah, do you see that bottom message in green that says: I know it's late, but we really have to set something up?

A Yes, I do.

Q Who sent that message?
A Spongebobdoodlepants.
Q And what did you understand Spongebobdoodlepants to mean when he said that?
A He was referencing him sending me money in exchange for nude photos.
Q Can you read the date of this message?
A March 19th, 2024.
MS. THEODORA: Ms. Reed, can you navigate to the bottom of page 5?
Yes, there we go. Sorry, top of page 6.
Q What -- who is this message in green from?
A Spongebobdoodlepants.
Q And what is the date of this message?
A March 26th, 2024.
Q And do you see how he says: We gotta set up our deal?
A Yes.
Q What did you believe him to mean by that?
A I believed him to be referencing him sending me money in exchange for nude photos.
THE COURT: Hold on.
Oh. They're fixing something.
THE COURTROOM DEPUTY: It should come right back on.
THE COURT: It just disappeared again.

Here it comes. Okay.

MS. THEODORA: Ms. Reed, can you navigate to page 9? And if you could go to the top, Ms. Reed. The top of right here.

Q Do you see that top blue message right there on page 9?

A Yes.

Q And you have the screen in front of you, too. You should.

Without reading the full thing out loud, what is that?

A My cashtag.

Q And why did you send --

THE COURT: Just what is a cashtag?

MS. THEODORA: Thank you, Your Honor.

Q What is a cashtag?

A Your username on Cash App.

THE COURT: And that's also when someone sends you money through that app?

THE WITNESS: Correct.

THE COURT: Okay.

Go ahead.

Q Why did you send your cashtag to Spongebobdoodlepants?

A So he could send me money.

Q And what is the date of that message, Kaliah?

A March 28th, 2024.

MS. THEODORA: If you could scroll down a little bit, Ms. Reed?

Q Kaliah, do you see that message from you in blue that says: I got it. TYSM?

A Yes.

Q What does TYSM stand for?

A Thank you so much.

Q What were you thanking Spongebobdoodlepants for?

A Sending me money.

MS. THEODORA: Ms. Reed, can we navigate to page 11 of this document?

Q Kaliah, do you see these top two messages in green: Can I see you as you just get up probably already awake and headed for school?

A Yes.

Q Who are those messages from?

A Spongebobdoodlepants.

Q And I want to ask you on the next page about a voice mail.

MS. THEODORA: You can scroll down to the next page. Stop there.

Q Do you see that green message that says you sent a voice message?

A Yes.

Q Who sent a voice message there?

A Spongebobdoodlepants.

MS. THEODORA: Ms. Reed, can we play --

And, Your Honor, actually, I don't think I technically offered this exhibit yet. I apologize. Government Exhibit 503b-1-B. We offer it into evidence.

THE COURT: 503b-1-B?

MS. THEODORA: Yes.

THE COURT: Any objection to that?

MS. HARRIS-CALVIN: No, Your Honor.

THE COURT: Okay. Government Exhibit 503b-1-B is received.

(Government's Exhibit 503b-1-B was received in evidence.)

THE COURT: You can play it for the -- and this is not sealed?

MS. THEODORA: It is not, Your Honor.

(Audio played; audio stopped.)

THE COURT: Play it again because I couldn't hear it. Just play it again. Thanks.

(Audio played; audio stopped.)

(Continued on the next page.)

(Continuing.)

THE COURT: Okay. Go ahead.

BY MS. THEODORA:

Q Kaliah, whose voice did you understand that to be?

A Spongebobdoodlepants.

Q What do you remember, if anything, about telling Spongebobdoodlepants about your school?

A I told him I went to school in Texas. I told him when my state testing was. I told him when I didn't go to school, and that's all I recall telling him about school.

Q Can you -- when you say your state testing, what state testing are you referring to?

A The STAR test that's for grades third through eighth in Texas, the readiness assessment.

MS. THEODORA: Ms. Reed, can you navigate to Page 15 of Government Exhibit 503b-1-R?

Q Kaliah, do you see that top message in green from Spongebobdoodlepants?

A Yes.

Q What does that message say?

A Sending message at EMIJ.1996@gmail.com.

Q Did you ever send Spongebobdoodlepants a message at EMIJ.1996@gmail.com?

A Yes.

Q And how did you send him that message?

A Through iMessage.
Q Can you iMessage a Gmail account like that?
A Yes, when it's going to be to an Apple ID.
MS. THEODORA: Ms. Reed, can you pull up what's in evidence as Government Exhibit 102-F?
And just for the jury.
BY MS. THEODORA:
Q Kaliah, what is this? Can you see it?
A (No verbal response.)
Q No?
A I see it now.
It is me and Spongebobdoodlepants' messages on iMessage.
Q And do you see under the participants column of this exhibit the phone number that says 9968?
A Yes.
Q Whose phone number is that?
A It was my phone number at the time.
Q And what is your understanding of why it says Lonnie underneath you phone number?
A Because it was my phone, my Apple ID was connected to my mother's account, and that's what I had her contact name as.
Q Did your mom use this phone number at this time?
A Yes.

Q And who is the other participant in this message thread?
A Spongebobdoodlepants.
MS. THEODORA: Ms. Reed, can you pull up the redacted version of 102-X, and then we can push it to the gallery.
Q So, Kaliah, you testified that these are your iMessages with EMIJ.1996, who understand to be Spongebobdoodlepants?
A Yes.
Q Do you remember that?
A Yes.
Q In these exhibit, whose messages are in green and whose are in blue?
A Mine are in green and Spongebobdoodlepants' messages are in blue.
Q So on the iMessages, it's flipped?
A Yes.
Q Okay.
So similar to the Instagram messages we just looked at with you, I'm not going to walk you through this whole conversation with is 60 pages. But I do want to ask you a few questions about some messages, okay?
A Okay.
MS. THEODORA: Ms. Reed, can you go the Page 8?
BY MS. THEODORA:

Q Kaliah, do you see the blue message there that says: Wait, so do you have a Cash App card?
A Yes.
Q Whose is sending that message?
A Spongebobdoodlepants.
Q What is a Cash App card?
A The cash -- it's a debit card that runs through Cash App.
Q And at this time in March 2024, did you have a bank account?
A No.
Q Was -- did you have a Cash App card?
A Yes.
Q Okay.

MS. THEODORA: And, Ms. Reed if we could go down to Page 18.

BY MS. THEODORA:
Q Kaliah, you can stop --

MS. THEODORA: Ms. Reed, you can stop there, I'm sorry.

BY MS. THEODORA:
Q Kaliah, do you see that green message that says, Want to see something?
A Yes.
Q Who sent that message?

A I did.

MS. THEODORA: And if we could go down to the next page?

Q Kaliah, do you see this message in green that says attachments, and then it's a file that says, IMG_5473.MOV?

Do you see that?

A I do.

Q What date did you send this to Spongebobdoodlepants?

A March 28th, 2024.

Q Kaliah, in advance of your testimony today, did you review what this attachment is?

A Yes.

Q Is it a video?

A Yes.

Q And did you rewatch the video?

A Yes.

Q Before you rewatched it -- when did you rewatch it?

A Yesterday.

Q And before yesterday, did you remember what was on this video?

A No.

Q Okay.

And did rewatching it yesterday help you remember what's on it?

A Yes.

Q Sitting here right now, can you remember the specific details of what's on that video?
A Yes.
Q Oh, okay.
What -- what do you remember; what's on that video?
A It is a video of me in my guest bedroom closet undressing.
Q Okay. And what did you believe would happen when you sent this video to Spongebobdoodlepants?
A That I would get money in return.
MS. THEODORA: Ms. Reed, can we navigate to Page 22? And if you could go to the "how much" message.
Q Do you see that message in blue that says "how much"?
A Yes.
Q What is the date of that message?
A March 28th, 2024.
Q Same day that you sent the video that we just talked about?
A Yes.
Q So who sent this message in blue?
A Spongebobdoodlepants.
Q Okay. So starting with this message in blue, I'm going to read the messages in blue and then I'll ask you to read the messages in green, if that's okay with you.

A Okay.
Q Okay.
How much?
A How much do you think I deserve?
Q Well, if you want to make it interesting.
A I do.
MS. THEODORA: You can stop there, Ms. Reed.
Q If you want to make something special for me, POV video of you riding something. Front facing camera. Tell daddy how much you want him to fuck you. It does not have to be anytime soon. Just when you're in the mood and enjoying yourself.
Kaliah, did you understand what Spongebobdoodlepants was asking you do in the message that I just read out loud?
A Not entirely.
Q How did the message make you feel?
A Uncomfortable.
Q Is it a little hard to put into words how you remember feeling?
MS. HARRIS-CALVIN: Objection.
THE COURT: Well, I'll sustain the objection. But Mr. John should be making the objections if there's an objection.
Sustained.

MS. THEODORA: Ms. Reed, can we navigate to Page 25?
Q Kaliah, do you see that message that says: I give small at a time?
A Yes.
Q What is the date of that message?
A March 28th, 2024.
Q And who sent that message?
A Spongebobdoodlepants.
Q And do you see the message in green from you in response to that message?
A I do.
Q What does it say?
A Thank you.
Q Why did you say "thank you"?
A Because he had sent me money.
Q Can you read the date -- you read the date. But can you read also the time?
A March 28th, 2024, at 9:31 p.m.
Q Okay.
MS. THEODORA: Ms. Reed, can you pull up what's in evidence as Government Exhibit 103?
Q Kaliah, what is this?
A A Cash App transaction.
Q And what is the date and time of this message?

A March 28th at 9:31 p.m.
Q Who is this Cash App transaction between?
A Myself and Spongebobdoodlepants.
Q And did you pay him or did he pay you?
A He paid me.
Q What is his Cash App name?
A O-L-I-S-T-E-P-H-A.
Q And is there another display name there?
A A.J.
Q How much was this payment for?
A $20.
Q All right.

MS. THEODORA: Ms. Reed, can you go back to Kaliah's Instagram messages with Spongebobdoodlepants, which is Government Exhibit 503b-1-R, and you can do to Page 24.

Your Honor, to the extent I did not offer this exhibit, I'm sorry about that.

I offer it now, Government Exhibit 503b-1-R and S.

THE COURT: Any objection?

THE DEFENDANT: No, Your Honor.

THE COURT: Government's Exhibits 503b-1-R and b-1-S are received.

(Government's Exhibits 503b-1-R and 503b-1-S admitted.)

Q Kaliah, do you see the green message on these Instagram

messages that says how do you feel about my request?
A Yes.
Q Who sent that message?
A Spongebobdoodlepants.
Q And what is the date of this message?
A March 31, 2024.
Q So a few days after that Cash App payment we just looked at?
A Yes.
Q What did you believe Spongebobdoodlepants to be referring to when he mentioned his request?
A The request he had previously made on March 28th.
MS. THEODORA: And if we scroll down to the next -- to Page 30?
Q Kaliah, do you see the blue message there that says, sent a video?
A Yes.
Q Whose message is that?
A Mine.
Q And did you review this video in advance of your testimony today?
A Yes.
Q Before you watched this video to prepare for your testimony, did you remember what was on it?
A No.

Q Did watching it yesterday help refresh your recollection?
A Yes.
Q Do you remember the specific details of it right now sitting here today?
A Yes.
Q Okay.
What does this video generally show?
A It is a video of me in the guest bedroom of my house on the guest bedroom bed, and I'm on top of a pillow.
Q Okay.
MS. THEODORA: Ms. Reed, can you scroll down to the next green message.
You can stop there.
Q Kaliah --
MS. THEODORA: And is this is Page 31, for the record.
Q What does this green message at the top from Spongebobdoodlepants say?
A Send iMessage.
Q Did you understand why he said that?
A No.
MS. THEODORA: Ms. Reed, can you go to Page 33?
Q So Kaliah, same thing, I'm going to ask you because your messages are in blue on this Instagram conversation and

Spongebobdoodlepants' are in green.

And I'm going to ask you to read the blue ones and I'll read the green ones. Okay? Starting with seen.

MS. THEODORA: And then, Ms. Reed, we'll go to the bottom of Page 35.

A Okay.

Seen.

Q Jaw jaw.

A Question mark.

Q Yeah.

A I did what you wanted.

Q Almost.

A What do you mean?

Did I do something wrong?

Q Nope. What's cool?

When I said riding, I meant, like, a makeshift dildo, something like that.

Also, your fit.

A I really don't want to. Do I have to? I don't feel comfortable with that. You know, I'm only 13.

Q Oh. Thought you were older. You've never tried anything? Does not have to be anything big.

A I'm scared, though.

Q A marker? It's okay, though.

A I guess.

Q Then just regular stuff then. In terms of you having fun with yourself.

I just prefer it when -- I just prefer when you enjoy it and it shows.

Kaliah, have you ever done the things that Spongebobdoodlepants was asking you to do in these messages?

A No.

Q If you remember, how did these messages from Spongebobdoodlepants make you feel?

A Pressured into doing what he was asking me to do.

Q And what, if anything, did you do in response to receiving these messages from Spongebobdoodlepants?

A I sent him two more videos.

Q Okay.

MS. THEODORA: So, Ms. Reed, can you go back to the iMessages, which are Government Exhibit 102-R in evidence? And at Page 40.

Q Kaliah, do you see that green message right there that says attachments, and then it says IMG5722.mov?

A Yes.

Q What is the date and time that you sent -- is this message from you?

A Yes.

Q Okay.

And what is the date and time that you sent this

message?
A March 31st, 2024 at 8:28 p.m.
MS. THEODORA: And then, Ms. Reed, can you scroll to the next page?
Q Do you see that second attachment there that's labeled IMG_5724.mov?
Do you see that?
A Yes.
Q Whose sent this attachment?
A I did.
Q And what is the date and time of this message?
A March 31st, 2024 at 8:30 p.m.
Q Did you watch these two videos in advance of your testimony today?
A Yes.
Q And did you remember what was on them before you re-watched them?
A No.
Q Do you remember what was on them now, the specific details?
A Yes.
THE COURT: When did you watch them?
THE WITNESS: Yesterday.
THE COURT: Okay.
BY MS. THEODORA:

Q What do these videos show?
A The first one is a video of me in my guest bedroom closet, nude, with my legs open facing the camera.
The second video is in the same location, nude, and this time I'm on top of the pillow.
Q Okay.
Kaliah, who did you create these videos for?
A Spongebobdoodlepants.
MS. THEODORA: If we can go to Page 43.
Q Do you see that message in blue that says, hold up, where you get a vibrator?
A Yes.
Q Who sent that message?
A Spongebobdoodlepants.
Q Did either of the videos that you just described display a vibrator?
A Yes.
Q So Kaliah, I'm going to switch gears a little bit, okay?
A Okay.
MS. THEODORA: Ms. Reed -- and Your Honor, at this time, the Government offers Government Exhibit 202-A-S, 200-S, 202-A-R, and that is it.
THE COURT: Any objection to Government's Exhibit's 202-A-S, 200-S, 202-A-R, Mr. John?

THE DEFENDANT: No objection -- no objection, Your Honor.

THE COURT: All right. Those three exhibits are received.

(Government's Exhibits 202-A-S, 200-S, 202-A-R admitted.)

MS. THEODORA: So, Ms. Reed, can you pull for the Court, the Defendant, the witness, and just the jury what's been -- what's in evidence as Government's Exhibit -- what was that -- oh, okay. Government Exhibit 202-A-S.

Q Kaliah, can you see this exhibit?
A Yes.
Q So by just a yes-or-no answer at first.
Do you recognize this person?
A Yes.
Q And without identifying her by name, who is this?
A My best friend.
Q So I'm going to refer to her as Jane Doe going forward.
Is that okay with you?
A Yes.
Q Okay. Does this photo fairly and accurately depict Jane Doe in March 2024?
A Yes.
Q How old was Jane Doe in March 2024?
A 13.

MS. THEODORA: And Ms. Reed, can you publish what's in evidence just for the jury, Counsel, the Court, and the witness Government's Exhibit 200-S?

Q Kaliah, without reading this out loud, what is written here?

A Jane Doe's first and last name.

Q Okay.

So Kaliah, you said Jane Doe is your best friend.

How did you meet her?

A Through the school.

Q Did you have any classes together?

A Yes.

Q Which classes did you have together?

A Theater and homeroom.

Q And what grade were you in when you met Jane Doe?

A 7th.

MS. THEODORA: Ms. Reed, can you pull up what's in evidence as Government's Exhibit 102-S, and navigate to Page 44, and this is for the jury only.

Q Kaliah, do you see those green messages that say, I have something for you. One of my friends.

Do you see that?

A Yes.

Q Who sent those messages?

A I did.

Q And what is the date of these messages?
A April 12th, 2024.
Q Just a reminder not to use anyone's real name, but who are you referring to here?
A Jane Doe.
Q And why did you say this to Spongebobdoodlepants?
A That -- that same night, me and Jane Doe were on the phone, and I do not recall if I told her about this situation or if I was sharing my screen and she had seen something in my phone. But -- but we ended up having a conversation about the Spongebobdoodlepants situation, and I informed her of how I was making money, and she expressed to me that she was interested in making money the same way. So I texted Spongebobdoodlepants these two messages.
MS. THEODORA: Ms. Reed, can you go Page 47?
Q Kaliah, do you see the message there in blue from -- Page 47, the message in blue that says, Insta first?
A Yes.
Q Who is this message from?
A Spongebobdoodlepants.
Q And he's using emej.1996@Gmail.com?
A Yes.
Q To your understanding?
A Yes.
Q What did you believe about why he said, Insta first in

that message to you?
A Because he wanted Jane Doe's Instagram before proceeding with anything else.
MS. THEODORA: And Ms. Reed, if we could go to Page 48?
Q So Kaliah, do you see is this top green message?
A Yes.
Q Without reading that out loud, what -- what does that message say? And just a reminder not to use anyone's real name.
A It is Jane Doe's Instagram at the time.
Q Why did you provide Spongebobdoodlepants with Jane Doe's Instagram?
A Because he asked for it.
Q All right.
MS. THEODORA: Your Honor, at this time we'd like to -- can I approach the witness with the thumb drive, Government Exhibit 106, which is already in evidence?
THE COURT: Yes.
Q Kaliah, I'm handing you what's in evidence as Government Exhibit 106-S.
Kaliah, what is that?
A This -- these are -- this is the thumb drive with the four attachments mentioned previously on it.
Q The four videos --

A Yes.
Q -- we talked about in your testimony?
A Yes.
Q And are -- is this how you reviewed the videos yesterday?
A Yes.
Q And how to do you recognize this thumb drive?
A I signed and dated it yesterday.
Q And just to be clear for the record, who is pictured on this thumb drive?
A Myself.
Q And Kaliah, have you spoken to Spongebobdoodlepants since 2024?
A No.
Q And after you met him online, did there come a point in time when you gave your phone to law enforcement?
A Yes.

MS. THEODORA: No further questions, Your Honor.

We would like to do what we had proposed --

THE COURT: Okay.

MS. THEODORA: -- with this exhibit.

THE COURT: Okay. Kaliah, I'm going to ask you to step out of the courtroom, and we're going to play the videos for the jury, the Defense, the Government, and the Court.

And we will retrieve you when we're ready for you.

Are we going to do first video first as we discussed?

MS. THEODORA: Yes, Your Honor.

THE COURT: Okay. Ladies and gentlemen, the Government is now going to play four videos that are on the flash drive that the witness just discussed. The first video is numbered 5473.mov.

The Government is not offering this video to prove that Mr. John is guilty of Count One, the sexual exploitation of a child count.

The other three videos are being offered as proof, the Government contends, as proof of Mr. John's conduct in violation of -- as charged in Count One.

All four videos are being offered as proof of the crime charged in Count Two, which is accessing video on the Internet of a child, of pornography. So just so you know, there's a difference between the first video and the other three videos.

Okay. Go ahead.

MS. THEODORA: Oh, Your Honor, would you please ask the public to leave the gallery right now.

THE COURT: Okay. They can't see but --

MS. THEODORA: Oh, okay.

THE COURT: Is there sound?

(*Sotto voce* discussion.)

THE COURT: Is there a problem if -- if the videos cannot be seen by those in the back?

MS. THEODORA: I don't think so, Your Honor. I think we can just proceed. I'm sorry.

THE COURT: Okay.

Let's proceed.

And for the record, the videos are not up on the big screen or on the screens in the back of the courtroom. They can only be seen by the jury, the Government, the Defense, and the Court.

(Video plays.)

(Video stops.)

THE COURT: Okay.

MS. THEODORA: For the record, that was IMG5473.

The next one is --

THE COURT: And that one is the one that's not being offered to prove Count One.

MS. THEODORA: Yes.

THE COURT: The next one?

MS. THEODORA: The next one starts with unified message and it ends in 2099.

THE COURT: All right.

(Video plays.)

(Video stops.)

MS. THEODORA: So we're now playing the third video, which is 5722 -- IMG_5722.

THE COURT: All right.

(Video plays.)

(Video stops.)

MS. THEODORA: I think we can move on to the next.

THE COURT: Okay.

MS. THEODORA: Fourth video, IMG_5724.

THE COURT: All right.

(Video plays.)

(Video stops.)

MS. THEODORA: I think we can stop this one.

THE COURT: Okay.

MS. THEODORA: No further questions, Your Honor.

THE COURT: All right.

Let's bring back the witness. And Ms. Harris-Calvin is going cross-examine.

MS. HARRIS-CALVIN: Yes. Thank you, Your Honor.

THE COURTROOM DEPUTY: Just for the record, I'm reminding you, you're still under oath.

THE COURT: You can see the witness from there?

MS. HARRIS-CALVIN: Can you see me, Kaliah?

THE WITNESS: Yes.

MS. HARRIS-CALVIN: Okay.

I'm just going to put this is on.

CROSS-EXAMINATION
MS. HARRIS-CALVIN:
Q Okay. And you can hear me, too, Kaliah?
A Yes.
Q I'm Jullian. I'm just going to ask you a few questions. Okay?
A All right.
Q So when you were talking to Ms. Theodora, you mentioned that you posted on Reddit because you wanted a confidence boost.

And then she showed you what has been marked as Government Exhibit 104.

MS. HARRIS-CALVIN: May I ask you to please pull that up?

THE COURT: You are doing R or S.

MS. HARRIS-CALVIN: S, we'll do S.

THE COURT: S, okay, so not for the gallery.

MS. HARRIS-CALVIN: Okay.

BY MS. HARRIS-CALVIN:
Q And are you looking at the Government Exhibit 104-S, Kaliah?
A It hasn't shown up yet.
Q Okay.

THE COURT: Give it a second. It should come.

MS. HARRIS-CALVIN: Let me know when you're ready.

THE WITNESS: No.

THE COURT: It's not up?

(Pause in proceedings.)

THE COURT: No? No?

(Pause in proceedings.)

THE COURT: No -- nope.

Nothing happens.

THE COURTROOM DEPUTY: Let me see a quick.

(Continued on the next page.)

(Pause in proceedings.)

MS. HARRIS-CALVIN: Do we want to take maybe a five-minute break?

THE COURT: No, let's just try it because I want to be done.

Put it back up.

If you are sitting forward, can you see it on my screen?

THE COURTROOM DEPUTY: If you don't mind standing.

THE COURT: She can see it on my screen.

MS. HARRIS-CALVIN: Thank you, Your Honor.

BY MS. HARRIS-CALVIN:

Q So looking at Government Exhibit 104-S, you testified earlier that this is the photograph you posted on Reddit before meeting Mr. John, right?

A Correct.

Q And you noted that in that top corner of the photo of you, it says 1 of 15, right?

A Correct.

Q And that's because this is just 1 of 15 photographs that you posted?

A Correct.

Q And at least some of those photos were topless photos of you, right?

A No.

Q But you did post topless photos of you on Reddit, right?
A No.
Q So it's your testimony here today that you did not post any topless photos on Reddit?
A I did not.
Q Do you remember speaking with the FBI in 2024?
A Yes.
Q And do you remember telling them -- did you not tell them that you posted topless photos on Reddit?
A Can you ask the question again?
Q Of course.

When you met with the FBI in 2024, you told them that you posted topless photos on Reddit?
A I did not.
Q And did you not -- and is it your testimony that you did not tell them you posted topless photos because you were money hungry?
A Can you ask the question again?
Q Did you tell the FBI in 2024 that you posted topless photos because you were money hungry?
A I did not.

THE COURT: Do you have a -- is it up on your screen now?

THE WITNESS: It's not.

THE COURT: No. Okay.

Q All right. Now, you also testified when you were talking to Ms. Theodora that you sent Mr. John some photos and videos, right?
A Correct.
Q And they were sexually explicit?
A Correct.
Q And in exchange, he would give you money?
A Correct.
Q And there were also times when he gave you money because you simply asked for it, right?
A Correct.
Q Like, when you missed the bus and needed an Uber?
A Correct.
Q And you also were at the store one day and wanted to buy some food?
MS. THEODORA: Objection, Your Honor.
THE COURT: Overruled.
Q You were at the store one day and asked him for money for snacks?
A Correct.
Q And both those times, he sent you money?
A Correct.
Q You also told him that you used some of the money for clothes, right?
A Correct.

Q For makeup?
A Correct.
Q And for self-care?
A Correct.
Q And you told him that you were chatting with him for fun and for the money?
A I do not recall.
Q Would it help you to take a look at your Instagram thread with him?
A Per chance.

MS. HARRIS-CALVIN: Let's pull up for Kaliah Government Exhibit 503-B-1-R, I believe. And on page, let's start on 25.

THE COURTROOM DEPUTY: Can I switch seats with her, have her sit on my mic by the chair?

THE WITNESS: Okay.

THE COURT: Why don't you step down. That way you can see the screen.

Q All right. So I will let you read from 25 to 26. And then when you're done, let me know.
A 25 to 26?
Q Yes. I will scroll.

THE COURT: Okay. Enough, I think.

MS. HARRIS-CALVIN: Yes, sorry.

Q Okay. Does that help refresh your recollection?

A Yes, it does.
Q Okay. And so you told him that you did it for the fun and for the money, right?
A Yes, I did.
MS. HARRIS-CALVIN: Do you want to just keep her there?
THE COURT: No. Unless you have more to show her, you can go back to the witness box.
MS. HARRIS-CALVIN: Not for that question. Thank you, Kaliah.
Q Okay. A moment ago you talked about Mr. John asking you for videos, yes?
A Correct.
Q Oops. I think her mic is off.
THE COURT: Well, just make sure. Now the mic is off.
There we go.
Do the question again.
Q Yes. A moment ago you were talking to Ms. Theodora about Mr. John asking you for videos?
A Correct.
Q And you went over him asking for a video with you masturbating with a marker, right?
A Can you repeat the question?
Q Sure.

You told the Government a moment ago that Mr. John asked you to masturbate with a marker, yes?
A Did I tell them that? Is that what you're asking?
Q On your testimony, you guys talked about him asking you to masturbate with a marker?
A Yes.
Q And potentially a makeshift dildo?
A Yes.
Q You did not send him a video with a dildo, right?
A I did not.
Q And not a makeshift dildo?
A I did not.
Q Instead, you sent him a video with a green vibrator, correct?
A Correct.
Q And you already had that vibrator?
A Correct.
Q Before Mr. John asked you for that particular video?
A Correct.
Q I just have a few more questions and then I will be done.
Okay. You live in North Carolina now, yes?
A Correct.
Q And so you flew in for this trial?
A I did.
Q And before coming here, you viewed this as a great

experience, right?

MS. THEODORA: Objection.

THE COURT: Sustained, sustained. We talked about this.

Next question.

MS. HARRIS-CALVIN: Sure.

Q You believe this experience is an inside look into the justice system?

MS. THEODORA: Objection.

THE COURT: Overruled. You can answer that one.

A Which experience?

Q Coming here for this trial?

A I viewed it as what?

Q An inside look into the legal system?

A I believe so.

Q One in which you would get to talk to the prosecutors?

A Yes.

MS. HARRIS-CALVIN: May I have just one moment, Your Honor?

THE COURT: All right.

Q Just one more -- a couple more questions.

Mr. John never told you to post anything on Reddit, right?

A Correct.

Q He never told you to share your photos with anyone,

right?
A Correct.
MS. HARRIS-CALVIN: Okay. I think that's all I have. Thank you.
Thanks, Kaliah.
THE COURT: Any redirect?
MS. HARRIS-CALVIN: Brooke.
MS. THEODORA: Oh, yeah.
MS. HARRIS-CALVIN: Sorry.

REDIRECT EXAMINATION

BY MS. THEODORA:

Q Kaliah, just briefly.
Do you remember Counsel just asking you right now about the Defendant not asking you to share photos with anyone?
A Yes.
Q Did you share photos and videos with him?
A Yes.
Q And he asked to you do that, right?
A Yes.
Q And do you remember Ms. Calvin-Harris asking you about you saying that this is getting an inside look into the justice system?
A Yes.
Q Kaliah, what do you want to be when you grow up?

A A prosecutor.
Q Why?
A When I was younger, I used to want to be an actress. And as I was, like, entering middle school, it transformed me wanting to get into psychology. And last summer, I was invited to attend a law program at the University of Maryland, and that made me realize that this -- that being a prosecutor is the career path I want to explore in my future.

MS. THEODORA: No further questions.

THE COURT: Anything else?

MS. HARRIS-CALVIN: No. Thank you, Your Honor.

THE COURT: Kaliah, thank you very much. You can step down. You're excused.

THE WITNESS: Thank you.

(Witness steps down.)

THE COURT: We have eight minutes. Should we break for the day?

MS. ELARDO: It's up to Your Honor. Perhaps maybe.

THE COURT: The next witness is going to take more than eight minutes. All right. Let's break.

Ladies and gentlemen, we're going to stop for the day. Thank you for your patience. We will resume at 9:30 tomorrow morning. Again, as you were at lunchtime, please be on time so that we can start promptly.

As I've said and as I will say again: Don't discuss

the case with anyone, not even with each other. Don't do any investigation or research. No jumping on the internet to look at these cases. In the event there is anything in the media about the cases, don't read it, don't view it, just skip it. When the case is all over, you can go back and look at all of that stuff. Keep an open mind. And have a good evening. Thank you.

THE COURTROOM DEPUTY: All rise.

Take your note pads with you and just leave it in the jury room.

(Jury exits.)

THE COURT: Please be seated.

We circulated a draft charge this afternoon. We'll find some time to do a charge conference. There are some things in there, I don't know that we need them. They're venue. Most cases I've had, the Defendant waives venue. It's usually just confusing, it charges a different burden of proof, for example. There were three ways to prove interstate commerce. I don't know that we need all three ways. Just to the extent -- there were some other issues that I raised. To the extent that we can streamline this anything more, that would be preferable. So we will see how the schedule goes, and at some point we will do a charge conference.

Any other issues that we need to discuss now?

MS. HARRIS-CALVIN: Just one, Your Honor.

Earlier, before we brought in the jury to start the case, we had talked about Ms. Wells and I being able to object for our witnesses. But then when I was objecting for Kaliah, the Court stated that Mr. John had to object. So I just wanted to clarify.

THE COURT: That was my mistake.

MS. HARRIS-CALVIN: It's fine.

THE COURT: But you can -- the lawyers can object for their witnesses. If I do it again, just remind me respectfully that I had ruled otherwise, and I will adhere to my decision.

MS. HARRIS-CALVIN: Thank you.

THE COURT: Okay?

Anything else?

If anything comes up and you want to see us, let us know, send my clerks an e-mail, and we can come down a little bit early. Otherwise, we will start at 9:30 sharp.

And the next witness will be the mother?

MS. ELARDO: Yes, Your Honor. That's correct.

THE COURT: Of Jane Doe 2.

MS. ELARDO: That's correct.

THE COURT: Okay. Have a good evening.

MS. THEODORA: Thank you, Judge.

(Matter adjourned to Tuesday, May 5th, 2026 at 9:30 a.m.)

**I N D E X**


| **WITNESS** | **PAGE** |
|---|---|
| **KALIAH** | |
| DIRECT EXAMINATION | |
| BY MS. THEODORA | 192 |
| CROSS-EXAMINATION | |
| MS. HARRIS-CALVIN | 230 |
| REDIRECT EXAMINATION | |
| BY MS. THEODORA | 239 |


**E X H I B I T S**


| | |
|---|---|
| Government Exhibits 100-R, 100-S, 101-R, 101-S, 102-R, 102-S, 103, 104-R, 104-S, 105-R, 105-S, 106-S, 107-S, 108-S, 109-S, 110-S, 111, 112, and 113 | 192 |
| Government's Exhibit 503b-1-B | 206 |
| Government's Exhibits 503b-1-R and 503b-1-S | 215 |
| Government's Exhibits 202-A-S, 200-S, 202-A-R | 222 |